1  OFFICE OF THE MONTEREY COUNTY COUNSEL
   CHARLES J. MCKEE (SBN 152458), COUNTY COUNSEL
2  LEROY W. BLANKENSHIP (SBN 065233), ASSISTANT COUNTY COUNSEL
   EFREN N. IGLESIA (SBN 71309), SENIOR DEPUTY COUNTY COUNSEL
3  168 W. ALISAL, 3RD FLOOR
   SALINAS, CA 93901-2680
4  Telephone: (831) 755-5045
   Facsimile: (831) 755-5283
5
   NOSSAMAN, GUTHNER, KNOX & ELLIOTT, LLP
6  STEPHEN N. ROBERTS (SBN 062538)
   50 CALIFORNIA STREET, 34TH FLOOR
7  SAN FRANCISCO, CALIFORNIA 94111-4799
   Telephone: (415) 398-3600
8  Facsimile: (415) 398-2438
   Email: montereycase@nossaman.com
9
   NOSSAMAN, GUTHNER, KNOX & ELLIOTT, LLP
10 JOHN J. FLYNN III (SBN 076419)
   18101 VON KARMAN AVENUE
11 IRVINE, CA 92612-0177
   Telephone: (949) 833-7800
12 Facsimile: (949) 833-7878
   Email: montereycase@nossaman.com
13
   Attorneys for Defendants
14

15              UNITED STATES DISTRICT COURT

16            NORTHERN DISTRICT OF CALIFORNIA

17                   SAN JOSE DIVISION

18                                    )  NO: C 06-01407 JW
                                      )  NO: C 06-02202 JW
19 In re: County of Monterey Initiative Matter  )
                                      )
20            and                     )
                                      )  COUNTY DEFENDANTS' REQUEST FOR
21 In re: Monterey Referendum         )  JUDICIAL NOTICE IN SUPPORT OF
                                      )  SUMMARY JUDGMENT IN REFERENDUM
                                      )  CASES AND IN SUPPORT OF DISMISSAL
22                                    )  IN THE MELENDEZ INITIATIVE CASE
                                      )
23                                    )  Date:  February 27, 2007
                                      )  Time:  9:00 a.m.
24                                    )  Place: Courtroom 8
                                      )  Judge: Honorable James Ware
25                                    )
                                      )
26 ─────────────────────────────────  )
27

28
   211685_1.DOC
   ─────────────────────────────────────────────────────────────
   COUNTY DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF SUMMARY JUDGMENT IN
   REFERENDUM CASES AND IN SUPPORT OF DISMISSAL IN THE MELENDEZ INITIATIVE CASE

1    Defendants respectfully request that this Court take judicial notice of the following documents,

2  pursuant to Federal Rule of Evidence 201. Exhibit As – C were submitted with the County Defendant's

3  own Summary Judgment Motion, and so County Defendant's will not burden the record by attaching

4  another copy. Exhibit D is attached to the Declaration of Claudio Valenzuela, submitted herewith.

5    1.    Joint Case Management Statement and Proposed Order, filed October 13, 2006,

6        submitted as Exhibit A.

7    2.    Sen. Rep. No. 94-295 (1975), submitted as Exhibit B.

8    3.    Portions of legislative history of 2006 renewal of the Federal Voting Rights Act, as

9        supplied by the Legislative Intent Service, submitted as Exhibit C.

10   4.    Referendum Petition, submitted as Exhibit D.

11   5.    Resolution, submitted as Exhibit E.

12

13  Dated: February 7, 2007                    NOSSAMAN, GUTHNER, KNOX & ELLIOTT, LLP

14

15                                    BY: _____/ S / _____
                                         STEPHEN N. ROBERTS

16

17

18

19

20

21

22

23

24

25

26

27

28  211685_1.DOC                              -2-

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Rancho San Juan Opposition Coalition, *et al.* <br><br> Sabas Rangel, and Maria Buell, <br><br>               Plaintiff(s), <br><br>                 v. <br><br> Board of Supervisors of the County of Monterey, *et al.* <br><br>               Defendant(s). | CASE NO. C 06-2369 JW <br><br> JOINT CASE MANAGEMENT STATEMENT AND PROPOSED ORDER |

On September 28, 2006, counsel for the parties met and conferred about this Joint Case Management Statement and Proposed Order. The parties jointly submit this Case Management Statement and Proposed Order and request the Court to adopt it as its Case Management Order in this case.

### DESCRIPTION OF THE CASE

**1. A brief description of the events underlying the action:**

Petitions for the Referendum Against Resolution No. 05-305 were circulated to voters of Monterey County only in English. In January 2006, the Monterey County Registrar of Voters certified the sufficiency of the petitions and the Board of Supervisors ordered the Referendum to be submitted to the voters at the June 6, 2006, primary election. In March 2006, however, the Board withdrew the Referendum from the ballot on the grounds, in part, that under the Ninth Circuit's panel decision in *Padilla v. Lever*, 429 F. 3d 910 (2005), *rehearing en banc granted*,

446 F.3d 922 (Apr. 20, 2006), *opinion withdrawn*, 446 F.3d 963 (Apr. 28, 2006), *and opinion reversed*, ___ F.3d ___ (Sept. 19, 2006), the English-only petitions violated Section 203 of the Voting Rights Act.

**2. The principal factual issues which the parties dispute:**

The parties do not dispute any factual issues.

**3. The principal legal issues which the parties dispute:**

The sole legal issues in dispute are whether Section 203 of the Voting Rights Act requires the Referendum petitions at issue here to have been translated into Spanish, and whether the Referendum proponents' failure to have circulated the petitions in Spanish justifies the Board of Supervisors' refusal to hold an election on the Referendum.

**4. The other factual issues** *[e.g. service of process, personal jurisdiction, subject matter jurisdiction or venue]* **which remain unresolved for the reason stated below and how the parties propose to resolve those issues:**

The parties do not have any other factual issues that need to be resolved.

**5. The parties which have not been served and the reasons:**

All parties to this dispute have been served.

**6. The additional parties which the below-specified parties intend to join and the intended time frame for such joinder:**

The parties do not anticipate joining additional parties.

**7. The following parties consent to assignment of this case to a United States Magistrate Judge for** *[court or jury]* **trial:**

The parties do not consent to assignment of this case to a United States Magistrate Judge for trial.

## ALTERNATIVE DISPUTE RESOLUTION

8. *[Please indicate the appropriate response(s).]*

☐   The case was automatically assigned to Nonbinding Arbitration at filing and will be ready for the hearing by *(date)*_____.

☐   The parties have filed a Stipulation and Proposed Order Selecting an ADR process *(specify process):*_____.

x   The parties filed a Notice of Need for ADR Phone Conference and the phone conference was held on or is scheduled for _____ not scheduled yet _____.

☐   The parties have not filed a Stipulation and Proposed Order Selecting an ADR process and the ADR process that the parties jointly request [or a party separately requests] is _____.

9. Please indicate any other information regarding ADR process or deadline. None.

## DISCLOSURES

10. The parties certify that they have made the following disclosures *[list disclosures of persons, documents, damage computations and insurance agreements]*:

The parties have agreed that initial disclosures are unnecessary in this action.

## DISCOVERY

11. The parties agree to the following discovery plan *[Describe the plan e.g., any limitation on the number, duration or subject matter for various kinds of discovery; discovery from experts; deadlines for completing discovery]*:

The parties have agreed that discovery is unnecessary in this action.

### TRIAL SCHEDULE

12. The parties request a trial date as follows:

Plaintiffs Rancho San Juan, *et al.* believe that a trial is unnecessary because there are no factual issues in dispute. They propose that this action be resolved as quickly as possible through cross-motions for summary judgment.

Plaintiffs Buell, *et al.* and Defendants would like to discuss this issue with the Court at the Case Management Conference.

13. The parties expect that the trial will last for the following number of days:

See #12.

Dated: _____10/13/06_____        _____/s/_____
                                 Fredric D. Woocher, Attorney for Plaintiffs Rancho San
                                 Juan Opposition Coalition, Citizens for Responsible
                                 Growth, and Julie Engell

Dated: _____10/13/06_____        _____/s/_____
                                 Joaquin Avila, Attorney for Plaintiffs Sabas Rangel and
                                 Maria Buell

Dated: _____10/13/06_____        _____/s/_____
                                 Ciaran O'Sullivan, Attorney for Defendants County of
                                 Monterey, Board of Supervisors of the County of
                                 Monterey, and Anthony Anchundo

I hereby attest that I have been authorized by Joaquin Avila and Ciaran O'Sullivan to indicate their conformed signatures (/s/) to this e-filed document.

Dated: _____10/13/06_____        _____/s/_____
                                 Fredric D. Woocher, Attorney for Plaintiffs Rancho San
                                 Juan Opposition Coalition, Citizens for Responsible
                                 Growth, and Julie Engell

**Exhibit A
Page 4 of 5**

## CASE MANAGEMENT ORDER

The Case Management Statement and Proposed Order is hereby adopted by the Court as the Case Management Order for the case and the parties are ordered to comply with this Order. In addition the Court orders:

*[The Court may wish to make additional orders, such as:*

*a.  Referral of the parties to court or private ADR process;*

*b.  Schedule a further Case Management Conference;*

*c.  Schedule the time and content of supplemental disclosures;*

*d.  Specially set motions;*

*e.  Impose limitations on disclosure or discovery;*

*f.  Set time for disclosure of identity, background and opinions of experts;*

*g.  Set deadlines for completing fact and expert discovery;*

*h.  Set time for parties to meet and confer regarding pretrial submissions;*

*i.  Set deadline for hearing motions directed to the merits of the case;*

*j.  Set deadline for submission of pretrial material;*

*k.  Set date and time for pretrial conference;*

*l.  Set a date and time for trial.]*

Dated: _____

_____
UNITED STATES DISTRICT/MAGISTRATE JUDGE



S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295,  1975 U.S.C.C.A.N. 774)


**774 P.L. 94-73, VOTING RIGHTS ACT OF 1965-- EXTENSION
House Report (Judiciary Committee) No. 94-196,
May 8, 1975 (To accompany H.R. 6219)
Senate Report (Judiciary Committee) No. 94-295,
July 22, 1975 (To accompany S. 1279)
Cong. Record Vol. 121 (1975)
DATES OF CONSIDERATION AND PASSAGE
House June 4, July 28, 1975
Senate July 24, 1975
The House bill was passed in lieu of the Senate bill after substituting for its
language the text of the Senate bill.
The Senate Report is set out.


(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED MATERIAL.  EACH
COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)


SENATE REPORT NO. 94-295
July 22, 1975
*1 The Committee on the Judiciary, to which was referred the bill (S-1279) to
amend the Voting Rights Act of 1965 to extend certain provisions for an additional
ten years, to make permanent the ban against certain prerequisites to voting,
having considered the same, reports favorably thereon with amendments and recommend
that the bill as amended do pass.


*          *          *          *


*8 PURPOSE


The principal objectives of S. 1279 as amended, are: (1) to extend for an
additional ten years the special provisions of the Voting Rights Act of 1965; (2)
to make permanent the 1970 temporary ban on literacy tests and other devices and
(3) to expand the coverage of the Act to certain jurisdictions in which language
minorities reside.
The special provisions of the existing Voting Rights Act apply to certain states
and political subdivisions with a history of voting discrimination.  In those
jurisdictions, all literacy tests and other similar devices have been suspended, by
operations of Section 4(a), since August 6, 1965,  the date on which the original
Act was approved. [FN1]
*9 Under the current provisions of the Voting Rights Act, a state or political
subdivision may exempt itself from coverage by showing that during the preceding
ten years, no such test or device has been used for the purpose or with the effect
of denying the right to vote on account of race or color. Thus, many jurisdictions
now subject **775 to the Section 4(a) literacy test suspension will be in a
position to obtain automatic exemption beginning in August, 1975-- 10 years after
passage of the Act. [FN2] In effect, S. 1279 would continue the coverage of the Act
for those jurisdictions until August 1985.
A second purpose of S. 1279 is to enact a permanent nationwide ban on the use of
literacy tests and other similar devices as prerequisites to voting or
registration.  In 1970, when the Act was last extended, Congress also created, in
Section 201 of the Voting Rights Act, a temporary nationwide 'test or device' [FN3]


© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295                                                           Page 2
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

suspension (P.L. 91-285). Under the Act's present provisions, that suspension is
scheduled to expire on August 6, 1975. Title I of S. 1279 would convert that
temporary suspension into a permanent prohibition against the use of such tests or
devices, with that prohibition to be applicable to all states and political
subdivisions.

As a third objective, this bill also seeks to expand the Act's special coverage
to additional areas throughout the country. The focus of the proposed legislation,
in this regard, is to insure that the Act's special temporary remedies are
applicable to states and political subdivisions where (i) there has been evidenced
a generally low voting turnout or registration rate and (ii) significant
concentrations of minorities with native languages other than English reside. The
provisions of S. 1279 accomplish this goal by expanding the definition of 'test or
device' to include the conduct of English only elections where large numbers of
language minority persons live. In these newly covered areas, where severe voting
discrimination was documented, S. 1279 would, for ten years, mandate bilingual
elections, make applicable the Section 5 preclearance provisions, and authorize the
appointment of Federal examiners and observers by the Attorney General.

In those areas of the country with significant populations of language minorities
who experience a high rate of illiteracy, the provisions of S. 1279 would also
impose, for ten years, a bilingual elections mandate. In these particular areas,
where no showing is required with respect to low voting turnout or registration
rates, and where evidence of discrimination was less egregious, none of the Act's
other special remedies, such as Section 5 preclearance, would apply.

Apart from its three principal aims, S. 1279, as amended, would also require the
Director of the Census to collect voting and registration statistics by race, color
and national origin in those jurisdictions covered by the Act and in jurisdictions
designated by the U.S. Commission on Civil Rights. The bill also codifies the
administrative procedure employed by the Attorney General to provide expedited
consideration for Section 5 submissions. Furthermore, private persons are
authorized to request the application of the Act's special *10 remedies in voting
rights litigation. The awarding of attorney's fees to prevailing parties is
provided for in suits brought to enforce the voting guarantees of the 14th and 15th
Amendment. The awarding of attorneys' fees to prevailing parties is also provided
for in suits brought under 42 U.S.C. 1981-1988 and Title VI of the Civil Rights
**776 Act of 1964. Finally, S. 1279 would update Section 10 and Title III of the
Voting Rights Act to reflect the current state of the law with respect to poll
taxes and 18 year old voting.


                          HISTORY OF THE LEGISLATION


On January 27, 1975, S. 407 was introduced to extend the Act for five years and
to continue for five more years the nationwide ban on 'tests and devices.' On
March 23, 1975, S. 903 was introduced to repeal the 'automatic provisions' of the
Act, sections four and five. Subsequently, on March 21, 1975, S. 1279 was
introduced to extend the special protections of the Act for 10 years and to make
permanent the ban on 'tests and devices.' Finally, in April, 1975, four amendments
to S. 1279 and two separate bills were introduced to expand the Act's protections
to other minority groups.

All of these measures were referred to the Subcommittee on Constitutional Rights
of the Senate Judiciary Committee, which conducted hearings for seven days in April
and May, 1975. The witnesses included congressional sponsors of the legislation,
other Members of Congress, the Assistant Attorney General for Civil Rights,
representatives of the U.S. Commission on Civil Rights, state and local officials,
private citizens, as well as members of various civic organizations with special
interest in the Voting Rights Act of 1965. Those who did not appear personally were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295                                                                 Page 3
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

given an opportunity to submit relevant material for the record.

In addition, the Subcommittee solicited the views of all state election officials affected by the proposed legislation.

With the conclusion of the hearings, the Subcommittee met in open Executive Session on June 6 and 11, 1975, to consider the various measures. Upon a proper motion, the Subcommittee chose to amend S. 1279 with the language of H.R. 6219, the Voting Rights bill passed by the House of Representatives. An amendment to award attorney's fees to prevailing parties in cases brought under Title 42 U.S.C. 1981-1988 was also adopted.

The Subcommittee then voted, eight to two, to report favorably S. 1279, as amended.

The Committee on the Judiciary met in Executive Session on June 18, 1975, and upon motion delayed consideration of S. 1279 until a later date. Subsequently, on July 17 and 18, 1975, the Committee met in open Executive Session to consider its report on the bill. The Committee considered and adopted by voice vote the following amendments:

(1)  Seven perfecting amendments;

(2)  To amend Title I of S. 1279 to require the Attorney General or his designee to provide an opportunity for consultation 'with affected state or political subdivision with 45 days of a Section 5 submission if the Attorney General determines there is a probability he will enter an objection';

*11 (3)  To amend Titles II and III of S. 1279 to exempt states or political subdivisions from compliance with the bilingual election mandate if the language in question is 'extinct;'

(4)  To amend Title IV of S. 1279 to change the effective date for the Bureau of the Census studies from January 1, 1974, to January 1, 1976;

**777 The Committee also considered and rejected by roll call votes the following amendments:

(5)  By a vote of 3 yeas to 9 nays, to repeal Sec. 4 of the Act. Chairman Eastland, not being present, was later polled as having voted yea;

(6)  By a vote of 4 yeas to 8 nays, to extend the Act for a five year period. The Chairman was polled as having voted yea;

(7)  By a vote of 3 yeas to 9 nays to strike November 1, 1964 and substitute November 1, 1972 in sections 4(b) and 5.  The Chairman was polled as having voted yea;

(8)  By a vote of 2 yeas to 6 nays to amend the Voting Rights Act by providing a new section allowing a state or political subdivision to 'bail-out' if the number of citizens voting in the elections after November 1, 1976, was over 50 percent. The Chairman was polled as having voted yea.  Senator Hruska, not being present, was polled as having voted yea;

(9)  By a vote of 4 yeas to 4 nays, to allow all 'bail-out' suits to be filed in the local Federal district courts. Jurisdiction is now exclusively in the District Court for the District of Columbia.  The Chairman was polled as having voted yea, as was Senator Hruska;

(10)  By a vote of 2 yeas to 5 nays, 1 present, to strike Sec. 5 of the Act.  The Chairman was polled as having voted yea, as was Senator Hruska;

(11)  By a vote of 2 yeas to 5 nays, to strike November 1, 1964 and substitute November 1, 1968 in Sections 4(b) and 5.  The Chairman was polled as having voted yea, as was Senator Hruska.

(12)  By a vote of 1 yea to 7 nays, 1 present, to allow courts to review relevant findings of the Census.  The Chairman was polled as having voted yea, Senator Hruska was polled as having voted nay;

(13)  By a vote of 5 yeas to 8 nays, to allow changes in precinct lines without Section 5 review if no district lines were changed.  The Chairman was polled as having voted yea as was Senator Hruska;

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit B
Page 3 of 45

S. REP. 94-295                                                                Page 4
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

(14)  By a vote of 4 yeas to 9 nays, to allow a political subdivision, if the
whole state is covered, to seek to receive declaratory judgment from the District
Court for the District of Columbia, neither the Chairman nor Senator Hruska
recorded their vote.

The Committee then voted, ten yeas to four nays, to report favorably S. 1279, as
amended.  The Chairman was polled as voting nay.

### A.  TITLE I:  EXTENSION OF THE VOTING RIGHTS ACT

#### BACKGROUND FOR EXTENSION

The Voting Rights Act of 1965 has been hailed by many to be the most effective
civil rights legislation ever passed.  It was designed to provide swift
administrative relief in those areas of the country where racial discrimination
plagued the electoral processes.  The case-by-case litigation approach of the 1957,
1960, and 1964 voting legislation had proven to be totally ineffectual. In
describing the experiences *12 under earlier voting rights legislation, the House
Judiciary Committee's report on the 1965 Act noted the following:

Progress has been painfully slow, in part because of the intransigence of state
and local officials and repeated delays in the judicial process. Judicial relief
has had to be gauged **778 not in terms of months-- but in terms of years. With
reference to the 71 voting rights cases filed to date by the Department of Justice
under the 1957, 1960, and 1964 Civil Rights Acts, the Attorney General testified
before a Judiciary subcommittee that an incredible amount of time has had to be
devoted to analyzing voting records-- often as much as 6,000 man-hours-- in
addition to time spent on trial preparation and the almost inevitable appeal. The
judicial process affords those who are determined to resist plentiful opportunity
to resist.  Indeed, even after apparent defeat resisters seek new ways and means of
discriminating.  Barring one contrivance too often caused no change in result, only
in methods (H.R. Rep. No. 439, 89th Cong., 1st Sess. 9-10 (1965)}.

The Voting Rights Act of 1965 was landmark in terms of its abandonment of this
case-by-case approach.  Under the provisions of the 1965 enactment, literary tests
and other devices were automatically suspended in states or political subdivisions
where a literacy test or other similar device was in effect on November 1, 1964 and
where less than 50 percent of voting age persons were registered for or voted in
the presidential election of November 1964.  In these same jurisdictions, the
Section 5 preclearance provisions applied to all changes relating to voting which
were to be implemented after November 1, 1964.  Also, the Attorney General was
authorized to certify the need for Federal examiners to list eligible voters and
Federal observers to oversee the casting and counting of ballots in covered
jurisdictions.  Jurisdictions brought under the Act's coverage by the 1965
legislation included the entire States of Alabama; Alaska; Georgia; Louisiana;
Mississippi; South Carolina; and Virginia; 40 counties in North Carolina; four
counties in Arizona; Honolulu County, Hawaii; and Elmore County Idaho. [FN4] See
Appendix A.

These jurisdictions were originally eligible for automatic release from Rights
Act Amendment of 1970 (Public Law 91-285) their special coverage was continued for
an additional five years, now making them eligible for automatic release under the
current provisions of the Act after August of 1975.

In the 1970 amendments, Congress also brought under the Act's special coverage
states and political subdivisions which maintained a test or special coverage after
August of 1970. However, when Congress passed the Voting Rights Act Amendments of
1970 (Public Law 91-285) their special coverage was continued for an additional
five years, now making them eligible for automatic release under the current
provisions of the Act after August of 1975.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit B**
Page 4 of 45

S. REP. 94-295                                                                    Page 5
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295,  1975 U.S.C.C.A.N. 774)

In the 1970 amendments, Congress also brought under the Act's special coverage
device on november 1, 1968, and which had less than a 50% *13 turnout or
registration rate at the time of the November 1968 presidential election.  In these
newly-covered jurisdictions, the same special remedies applied: literacy tests and
other devices were suspended. **779 Section 5 preclearance requirements were
applied to voting changes to be implemented after November 1, 1968, and Federal
examiners and observers could be authorized by the Attorney General. Jurisdictions
brought under coverage by the 1970 amendments include Bronx, Kings and New York
Counties in the State of New York; Campbell County, Wyoming; Monterey and Yuba
Counties in California; Apache, Coconino, Navajo, Cochise, Mohave, Pima, Pinal, and
Santa Cruz Counties in Arizona; Elmore County, Idaho; Election Districts 8, 11, 12,
and 13 in Alaska; and towns in Connecticut, New Hampshire, Maine, and
Massachusetts. [FN5] See Appendix B.

### ANALYSIS OF PROGRESS UNDER THE ACT

The Voting Rights Act has been extremely effective in terms of diminishing
barriers to and improving minority voting and registration throughout the covered
areas.  Registration rates for blacks in the covered southern jurisdictions has
continued to increase since the passage of the Act.  For example, while only 6.7
percent of the black voting age population of Mississippi was registered before
1965, 63.2 percent of such persons were registered in 1971-72.  Similar dramatic
increases in black registration can be observed in Alabama, Georgia, Louisiana, and
Virginia.

Severe gaps between black and white registration rates have also greatly
diminished since the Act's passage.  Prior to 1965, the black registration rate in
the State of Alabama lagged behind that of whites in that state by 49.9 percentage
points.  In 1972, that disparity had decreased to 23.6 percentage points. Likewise,
in Mississippi, that disparity has decreased 63.2 to 9.4 percentage points.  As the
following table indicates, these closing registration gaps have occurred throughout
the covered southern jurisdictions.

Despite these impressive gains in the area of black registration, a bleaker side
of the picture yet exists. Most recently available data reveal that percentage
point disparities of 23.6, 16, and 17.8 can still be found in the States of
Alabama, Louisiana and North Carolina. [FN6] respectively.  In addition, the
diminishing statewide disparities which have been pointed to cannot be allowed to
obscure the tremendously low rates of registration still afflicting blacks within
various counties in the covered states.  In Louisiana, for example, significant
disparities are much more evident in rural than in urban parishes.  The disparity
is greater than 20 percentage points in eight of the ten least populous parishes of
that state.  In six of the covered counties in North Carolina,

### *14 **780 REGISTRATION BY RACE AND STATE IN SOUTHERN STATES COVERED BY THE VOTING RIGHTS ACT

(In percent)

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

white registration exceeds that of blacks by more than 25 percentage points. In
South Carolina, as in Louisiana, whites are registered at much higher rates
than blacks in many rural counties. See generally Civil Rights Commission, 'The
Voting Rights Act: Ten Years After,' dated January, 1975. [FN7]

In much the same manner as improved registration rates have been documented for
blacks in covered southern jurisdictions so also has there been improvement in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

those areas in terms of an increasing number of black elected officials. One
estimate suggests that only 72 blacks served as elected officials in the 11
southern states in 1965, including those southern states presently covered by the
Act (Hearings, 115). By April 1974, the total of black elected officials in the
seven southern states covered by the Act had increased to 963. After the November
1974 elections, those states could boast of one black member of the United States
Congress, 68 black state legislators, 429 black county officials, and 497 black
municipal officials (TYA 49). This rapid increase in the number of black officials
marks the beginning of significant changes in political life in the covered
southern jurisdictions (TYA 52).

So as not to be misled by the sheer numbers, however, other points should be
noted when assessing this progress. Significant among these points is the fact that
most of the offices newly-held by blacks are relatively minor and located in small
municipalities or counties with overwhelmingly black populations. Also, in the
seven counties which are totally or partially covered by the Voting Rights Act, no
black holds statewide office. As of November 15, 1974, the number of blacks in the
state legislatures in the covered southern areas fall far short of being
representative of the number of blacks residing in those jurisdictions. In
Mississippi, for example, the percent of state legislative seats held by blacks is
0.6, despite the fact that 36.8 percent of Mississippi's population is black. In
South Carolina, a state with a 30.7 percent black population, only 7.6 percent of
the state legislative seats are occupied by blacks (TYA 61-63).

That minority political progress has been made under the Voting Rights Act is
undeniable. However, the nature of that progress has *15 **781 been limited. It
has been modest and spotty in so far as the continuing and significant deficiencies
yet existing in minority registration and political participation. The
Subcommittee thus approached its deliberation on this legislation with both an
awareness of the significant strides which have been made during the Act's special
coverage as well as an appreciation of the gains yet to be achieved.

## NEED FOR SPECIAL REMEDIES

Under the provisions of the Voting Rights Act, covered states and political
subdivisions are subject to a series of special statutory remedies. Included among
these remedies are: (1) an automatic suspension of literacy tests or other similar
devices as prerequisites to voting or registration; (2) Section 5 preclearance
requirements; (3) Attorney General authority to appoint Federal examiners; and (4)
Attorney General authority to appoint Federal observers. Beginning in August, 1975,
many jurisdictions may remove themselves from the coverage of these remedies. It
was the Subcommittee's task, in considering various legislative proposals to extend
the Voting Rights Act, to make an assessment of the continued need for these
special provisions, particularly in those jurisdictions soon eligible for release
under the Act's current provisions. As the following discussion reveals, it was
the Subcommittee's judgment that each of the Act's special remedies must continue
to apply in currently covered areas for at least an additional ten year period.
Such a ten year extension is provided for in Title I of S. 1279.

## REVIEW OF VOTING CHANGES

Section 5 of the Act requires review of all voting changes prior to
implementation by the covered jurisdictions. The review may be conducted by either
the U.S. District Court for the District of Columbia or by the Attorney General of
the United States.

In recent years the importance of this provision has become widely recognized as
a means of promoting and preserving minority political gains in covered

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

Page 7

jurisdictions. Section 5 attests to the foresight and wisdom of the 89th Congress, in anticipating the need for future Federal review of voting changes in covered jurisdictions. At the time of the 1965 enactment, the House committee had evidence of the great lengths to which certain jurisdictions would go in order to circumvent the guarantees of the 15th amendment (H.R. Rep. No. 439, 89th Cong., 1st Sess., 10-11). In order to insure that any future practices of these jurisdictions be free of both discriminatory purpose and effect, the Section 5 preclearance requirements were adopted. The Supreme Court, in upholding the constitutionality of Section 5, noted:

Congress knew that some of the States covered by Section 4(b) of the Act had resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees. Congress had reason to suppose that these States might try similar maneuvers in the future in order to evade the remedies for discrimination contained in the Act itself. South Carolina v. Katzenbach, 383 U.S. 301, 335 (1966). [FN7a] **782 *16 Under Section 5 the jurisdiction submitting the proposed change bears the burden of proving nondiscriminatory purpose and effect and the change cannot be implemented until the Section 5 review requirements have been met.

It was not until after the 1970 Amendments that Section 5 actually came into extensive use. At the time of the adoption of those amendments, Congress resisted attempts to repeal the preclearance provisions, and in so doing gave a clear mandate to the Department of Justice that it improve enforcement of Section 5. In addition, near that same time, The Supreme Court acted in two decisions (Allen v. State Board of Elections, 393 U.S. 544 (1969) [FN7b] and Perkins v. Matthews, 400 U.S. 379 (1971)} [FN7c] which gave broad interpretations to the scope of Section 5. On September 10, 1971, the Department of Justice for the first time adopted regulations for implementing Section 5's preclearance provisions. [FN8] Today, enforcement of Section 5 is the highest priority of the Voting Section of the Department of Justice's Civil Rights Division (S. Hearings 561).

As is evidenced from the following tables, many and varied changes have been submitted from most of the covered jurisdictions for the Attorney General's review. [FN9] The number of submissions increased from 1 in 1965 to 1,118 in 1971. In 1974, the number of submissions was 988. The Justice Department has entered objections to changes submitted from a number of jurisdictions, including Arizona, Georgia, Louisiana, Alabama, Virginia, North Carolina, and New York.

The recent objections entered by the Attorney General of the United States to Section 5 submissions clearly bespeak the continuing need for this preclearance mechanism. As registration and voting of minority citizens increases, other measures may be resorted to which would dilute increasing minority voting strength. Such other measures may include switching to at-large elections, annexations of predominantly white areas, or the adoption of discriminatory redistricting

NUMBER OF CHANGES SUBMITTED UNDER SEC. 5 AND REVIEWED BY THE DEPARTMENT OF JUSTICE, BY STATE AND YEAR, 1965-74

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

*17 **783 NUMBER OF CHANGES SUBMITTED UNDER SEC. 5 AND REVIEWED BY THE DEPARTMENT OF JUSTICE, BY TYPE AND YEAR, 1965-74

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

NUMBER OF SEC. 5 OBJECTIONS INTERPOSED BY THE DEPARTMENT OF JUSTICE, BY STATE AND YEAR, FROM 1965 to 1975

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295

S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

Page 8

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

In fact, the Justice Department has recently entered objections, at the state
and local level, to at-large requirements, polling place changes, majority vote
requirements, staggered terms, increased candidate filing fees, redistrictings,
switches from elective to appointive offices, multimember districts, and
annexations (S. Hearings 598). In each of these objection situations the
submitting jurisdiction failed to meet its burden of satisfying the Attorney
General of the nondiscriminatory purpose or effect of the proposed change.

The provisions of S. 1279 propose to amend the Act so that the special remedies,
including Section 5 preclearance, will be operative for an additional ten years.
Although the 1965 legislation and the 1970 amendments did, in large part, provide
for only five year coverage periods at a time, the Committee concludes that it is
imperative that a ten year extension now be adopted in order to insure that
applicability of Section 5 protections during the reapportionment and redistricting
which will take place subsequent to the 1980 Decennial Census.

**\*784 \*18 Approximately one-third of the Justice Department's objections have
been to redistrictings at the state, county and city levels. (S. Hearings 539-540,
581-582). This past experience ought not be ignored in terms of assessing the
future need for the Act. It is ironic that the Supreme Court's 'one man-one vote'
ruling (Reynolds v. Sims, 377 U.S. 533 (1964)) [FN9a] has created opportunities to
disfranchise minority voters. Having to redraft district lines in compliance with
that ruling, jurisdictions may not always take care to avoid discriminating against
minority voters in that process. [FN10] By providing that Section 5 protections not
be removed before 1985, S. 1279 would guarantee Federal protection of minority
voting rights during the years that the post-census redistrictings will take place.

Mr. J. Stanley Ottinger, the Assistant Attorney General of the Civil Rights
Division said in this regard:

Congress gave a strong mandate to us to improve the enforcement of Section 5, we
believe, by passing the 1970 amendments. We subsequently promulgated regulations
for the enforcement of section 5 and directed more resources to section 5 so that
today enforcement of this section is the highest priority of our voting section
itself.

The facts set forth in detail on pages 12 through 19 of my testimony, Senator,
demonstrate, in summary, that the protections of section 5, we believe, should be
extended because:

First, it has been effective in preventing discrimination; second, it has never
been completely complied with in the covered jurisdictions; and third, the
guarantees it provides are more significant to the country than the slight
interference to the federal system. (S. hearings, 537)

The Supreme Court, in Connor v. Waller, 43 U.S.L.W. 3643 (June 5, 1975),
reiterated its previous holdings which make Section 5 the front line defense
against voting discrimination. It held that where the Mississippi legislature had
adopted a reapportionment plan, the plan had to be submitted for Section 5 review
even though the plan arose in the context of ongoing litigation and even though it
was patterned after a plan previously devised by the Court itself. The Court also
ruled that the federal courts should not inquire into fourteenth and fifteenth
amendment questions until all Section 5 questions had been determined. [FN11] This
ruling is consistent with the Committee's objective to utilize a form of primary
jurisdiction for Section 5 review under which courts dealing with voting
discrimination issues should defer in the first instance to the Attorney General or
to the District of Columbia District Court.

Thus, for example, where a federal district court holds unconstitutional an
apportionment plan which predates the effective date of coverage under the Voting
Rights Act, any subsequent plan ordinarily would be subject to Section 5 review.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295                                                                Page 9
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

In the typical case, the court *19 **785 either will direct the governmental body
to adopt a new plan and present it to the court for consideration or else itself
choose a plan from among those presented by various parties to the litigation. In
either situation, the court should defer its consideration of-- or selection among-
- any plans presented to it until such time as these plans have been submitted for
Section 5 review.  Only after such review should the district court proceed to any
remaining fourteenth or fifteenth amendment questions that may be raised.

The one exception where Section 5 review would not ordinarily be available is
where the court, because of exigent circumstances, actually fashions the plan
itself instead of relying on a plan presented by a litigant. This is the limited
meaning of the 'court decree' exception recognized in Connor v. Johnson, 402 U.S.
690 (1971). [FN11a] Even in these cases, however, if the governmental body
subsequently adopts a plan patterned after the court's plan, Section 5 review would
be required, Connor v. Waller, supra. Furthermore, in fashioning the plan, the
court should follow the appropriate Section 5 standards, including the body of
administrative and judicial precedents developed in Section 5 cases.

A correct application of Section 5, for example, was demonstrated in Gaillard v.
Young (Civil Action No. 74-1265 D. South Carolina, 1975), which involved the
reapportionment of the City Council of Charleston, S.C.  The district court
invalidated the existing apportionment plan on grounds of 'population inequality'
and then deferred consideration of any new plan pending Section 5 review.  A number
of plans were submitted to the Attorney General, who objected to all but one.  That
one was then submitted to the local district court which concluded that the plan
would not meet the population equality requirements of the fourteenth amendment.
The court then invited the litigants in the reapportionment case to present plans,
and after selecting the one best meeting the population equality requirements of
the fourteenth amendment, ordered that plan submitted for Section 5 review.  Only
after the Attorney General decided not to object to this last plan did the district
court order it implemented.

In some Section 5 cases, a change in the voting practice or procedure may also
retain some features of the previous system, and all aspects of such a change are
within the reach of Section 5.  The Attorney General and the United States District
Court for the District of Columbia, as the experts in the area, have developed
familiarity with the impact of discriminatory voting systems, and it is they who
should assess the discriminatory impact of a system. For example, as in Beer v.
U.S., 374 F.Supp. 363 (D.D.C. 1974), Section 5 requires submission of the entire
seven member council plan when New Orleans sought approval for a reapportionment of
only the five single-member seats.

For the reasons above, the Committee is convinced that it is largely Section 5
which has contributed to the gains thus far achieved in minority political
participation.  Moreover, it is Section 5 which serves to insure that this progress
shall not be destroyed through new procedures and techniques.  Now is not the time
to jeopardize this progress through the removal of these crucial preclearance
protections.

## **786 *20 APPOINTMENT OF FEDERAL EXAMINERS

Under the Act, jurisdictions which are covered by the statutory formula are
subject to the appointment of Federal examiners (Section 6).  However, the
appointment of examiners is not automatic.  The Attorney General must determine
into which localities covered by the Act examiners should be sent, and Section 6(b)
sets standards to guide the exercise of his discretion. Examiners prepare lists of
applicants eligible to vote whom state officials are required to register.

Federal examiners have served in a Mississippi county as recently as 1974 and
Mississippi citizens were also listed by such examiners in 1971 and 1972.  Since

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295                                                        Page 10
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

the passage of the Act, approximately 317 examiners have been sent to 73 designated
jurisdictions. In the period from 1970-1974, Federal examiners listed 1,974 black
voters. Estimates provided by the Voter Education Project in Atlanta, Georgia,
indicate that the registration of blacks by Federal examiners accounted for 34.2
percent of the total increase in black voter registration in Alabama from 1964-
1972. The work of Federal examiners accounted for 1.9 percent of the black
registration increase in Georgia, 13.2 percent in Louisiana, 27.5 percent in
Mississippi, and 7.4 percent in South Carolina. In general, it is estimated that
18.9 percent of black registration has been accomplished through Federal examiners
(S. Hearings 584-585).

Although Federal examiners have been used sparingly in recent years, the
provisions of the Act authorizing their appointment must be continued. Diminishing
disparities between black and white registration rates in the covered southern
states can hardly be hailed as indicative of a lack of work to be performed by
Federal examiners. The use of such Federal officers cannot now be eliminated when
most recently available data indicates that the gap in Alabama is still over 20
percentage points and in Louisiana the disparity continues at 16 percentage points.
Also, such examiners might serve to increase minority registration in rural areas
where it is found to be lowest. [FN11b]

In addition, the hearing record developed before the Subcommittee revealed that
in many of the covered jurisdictions, the times and places of registration are so
restrictive that blacks, frequently living in rural communities, are unable to
register (TYA 71-78). Some white registrars in these areas are reputed to treat
blacks with extreme discourtesy, so much so that 'blacks find the registration
process under these circumstances at best embarrassing and humiliating' (TYR 79).
Discriminatory purgings have also been experienced by minority voters in certain
covered areas (TYA 87-90). Thus, the job which can yet be performed by Federal
examiners in these covered jurisdictions is significant and the Committee
recommends that the availability of this important remedy be continued.

## APPOINTMENT OF FEDERAL OBSERVERS

Under Section 8 of the Act, whenever Federal examiners are serving in a
particular area, the Attorney General may request that the Civil *21 **787 Service
Commission assign one or more persons to observe the conduct of an election. These
Federal observers monitor the casting and counting of ballots.

In 1974, a total of 464 observers served in Alabama, Georgia, Louisiana, and
Mississippi. A total of 568 observers served in 1970, 1,014 served in 1971, and
495 served in 1972. It has been found that the presence of observers tends to
diminish the intimidation of minority voters, especially when they must vote in
polling places located in traditionally hostile areas of a community. Also,
observer reports have served as important records relating to the conduct of
particular elections in subsequent voting rights litigation (TYA 37).

Despite the fact that the number of observers recently assigned has decreased
from the large numbers which were consistently assigned during the earlier years of
the Act's coverage, their use has nevertheless been significant since the time of
the passage of the 1970 amendments. Furthermore, the Subcommittee's record reveals
that the need for such Federal election observers continues. Many minority voters
in the covered jurisdictions have frequently found that their names have been left
off precinct lists and that other problems and abuses exist with respect to aid to
be provided to illiterate voters. Also, polls in these areas continue to be located
in all-white clubs and lodges where minority persons are otherwise not allowed to
go, with such locations representing an extremely hostile atmosphere for the
nonwhite voter (TYA 97-130). Under such circumstances, the role of Federal
observers can be critical in that they provide a calming and objective presence

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295                                                          Page 11
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

which can serve to deter any abuse which might occur. Federal observers can also
still serve to prevent or diminish the intimidation frequently experienced by
minority voters at the polls.

Thus, based upon the record developed in hearings and the report of the U.S.
Commission on Civil Rights, The Voting Rights Act: Ten Years After, the Committee
concludes that it is essential to continue for an additional ten years all the
special temporary provisions of the Act in full force and effect in order to
safeguard the gains thus far achieved in minority political participation, and to
prevent future infringements of voting rights.

### SUSPENSION OF TESTS AND DEVICES

Congress, in 1965, banned the use of tests and devices [FN12] in jurisdictions
covered by Section 4 of the Voting Rights Act. Strong evidence was presented to
both Houses that these devices had been used to deny blacks the franchise in these
areas, often in a humiliating and harassing fashion. See Hearings on H.R. 6400
before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st
Sess.; Hearings on S. 1564 before the Senate Committee on the Judiciary, 89th
Cong., 1st Sess.; see also Washington Research Project Publication *22 **788 The
Shameful Blight. The Supreme Court noted some of the more flagrant examples in
South Carolina v. Katzenbach, 383 U.S. 301 (1965). [FN12a]

In Panola County, Mississippi, the registrar required Negroes to interpret the
provision of the state constitution concerning the rate of interest on the fund
known as the 'Chickasaw School Fund' (citation). In Forrest County, Mississippi,
the registrar rejected six Negroes with baccalaureate degrees, three of whom were
also Masters of Arts. 383 U.S. at 312.

Equally important in Congress' decision to ban tests and devices in the covered
jurisdictions was the disparity in educational opportunities for blacks in these
areas. Prior to the Civil War, for example, many of the slave states made it a
crime to teach a Negro to read or write. [FN13] And from the Civil War until 1954
these states instituted racial segregation in their public schools, with those
blacks who did have school available receiving a woeful calibre of education. See
Brown v. Board of Education, 347 U.S. 483 (1954). [FN13a] While educational
opportunities for blacks in these states have improved since the Court's decision
in 1954, for many blacks Brown v. Board of Education came too late, as Table I
shows:

TABLE I--percent of POPULATION WITH LESS THAN 5 YEARS OF SCHOOL AND WITH 4
YEARS OF HIGH SCHOOL OR MORE, BY AGE, AND RACE OR ETHNIC ORIGIN: 19,3

(Persons 25 years old and over as of March, 1973. All races included those not
shown separately)

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

For both of these reasons, then-- the overwhelming evidence of abuse in
administering these tests, and the sorry history of educational neglect in these
areas-- Congress felt it necessary to ban all tests or devices as prerequisites to
voting in jurisdictions covered under Section 4 of the Voting Rights Act.

Subsequent court cases further underscored the state responsibility for failing
to provide blacks an adequate educational opportunity, and the unfairness of these
same jurisdictions making educational achievement a prerequisite to voting. See
e.g., Gaston County v. United States, 395 U.S. 285 (1969). [FN13b]

In 1970, Congress reiterating its view that the problems of 'test and devices'
and illiteracy were racial in impact and application, extended the ban on tests and
devices in the covered jurisdictions for five more years. (See Joint Views, S.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2753]. In addition, Congress acknowledged that inferior educational opportunities
for blacks were not limited to jurisdictions covered by the automatic provisions
*23 **789 of Section 4 and enacted Section 201 expanding the ban on tests or
devices to cover the entire Nation. Oregon v. Mitchell, 400 U.S. 112 (1970).
[FN13c] The Court agreed that the legislation was a proper exercise of Congress'
powers under the Fourteenth and Fifteenth Amendments, citing the two rationales
discussed above: (1) 'tests and devices' had been used to deny blacks access to the
political process; and (2) discrimination in educational opportunity makes itself
felt most severely on racial minorities. In addition, Justice Douglas asserted
that little justification exists for denying illiterates the opportunity to vote,
regardless of color, in a society where so much information is communicated through
the electronic media. 383 U.S. at 144-147. This reiterated the Congress' view
that 'there is insufficient relationship between literacy and responsible
interested voting to justify such a broad restriction of the franchise.' 116
Cong.Rec. 5221 (1970).

Since Section 201 has been in effect, use of tests and devices has been suspended
throughout the United States. Section 201 is effective only until August 6, 1975.
Much of the testimony presented to the Subcommittee in its hearings was directed to
these problems of educational neglect and racial minorities. Virtually every
witness agreed that Section 201 should be extended, even those witnesses opposed to
Title I of the Act. Most of S. 1279 is an attempt to address these problems of
illiteracy, race, and the political process. While Title II and parts of Title I of
the bill address the problems of overt discrimination such as harassment,
gerrymandering, and dilution of minority voting strength, Title III and the
extension of Section 201 address the dual problems of state responsibility for
illiteracy, particularly as to racial minorities, and state failure to respond to
this situation in the area of voting. The failure to respond to the problems of
language minorities-- that is, those racial minorities whose primary language is
other than English-- is addressed in Title III of S. 1279, discussed in greater
detail below. The problems of English-speaking illiterates-- those citizens who can
speak but can neither read nor write English-- are addressed in the extension of
Section 201.

## SECTION 201

The Subcommittee heard extensive testimony on extending Section 201. Although
other provisions of S. 1279 were often matters of controversy, no witness expressed
opposition to extending Section 201. Indeed, only 14 states retain laws providing
for literacy tests, and since 1970 six states have repealed their literacy
requirements. Hearings at 666.

The Committee believes that extension of Section 201 is justified on several
grounds. First, as discussed above, such tests and devices have notoriously been
abused to deny minorities the franchise. Second, under the rationale of Gaston
County, supra, it is patently unfair for the states to require citizens to achieve
a certain level of education prior to voting when the state educational systems all
too often have **790 denied minority citizens the opportunity to achieve this level
of education. Thus, as the Department of Justice stressed in its statement to the
Subcommittee, 'such tests are invalid under the Fourteenth Amendment because they
are not justified by any compelling state interest.' Hearings at 588.

*24 It is difficult to see why citizens who cannot read or write should be
prevented from participating in decisions that directly affect their environment,
particularly in an area when radio and television are primary sources of
information. The Committee is convinced that the suspension of 'test and devices'
as prerequisites to voting should continue indefinitely. While the Department of
Justice recommended a five-year suspension, the Committee concluded that in light

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975    Page 13
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

of the interests involved, the history of abuse of these tests, the inferior
education offered to racial minorities, and the availability of radio and
television as a means of informing the electorate, the suspension should continue
until such time as the Congress is persuaded that the suspension on tests and
devices is both unnecessary and undesirable.

### B.  TITLE II:  EXPANSION OF THE VOTING RIGHTS ACT

#### BACKGROUND

In January 1975, the U.S. Commission on Civil Rights submitted to Congress The
Voting Rights Act:  Ten Years After, a report evaluating the current status of
minority voting rights in jurisdictions covered by the Voting Rights Act of 1965.
In its report, the Commission indicated that although the focus of its study was on
covered jurisdictions, there was evidence to establish that minority citizens in
other jurisdictions encounter discrimination in the electoral process.  Serious
consideration should be given, the Commission recommended, to an amendment to the
Voting Rights Act to cover those language minorities who, according to preliminary
information, require the protection of the law (TYA 356).

Following the recommendation of the Commission, the Subcommittee's study on
whether to extend the Voting Rights Act or to allow it to expire in August 1975,
was broadened to include an examination of the voting problems of minority citizens
outside the current jurisdiction of the Act.  In 7 days of hearings and testimony
from 29 witnesses, the Subcommittee documented a systematic pattern of voting
discrimination and exclusion against minority group citizens who are from
environments in which the dominant language is other than English.  Based on the
extensive evidentiary record demonstrating the prevalence of voting discrimination
and high illiteracy rates among language minorities, the Subcommittee acted to
amend the current provisions of the Voting Rights Act to broaden its special
coverage to new geographic areas in order to ensure the protection of the voting
rights of 'language minority citizens.'  The term language minority citizens refers
to those persons who are Asian American, American Indian, Alaskan Natives, or
Spanish heritage. [FN14]

#### **791 *25 Barriers to Voting

The extensive record before the Subcommittee is filled with examples of the
barriers to registration and voting that language minority citizens encounter in
the electoral process. Testimony was received regarding inadequate numbers of
minority registration personnel, uncooperative registrars, and the disproportionate
effect of purging laws on non-english speaking citizens because of language
barriers (TYA 85-87).

In addition, liberal electoral laws in some jurisdictions are nullified by
inadequate and unsystematic local implementation. Such problems discourage the
exercise of voting rights, particularly by those who are newcomers to politics by
virtue of previous total exclusion from the political process. Language minority
citizens, like blacks throughout the South, must overcome the effects of
discrimination as well as efforts to minimize the impact of their political
participation.  The State of Texas, for example, has a substantial minority
population, comprised primarily of Mexican Americans and blacks.  Evidence before
the Subcommittee documented that Texas also has a long history of discriminating
against members of both minority groups in ways similar to the myriad forms of
discrimination practiced, against blacks in the South.

Turnout in recent presidential elections in Texas (1960-1972) has been
consistently below 50 percent of the voting age population. Indeed, the only reason

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit B**
Page 13 of 45

S. REP. 94-295                                                      Page 14
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295,  1975 U.S.C.C.A.N. 774)

that Texas was not covered by the Voting Rights Act in 1965 or by the 1970
amendments was that it employed restrictive devices other than a formal literacy
requirement.  A generation ago numerous suits were required to eliminate the Texas
white primary. Nixon v. Herndon, 273 U.S. 536 (1927); [FN14a] Nixon v. Condon, 286
U.S. 73 (1932); [FN14b] Grovey v. Townsend, 295 U.S. 45 (1935); [FN14c] Smith v.
Allwright, 321 U.S. 649 (1944); [FN14d] Terry v. Adams, 345 U.S. 461 (1953).
[FN14e] More recently a Federal constitutional amendment and a suit brought by the
Department of Justice pursuant to Congressional instructions, contained in Section
10 of the Voting Rights Act, were required to eliminate the Texas poll tax.  United
States v. Texas, 252 F.Supp. 234 (W.D. Tex.), aff'd 384 U.S. 155 (1966) (per
curiam). Subsequently, the state enacted the 'most restrictive voter registration
procedures in the nation' to replace the poll tax. Graves v. Barnes, 343 F.Supp.
704, 731 (W.D. Tex. 1972), aff'd sub nom. White v. Regester, 412 U.S. 755 (1973).
[FN14f] This new registration system was declared unconstitutional through private
litigation in the Federal court. Beare v. Smith, 321 F.Supp. 1100 (S.D. Tex. 1971),
aff'd nom. Beare v. Briscoe, 498 F.2d 244 (5th Cir. 1974) (per curiam).  The
District Judge in Graves v. Barnes, supra at 731 noted the effect which this
history had on persons of Spanish origin:

    This cultural and language impediment, conjoined with the poll tax and the most
restrictive voter registration procedures **792 in the nation have operated to
effectively deny Mexican Americans access to the political processes in Texas even
longer than the blacks were formerly denied access by the white primary.

    Registration is merely the beginning of participation in the political process.
Once registered language minorities have no guarantee that *26 they may easily cast
a ballot.  What is done at the local level by local officials has the most impact
upon the ability of these minorities to vote and the effectiveness of that vote.
Language minorities do not control the election or appointment of local officials
and are seldom in positions of influence.  Many obstacles placed by these officials
frighten, discourage, frustrate, or otherwise inhibit language minority citizens
from voting. Outright exclusion and intimidation at the polls are only two of the
problems they face.

    Other problems that have a discriminatory impact on language minority voters are
denial of the ballot by such means as failing to locate voters' names on precinct
lists, location of polls at places where minority voters feel unwelcome or
uncomfortable, or which are inconvenient to them, and the inadequacy of voting
facilities. [FN15] Some of the other barriers to voting which language minority
citizens face are the underrepresentation of minority persons as poll workers;
unavailability or inadequacy of assistance to illiterate voters; lack of bilingual
materials at the polls for these non-English speaking persons; and problems with
the use of absentee ballots. Memories of past discourtesies or physical abuse may
compound the problems for many language minority voters. The people in charge are
frequently the same ones who so recently excluded minorities from the political
process.

    The exclusion of language minority citizens is further aggravated by acts of
physical, economic, and political intimidation when these citizens do attempt to
exercise the franchise.  Witnesses testified that local law enforcement officials
in areas of Texas patrol only Mexican American voting precincts, and harass and
intimidate Mexican American voters.  (S. Hearings, 735-737); see also Allee v.
Medrano, 416 U.S. 802 (1974). [FN15a]

    Much more common, however, are economic reprisals against minority political
activity.  Fear of job loss is a major deterrent to the political participation of
language minorities.  A witness from Texas indicated that an Anglo candidate who
was a loan officer at the bank went to each Mexican American who had loans with the
bank and told them he expected their votes.  (S. Hearing 735-736). The Subcommittee
record is replete with overt economic intimidation designed to interfere with and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

abridge the rights of Mexican American voters. In its analysis of problems of electoral participation by Spanish-speaking voters, the Commission on Civil Rights reported that some Mexican Americans in Uvalde, Texas, are afraid their welfare checks will be **793 reduced because of their political activity. [FN16] Underlying many of the abuses is the economic dependence of these minorities upon the Anglo power structure. People whose jobs, credit, or housing depend on someone who wishes to keep them politically powerless are not likely to risk retaliation for asserting or acting on their own views.

Because of discrimination and economic dependence, and the fear that these have created, language minority citizens for the most part have not successfully challenged white political domination. The proportion of elected officials who are Mexican American or Puerto Rican, for example, is substantially lower than their proportion of the *27 population. In Texas, although Mexican Americans comprise 16.4 percent of the population, they hold only 2.5 percent of the elective positions. In New York, where Spanish heritage citizens comprise 7.4 percent of the population, they hold less than .1 percent of elective positions. If a language minority person is not permitted to register, or if registered not allowed to vote, that person is obviously denied full participation in the political process. The same result occurs when a candidate whom a voter might support is kept from running.

But these blatant examples are not the only barriers obstructing equal opportunity for political participation. The Subcommittee heard extensive testimony on the question of representation of language minority citizens, that is, the rules and procedures by which voting strength is translated into political strength. The central problem documented is that of dilution of the vote-- arrangements by which the votes of minority electors are made to count less than the votes of the majority. Testimony indicated that racial discrimination against language minority citizens seems to follow density of minority population.

In Nacogdoches, Texas, the city charter provided for at-large elections with electoral victory for a plurality of the votes. In spring, 1972, a black candidate almost won a plurality of votes in the election. In June, 1972, the all-white city commission amended the city charter for the first time in 43 years to adopt a majority run-off, numbered place system for city elections. [FN17] In the April, 1973 election, another black candidate ran for city commissioner only to win a plurality of the votes but to lose in a majority run-off election (S. Hearings 489- 490). In 1975, a Federal district court ordered single-member districts for the City of Nacogdoches on grounds that the at-large majority run-off, numbered place system abridged the voting rights of black citizens. Weaver v. Muckleroy, Civil No. 5524 (E.D. Tex. 1975).

Election law changes which dilute minority political power in Texas are widespread in the wake of recent emergence of minority attempts to exercise the right to vote. The following communities have adopted such changes in the face of growing minority voting strength: Corpus Christi, Lufkin and Waco, in addition to a number of local school districts throughout the state (S. Hearings 490). In January, 1972, a three-judge Federal court ruled that the use of multi-member districts for the election of state legislators in Bexar and Dallas counties, Texas, unconstitutionally diluted and otherwise **794 cancelled the voting strength of Mexican Americans and blacks in those counties. This decision was affirmed by the United States Supreme Court in White v. Regester, 412 U.S. 755 (1973); [FN17a] see also Robinson v. Commissioners' Court, Anderson County, 505 F.2d 674 (5th Cir. 1974); Smith v. Craddick, 471 S.W.2D 375 (Tex. Sup. Ct. 1971).

The at-large structure, with accompanying variations of the majority run-off, numbered place system, is used extensively among the 40 largest cities in Texas. And, under state statute, the countless school districts in Texas elect at-large with an option to adopt the majority run-off, numbered place system. These

S. REP. 94-295                                                                    Page 16
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

structures effectively *28 deny Mexican Americans and black voters in Texas
political access in terms of recruitment, nomination, election and ultimately,
representation (S. Hearings 491).

Another device which is used to affect adversely minority participation is the
annexation of areas with large white voting populations. In 1972, in Pearsall,
Texas, for example, the City Council, while refusing to annex compact contiguous
areas of high Mexican American concentration, chose to bring a 100 percent Anglo
development within the city. The City of San Antonio, in 1972, made massive
annexations including irregular or finger annexations on the city's heavily Anglo
north side. The population breakdown in the areas annexed was overwhelmingly
Anglo, although the city was previously almost evenly divided between Anglos and
Mexican Americans (S. Hearings 477).

In addition to the serious strictures of their access to political participation
outlined previously, language minority citizens are also excluded from the
electoral process through the use of English-only elections. Of all Spanish
heritage citizens over 25 years old, for example, more than 18.9 percent have
failed to complete five years of school compared to 5.5 percent for the total
population. [FN18] In Texas, over 33 percent of the Mexican American population has
not completed the fifth primary grade. A series of reports by the U.S. Commission
on Civil Rights on Mexican American education in the southwestern United States
found that over 50 percent of all Mexican American children in Texas who enter the
first grade never finish high school. [FN19] The Commission concluded that the
practices of Mexican American education 'reflect a systematic failure of the
educational process, which not only ignores the educational needs of Chicano
students but also suppresses their culture and stifles their hopes and ambitions.
In a very real sense, the Chicano is the excluded student.' [FN20]

The Committee found that these high illiteracy rates are not the result of choice
or mere happenstance. They are the product of the failure of state and local
officials to afford equal educational opportunities to members of language minority
groups. For example, until 1947, a California statute authorized local school
districts to maintain separate schools for children of Asian descent, and if such
separate **795 schools were established, the statute prohibited these children from
attending any other school. See Guey Heung Lee v. Johnson, 92 S.Ct. 14, 404 U.S.
1215, 30 L.Ed.2d 19 (1971). [FN21] The effects of that past discrimination against
Asian Americans in education continues into the present.

In addition the language disabilities of Asian Americans are particularly
egregious and deter their participation in the electoral process. In Lau v.
Nichols, 414 U.S. 563 (1974), the Supreme Court held that the failure of the San
Francisco Board of Education to provide language instruction to Chinese students
who do not speak *29 English denied them a fruitful opportunity to participate in
the public school program. The Court observed:

We know that those who do not understand English are certain to find their
classroom experiences wholly incomprehensible and in no way meaningful. Id. at
566.

If we substitute the word 'voting' for the word 'classroom' in the Court's
opinion, we can appreciate the difficulties which Asian Americans face when they
seek to engage in the political process.

The same pattern of educational inequality exists with respect to children of
Indian, Alaskan Native, and Hispanic origin. In one of its many reports on the
subject, the United States Commission on Civil Rights concluded:

The basic finding of this report is that minority students in the Southwest--
Mexican Americans, blacks, American Indians-- do not obtain the benefits of public
education at a rate equal to that of their Anglo classmates. [FN22]

In Natonabah v. Board of Education, 355 F.Supp. 716 (D.N. Mex. 1973), a Federal
district court found that Navajo pupils in the Gallup-Mckinley School District have

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295                                                          Page 17
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

been denied equal educational opportunities. Similar findings have been made by
the Supreme Court and lower Federal courts regarding students of Spanish origin.
E.g., Keyes v. School District No. 1, 413 U.S. 189 (1973); [FN22a] Cisneros v.
Corpus Christi Independent School District, 467 F.2d 142 (5th Cir. 1972) (en banc);
United States v. Texas Education Agency, 467 F.2d 848 (5th Cir. 1972) (en banc);
Romero v. Weakley, 226 F.2d 399 (9th Cir. 1955); Soria v. Oxnard School District
Board of Trustees, 328 F.Supp. 155 (C.D. Cal. 1971); see generally Rangel and
Alcalo, De Jure Segregation of Chicanos in Texas Schools, 7 Harv.Civil Rights and
Liberties Rev. 379 (1972). [FN23] Finally, in Hootch v. State Operated School
System, Civil No. 72-2450 (Super. Ct. Alaska 1973) (plaintiff's motion for summary
judgment denied) (appeal pending before Supreme Court of Alaska), the plaintiffs
have challenged the practice of the State of Alaska to provide public secondary
schools for Alaskan native children only in urban areas distant from their
communities. **796 Most non-native children, on the other hand, are offered public
secondary schools in their own communities.

In addition to disparate treatment in the areas of voting and education, language
minority citizens have been the target of discrimination in almost every facet of
life. The U.S. Commission on Civil Rights in reports and hearings has documented
this discrimination in areas such as housing, administration of justice and
employment. [FN24] *30 Another measure for need is provided by the extent of
litigation needed to secure the rights of language minorities. The Assistant
Attorney General in the Civil Rights Division testified that the Department of
Justice has had to take legal action against state and local governments to enjoin
discrimination against language minorities in public schools, employment, voting
rights, and penal institutions (S. Hearings $98-592). The Department's Civil
Rights Division, for example, has participated in 97 civil suits and initiated
fourteen criminal actions involving the rights of Spanish-speaking citizens, Asian
Americans and American Indians (S. Hearings 695). [FN25]

In 1973, the Supreme Court upheld a lower court finding that the Mexican American
population in Texas has 'historically suffered from, and continues to suffer from,
the results and effects of invidious discrimination and treatment in the fields of
education, employment, economics, health, politics, and others.' Graves v. Barnes,
343 F.Supp. 704, 728 (W.D. Tex. 1972), aff'd in relevant part sub nom. White v.
Regester, 412 U.S. 755 (1973). [FN25a] Later, the same three-judge district court
iterated its finding that Texas has a 'history pock-marked by a pattern of racial
discrimination that has stunted the electoral and economic participation of the
black and brown communities in the life of state.' Graves v. Barnes, 378 F.Supp.
640, 643 (W.D. Tex.), vacated and remanded. White v. Regester, -- U.S. -- (1975)
(per curiam).

Despite the evidence of high illiteracy rates for language minority citizens,
states and local areas where they reside continue to adhere to a uniform language
system. It is clear from the subcommittee record that the practice of conducting
registration and voting only in English does impede the political participation of
voters whose usual language is not English. The failure of states and local
jurisdictions to provide adequate bilingual registration and election materials and
assistance undermines the voting rights of non-English speaking citizens and
effectively excludes otherwise qualified voters from participating in elections.

**797 In view of this overwhelming evidence of voting discrimination against
language minorities, it is not surprising that the registration and voting
statistics of language minorities are significantly below those of the Anglo
majority. In 1972, for example, only 44.4 percent of persons of Spanish origin
were registered compared to 73.4 percent for Anglos. [FN26] The date for 1974
indicates similar disparities; 34.9 percent of persons of Spanish origin were
registered to vote compared to 63.5 percent for Anglos. [FN27] Only 22.9 percent of
Spanish origin persons voted in the 1974 national election, less than one-half the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295                                                      Page 18
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295,  1975 U.S.C.C.A.N. 774)

rate of participation for Anglos. [FN28]

## Expansion of the Voting Rights Act

Weighing the overwhelming evidence before it on the voting problems encountered by language minority citizens, the Subcommittee acted to expand the protections of the Voting Rights Act to insure *31 their free access to the franchise.  The definition of those groups included in 'language minorities' was determined on the basis of the evidence of voting discrimination. Persons of Spanish heritage was the group most severely affected by discriminatory practices, while the documentation concerning Asian Americans, American Indians and Alaskan Natives was substantial.

No evidence was received concerning the voting difficulties  of other language groups.  Indeed, the voter registration statistics for the 1972 Presidential election showed a high degree of participation by other language groups:  German, 79 percent; Italian, 77.5 percent; French, 72.7 percent; Polish 79.8 percent; and Russian, 85.7 percent. [FN29]

TABLE 2.—REPORTED VOTER PARTICIPATION AND REGISTRATION OF PERSONS OF VOTING
AGE, BY ETHNIC ORIGIN AND SEX: NOVEMBER 1972

(Numbers in thousands:  civilian noninstitutional population)

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

**798 The Subcommittee, although cognizant of the extent of voting discrimination against these language minorities, was nonetheless aware that the problems were not uniform in their severity across the nation. Therefore, in expanding the Act, two distinct triggers were developed to identify areas with differing magnitude of barriers to full participation by language minorities in the political process. The remedies set in operation by these triggers mirror the differences in the evidentiary record on the severity of voting discrimination against language minorities. Title II of U.S. 1279 contains the prohibition and remedies for those jurisdictions with the more serious problems, while Title III imposes more lenient restrictions upon areas with less severe voting difficulties. [FN30]

Extending the protection of the Act to language minorities is accomplished by expanding the definition of 'test or device' to mean the use of English-only election materials in jurisdictions where more than five percent of the voting age citizen population is comprised of any *32 single language minority group.  In other words, a jurisdiction is deemed to employ a 'test or device' if it provided election materials or assistance only in the English language, and if it had more than a five percent population of American Indians, Alaskan Natives, Asian Americans or persons of Spanish heritage. [FN31] Even when such a test or device exists, however, coverage is not triggered for a jurisdiction unless it also had a low voter registration or turnout in the 1972 presidential election, namely, less than 50 percent.  Thus, the 'trigger' of Title II is essentially identical to the traditional trigger, now found in Section 4(b) of the Act, that is, the existence of a 'test or device,' as newly defined, and less than 50 percent registration or turnout in the most recent presidential election.

By covering these new geographic areas, we simply apply the Act's special remedies to jurisdictions where language minorities reside in greatest concentrations and where there is evidence of low voting participation. Currently available data indicate that Title II coverage would be triggered in certain counties in California (including the two counties already covered), in areas of Arizona (again, most of which are already covered), in areas of Florida, Colorado, New Mexico, Oklahoma, New York, North Carolina, South Dakota, Utah, Virginia, Hawaii, and for the entire states of Alaska and Texas. (See Appendix C of this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295,  1975 U.S.C.C.A.N. 774)

Report, for a tentative list of coverage under Title II.]

Title II would therefore mandate that in these covered areas bilingual election
procedures be implemented, that Section 5 preclearance be given to all new voting
changes, and that Federal examiners and observers be able to be designated to serve
in those areas.

Title II of the bill for ten years would prohibit English-only elections in
certain areas and mandate bilingual elections.  There is no question but that
bilingual election materials would facilitate voting **799 on the part of language
minority citizens and would at last bring them into the electoral process on an
equal footing with other citizens. The provision of bilingual materials is
certainly not a radical step.  Some court decisions already suggest that in order
for the right to vote to be effective voters belonging to a substantial minority
which speaks a language other than English should be provided election materials in
their own language.  Courts decisions in New York have resulted in specific orders
that the board of elections provide extensive bilingual assistance to voters in
election districts with substantial non-English-speaking population. [FN32] The
rationale behind the decisions is the same as the reasoning that required help for
illiterate voters:  meaningful assistance to allow the voter to cast an effective
ballot is implicit in the granting of the franchise. In Torres v. Sachs, 381
F.Supp. 309 (S.D.N.Y. 1974) a Federal court found that the conduct of elections
only in English deprived Spanish speaking citizens of rights protected by *33 the
Voting Rights Act:  'It is simply fundamental that voting instructions and ballots,
in addition to any other material which forms part of the official communication to
registered voters prior to an election, must be in Spanish as well as English, if
the vote of Spanish-speaking citizens is not to be seriously impaired.' [FN33]

Courts in New York have ordered complete bilingual election assistance, from
dissemination of registration information through bilingual media to use of
bilingual election inspectors. In some jurisdictions which have substantial Puerto
Rican populations and which are not subject to the special provisions of the Voting
Rights Act, courts have also ordered the development of bilingual systems pursuant
to Section 4(e) of the Act. [FN34] Some jurisdictions not under court order have
moved voluntarily to deal with the problem of assisting the non-English-speaking
voter. [FN35]

The California Supreme Court found that state's English-language literacy
requirement a violation of the equal protection clause of the 14th amendment but
did not eliminate the requirement of literacy altogether (since suspended by the
1970 Voting Rights Act Amendments) or order the development of a 'bilingual
electoral apparatus.' [FN36] Subsequently, the California state legislature enacted
legislation which required county officials to make reasonable efforts to recruit
bilingual deputy registrars and election officials in precincts with three percent
or more non-English-speaking voting age population.  In addition, California now
requires the posting of a Spanish-language facsimile ballot, with instructions,
that also must be provided to voters on request for their use as they vote. [FN37]

Since 1967, Congress has sought to improve the educational opportunities of
language minorities through amendments to various education acts.  The Bilingual
Education Amendments of 1974, for example, provided that a limited English speaking
child should receive his instruction in whichever language is necessary to insure
that he **800 has the same opportunity to learn and develop his skills as a non-
limited English-speaking child during the time that he is building his English
competence to a level equivalent with his non-limited English speaking peers.
[FN38]

*34 These statutes are, of course, designed to affect a permanent solution to the
difficulties encountered by citizens who do not speak English.  However beneficial
those laws may be, they have not yet been in operation long enough to reduce the
illiteracy rate of certain language minorities below the national average for all

S. REP. 94-295

Page 20

S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

citizens of voting age, and thus allow free and full participation in the political life of the Nation. Consequently, the prohibition of English-only elections in certain areas is necessary to fill that hiatus until genuinely equal educational opportunities are afforded language minorities.

Suspending English-only elections and mandating bilingual ones for a ten year period is an appropriate remedy for the kind of voting discrimination against language minorities disclosed by the record. But even if that remedy rested solely on the unequal educational opportunities which state and local officials have afforded members of language minority groups, it would still be proper to require it. In Gaston County v. United States, 395 U.S. 285 (1969), [FN38a] the Supreme Court recognized the inextricable relationship between educational disparities and voting discrimination. Even though a literacy test or other practice may be racially neutral on its face, see Lassiter v. Northampton Election Board, 360 U.S. 45 (1959), [FN38b] it may disproportionately disadvantage minorities when applied to persons denied equal educational opportunities. That reasoning is fully applicable to English-only elections which, while racially neutral, may have an impermissible discriminatory impact. See Torres v. Sachs, supra.

To be sure, the purpose of suspending English-only and requiring bilingual elections is not to correct the deficiencies of prior educational inequality. It is to permit persons disabled by such disparities to vote now. See Alexander v. Holmes County Board of Education, 396 U.S. 19 (1969) [FN38c] ; Carter v. West Feliciana Parish School Board, 396 U.S. 290 (1970). [FN38d] This bill rejects the notion that 'the 'denial of a right deemed so precious and fundamental in our society (is) a **801 necessary or appropriate means of encouraging persons to learn English.' Katzenbach v. Morgan, supra at 655. Title II of S. 1279 is a temporary measure to allow such citizens to register and vote immediately; it does not require language minorities to abide some unknown, distant time when local education agencies may have provided sufficient instruction to enable them to participate meaningfully in an English-only election.

The record before the Subcommittee establishes that prohibition of English-only elections would not alone assure access of all language minority citizens to registration and voting. Although English-only elections are an impediment to the participation of language minorities, other tactics of discrimination have also been used and would still readily be available to state or local election officials. Thus, the Subcommittee believes that the appointment of examiners and observers in those areas where violations of the voting guarantees of the 14th or 15th Amendment are occurring or where the Attorney General considers examiners and observers necessary, is the effective answer to such tactics. Federal observers could clearly serve to diminish the intimidating impact of having to vote in all-white areas of the city or being subject to constant 'law enforcement surveillance.' Examiners could 'list' those citizens residing in the communities of the uncooperative registrars.

*35 Further, in light of the ingenuity and prevalence of discriminatory practices that have been used to dilute the voting strength and otherwise effect the voting rights of language minorities, the Committee acted to extend the preclearance mechanism of Section 5 of the Voting Rights Act to the newly covered jurisdictions. The exhaustive case-by-case approach of the pre-1965 period proved to be inadequate and futile in dealing with the magnitude of the voting problems confronting blacks. The pervasive voting discrimination which now affects language minorities in certain areas throughout the Nation requires the application of the Section 5 remedy. That procedure has been in force for ten years and a whole body of administrative law has developed around it. [FN39] As a method which has shown a marked degree of success, it is appropriate to adopt it to the present task.

Bail-out from Coverage

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295                                                        Page 21
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)


Coverage under Title II is based on a rational trigger which describes those
areas for which we had reliable evidence of actual voting discrimination in
violation of the 14th or 15th Amendment. It is possible, of course, that there may
be areas covered by this title where there has been no voting discrimination. The
bill takes account of this possibility by a provision which allows a jurisdiction
to exempt itself from coverage of the Act if it meets certain criteria. Any state
or political subdivision may exempt itself by obtaining a declaratory judgment that
English-only elections or any other 'test or device' has not in fact been used in a
discriminatory fashion against language minorities and other racial or ethnic
groups for the ten years preceding **801 the filing of action. The 'bail-out'
process operates in the same manner as the current provision in the Act and is a
relatively minor one if no evidence of discrimination is present. In fact, the
Attorney General must consent to the entry of a declaratory judgment if, in his
opinion, no violation of voting rights have occurred. Alaska; Wake County, North
Carolina: Elmore County, Idaho: and Apache, Navajo, and Coconino Counties,
Arizona have successfully sued to bail-out from the special provisions of the
present Act.

                              Constitutionality

Section 5 of the 14th Amendment and Section 2 of the 15th Amendment give Congress
broad powers 'to enforce, by appropriate legislation, the provisions' of the
amendments. Those sections expand the authority of Congress to remedy problems
arising under them, and anticipate that the national legislature will act to
protect the rights of minorities. In Ex parte Virginia, 100 U.S. 339, 345-46
(1879), [FN39a] the Supreme Court held:
It is the power of Congress which has been enlarged, Congress is authorized to
enforce the prohibitions by appropriate legislation. Some legislation is
contemplated to make the amendments fully effective. Whatever legislation is
appropriate, that is, adapted to carry out the objects the amendments have in view,
whatever tends to enforce submission to the prohibitions *36 they contain, and to
secure to all persons the enjoyment of perfect equality of civil rights and the
equal protection of the laws against State denial or invasion, if not prohibited,
is brought within the domain of congressional power (emphasis in original).
In recent years, Congress has enacted and the Supreme Court has sustained
legislation which seeks to enfranchise members of minority groups. In South
Carolina v. Katzenbach, 383 U.S. 301 (1966), [FN39b] the Court upheld the original
Voting Rights Act of 1965 with its provisions suspending 'tests and devices'
requiring preclearance of new election laws, and authorizing Federal registrars and
observers. Three months later, the Court approved the sections of that Act which
allowed Puerto Ricans to vote even though they were illiterate in English.
Katzenbach v. Morgan, 394 U.S. 641 (1966). [FN39c]
The Morgan case has enormous significance for the bill now before us. The Court
approved the exercise of congressional power to enfranchise language minorities who
are being denied the right to vote because of their inability to read or understand
English. In that instance, Congress suspended the New York State statute requiring
ability to understand English as a prerequisite for voting as it applied to Puerto
Rican residents. Later litigation under that section held that New York must
provide bilingual election materials, as well as allow Spanish-speaking Puerto
Ricans to vote. Torres v. Sachs, supra.
**803 S. 1279 is merely an extension of the legislative and constitutional
principles approved by the Supreme Court in South Carolina v. Katzenbach, supra,
and Katzenbach v. Morgan, supra. Unlike the provision sustained in Morgan, which
was limited to one group, this bill would enfranchise four principal language

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975                           Page 22
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295,  1975 U.S.C.C.A.N. 774)

minorities:  persons of Spanish heritage (including Puerto Ricans), American
Indians, Alaskan Natives, and Asian Americans. These are the groups which, the
evidence shows, have been subjected to voting discrimination.  In suspending
English-only elections, this bill does no more than the statute upheld in Morgan.
In applying the special remedies of the present Act through Title II, S. 1279 does
no more than the law validated in South Carolina v. Katzenbach, supra.  And in
mandating bilingual elections, it affords a remedy implicit in the provisions
sustained in Morgan, and required by later court decisions.  Torres v. Sachs, supra
and Arroyo v. Tucker, supra.

   In both cases, the Court deferred largely to the congressional judgment as to
what is 'appropriate legislation' under the enforcement sections of the Fourteenth
and Fifteenth Amendments.  So long as it perceived a rational basis for the
legislative enactment, the Court would sustain the statute.  In this instance, the
record is replete with evidence of the discrimination against certain language
minorities.  Even since the Court has already sustained the remedial devices in
prior litigation, the corrective measures embodied in S. 1279 present no novel
constitutional issues.

   It is argued that, in extending the Act only to the four language minority
groups, the bill is constitutionally defective. In Morgan, the Supreme Court upheld
a federal law extending the right to vote to non-English-speaking Puerto Ricans.
The Court rejected the contention that the provision was too narrowly drawn in its
application only *37 to Puerto Ricans residing in New York.  In response to that
argument, the Court observed:

   [I]n deciding the constitutional propriety of the limitations in such a reform
measure we are guided by the familiar principles that a 'statute is not invalid
under the Constitution because it might have gone further than it did,' Roschen v.
Ward, 279 U.S. 337, 339. [FN39d] that a legislature need not 'strike at all evils
at the same time,' Semler v. Dental Examiners, 294 U.S. 608, 610, [FN39e] and that
'reform may take one step at a time, addressing itself to the phase of the problem
which seems most acute to the legislative mind,' Williamson v. Lee Optical Co.,
348 U.S. 483, 489. [FN39f] Id. at 657.

   Finally it is said that, since the decisions in South Carolina v. Katzenbach,
supra and Katzenbach v. Morgan, supra, the Supreme Court has retreated from the
broad latitude given Congress in those cases to deal with voting problems.  In
support of this view, some cite the opinions in Oregon v. Mitchell, 400 U.S. 112
(1970), [FN39g] in which a sharply and hopelessly divided Court sustained the
constitutionality of congressional legislation that enfranchised 18 year olds in
federal elections and that removed certain residency requirements as a prerequisite
**804 to voting. At the same time, it invalidated the provision which sought to
enfranchise 18 year olds in state and local elections.

   Whatever the ultimate impact of the Mitchell case, a majority of the justices did
not disagree with thy principles of South Carolina and Morgan as they applied to
protecting the rights of 'discrete and insular minorities.' That protection, after
all, was the thrust of the 14th and 15th Amendments, and, at a minimum, Congress is
fully authorized to secure the rights of such minorities.  Whether a particular
language minority is in need of protection is a question left largely to the
judgment of the legislature.  In view of the hearing record in this case, it is
clear that the Congress would properly be exercising its discretion by enacting S.
1279.


                              Separability

   S. 1279 contains a separability clause to ensure that the current provisions of
the Voting Rights Act of 1965, as amended by this bill, are preserved if the
constitutionality of the 1975 expansion amendments is successfully challenged.  At

              ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

                                                                    **Exhibit B**

8. REP. 94-295                                                    Page 23

S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

issue in questions of separability is the intent of the legislative body in
entering the statute, Lynch v. United States, 292 U.S. 571 (1934) [FN39h] . The
separability clause in s. 1279 clearly establishes the intent of Congress that the
provisions of these amendments be viewed independently. Although the amendments in
the bill are interwoven into the current Act, the indication of intent by Congress
as to the separability of the expansion amendments is sufficient for a court to
determine that Congress did not intend that the 1975 Act be enacted as an entirety.
This 1975 legislation should thus be considered as separable, and it is not to be
rejected as a whole in the even of a successful court challenge to any part
thereof.

### C. TITLE III:  BILINGUAL ELECTIONS PROVISIONS

### BACKGROUND

Title III of S. 1279 enhances the policy of Section 201 of removing obstructions
at the polls for illiterate citizens. See the discussion above *38 under
'Suspension of Tests and Devices.' Title III is specifically directed to the
problems of 'language minority groups,' that is, racial minorities whose dominant
language is frequently other than English. Section 307 of S. 1279 defines language
minorities as persons who are 'American Indian, Asian American, Alaskan Natives, or
of Spanish heritage.'

The Committee singled out the 'language minority' groups for several reasons.
First, as discussed above, illiteracy is all too often a product of racially
discriminatory educational systems.  See Civil Rights Commission, A Better Chance
to Learn: Bilingual Bicultural Education, Published May, 1975. See also discussion
in Lau v. Nichols, 414 U.S. 563 (1974). [FN39I]

Second, while the documentation of discrimination and non-responsiveness by the
states was substantial with regard to the particular minority groups, the
Subcommittee was presented with no evidence of **805 difficulties for other
language groups. Indeed, the voter registration statistics for the 1972
Presidential election showed a high degree of participation by other language
groups:

### TABLE 2.--REPORTED VOTER PARTICIPATION AND REGISTRATION OF PERSONS OF VOTING AGE, BY ETHNIC ORIGIN AND SEX: NOVEMBER 1972

(Numbers in thousands:  civilian noninstitutional population)

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

While the Committee clearly encourages states and political subdivisions to
assist other ethnic groups in voting and registration, the Committee received no
evidence of voting discrimination regarding these groups to compel Congressional
action at this time.

Third, the historical experience of these groups is far different from the
European immigrants who came to North American and eventually became part of the
Great Melting Pot.  For the most part, the Spanish-heritage, American Indian and
Alaskan Native groups were living on territory suddenly annexed by the United
States; in most cases their ancestors had been living on the same land for
centuries.  These groups stayed on their original lands after the annexation, and
while mobility *39 certainly existed within their own cultures, opportunity for
mobility within the European-dominated American culture was often denied them, most
frequently by poor educational institutions and unresponsive political
institutions.  Important decisions of direct consequence to them were often made
without their participation.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975    Page 24
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

The states and local jurisdictions have been disturbingly unresponsive to the problems of these minorities. Some, such as Connecticut, do provide bilingual officials or materials in areas with 5 percent or more Spanish-speaking citizens; others, with a much higher concentration of language minorities, provide no assistance whatsoever. Seventeen states do allow for the possibility of bilingual assistance 'through the aid of a judge or friend,' but according to testimony by the Civil Rights Commission, this assistance is often inadequate. **806 (See Senate Hearings, p. 94). Another seventeen states lack any provision for voter assistance whatsoever to language minorities, and of these seventeen, eleven come under Title III, which is based on a concentration of 5 percent or more of language minority citizens.

Because so many states and counties have not responded to the situation confronting the language minority citizens, the Committee believes strongly that Congress is obligated to intervene. Title III of S. 1279 requires that bilingual assistance and materials be provided in states or political subdivisions with a concentration of 5 percent or more of a language minority group, and where the illiteracy rate of that group is above the national average for all citizens of voting age (5.5 percent in 1970). It is hoped that this provision will assure language minority citizens equal access to the voting process.

The Committee has taken pains to insure that Title III will -e implemented effectively with minimal cost to the states and political subdivisions involved. The Subcommittee obtained an opinion from the Department of Justice that Title III requires bilingual materials and assistance be provided only to the language minority citizens and not to every voter in the jurisdiction (see Appendix D). Nor does Title III require the impossible. A jurisdiction with a minority group whose language is oral is, of course, required only to provide oral assistance. And, obviously, a jurisdiction is not required to provide materials or assistance in an extinct language. The Subcommittee sent letters to election officials in all areas to be covered by Title III; the great majority responded that the cost was not prohibitive. New York City, for example, has for several years has been holding elections in a manner complying with Title III, at relatively little cost ($100,000 per year covering 345,800 Spanish-speaking citizens).

Although the Subcommittee felt strongly that this legislation was essential, a constitutional expert was invited to help ascertain whether Title III was within Congress' powers under the Fourteenth and Fifteenth Amendments. Hearings, pp. 789-802. After examining the question at length, and after receiving the testimony of this witness, the Committee is convinced that Title III is clearly within Congress' enforcement powers under these two amendments.

## D.  TITLE IV:  MISCELLANEOUS PROVISIONS

Section 401 of S. 1279 amends Section 3 of the Voting Rights Act to afford to private parties the same remedies which Section 3 now *40 affords only to the Attorney General. Under the current provisions of Section 3, whenever the Attorney General has instituted a proceeding to enforce the guarantees of the 15th Amendment, the court may authorize the appointment of Federal examiners, may suspend the use of literacy tests and other similar devices, and may impose preclearance restrictions on all changes relating to voting or election processes. The amendment proposed by S. 1279 would authorize courts to grant similar relief to private parties in suits brought to protect voting rights in covered and noncovered jurisdictions. [FN40] The term which i used , 'aggrieved person,' is a commonly used phrase which appears throughout the United States Code. The words are used in the Civil Rights Acts of 1964 and 1968, and a similar expression is employed in the Administrative Procedure Act. An 'aggrieved person' is any person injured by an act of discrimination. It **807 may be an individual or an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295                                                        Page 25
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

organization representing the interests of injured persons. See Trafficante v.
Metropolitan Life Insurance Co., 409 U.S. 205 (1972); (FN40a) and NAACP v. Button,
371 U.S. 415 (1963). [FN40b] In enacting remedial legislation, Congress has
regularly established a dual enforcement mechanism. It has, on the one hand, given
enforcement responsibility to a governmental agency, and on the other, has also
provided remedies to private persons acting as a class or on their own behalf. The
Committee concludes that it is sound policy to authorize private remedies to assist
the process of enforcing voting rights.

Section 402 allows a court, in its discretion, to award attorneys' fees to a
prevailing party in suits to enforce the voting guarantees of the Fourteenth and
Fifteenth amendments, and statutes enacted under those amendments. This section is
similar to provisions in Titles II and VI of the Civil Rights Act of 1964, which
prohibit discrimination in public accommodations and employment, and to Section 403
of this act (the coverage of which is described below). [FN41] Such a provision is
appropriate in voting rights cases because there, as in employment and public
accommodations cases, and other civil rights cases, Congress depends heavily upon
private citizens to enforce the fundamental rights involved. Fee awards are a
necessary means of enabling private citizens to vindicate these Federal rights.

It is intended that the standards for awarding fees under sections 402 and 403 be
generally the same as under the fee provisions of the 1964 Civil Rights Act. A
party seeking to enforce the rights protected by the Constitutional clause or
statute under which fees are authorized by these sections, if successful, 'should
ordinarily recover an attorney's fee unless special circumstances would render such
an award unjust.' Newman v. Piggie Park Enterprises, Inc., 88 S.Ct. 964, 390 U.S.
400, 402, 19 L.Ed.2d 1263 (1968). [FN42] Such 'private attorneys general' should
not be deterred from bringing meritorious actions to vindicate the fundamental
rights here involved by the prospect of having to pay their opponent's counsel fees
should they *41 lose. Richardson v. Hotel Corporation of America, 332 F.Supp. 519
(ED.La. 1971), aff'd, 469 F.2d 951 (5th Cir. 1972). However, such a party, if
unsuccessful, should be assessed his opponent's fee where it is shown that his suit
was frivolous, vexatious, or brought for harassment purposes. United States Steel
Corp. v. United States, 385 F.Supp. 346 (W.D.Pa. 1974), aff'd, 9 E.P.D. Sec. 10,225
(3rd Cir. 1975). These provisions thus deter frivolous suits by authorizing an
award of attorney's fees against a party shown to have litigated in 'bad faith'
under the guise of attempting to enforce the Federal rights covered by sections 402
and 402. Similar standards have been followed not only in the Civil Rights Act of
1964, but in other statutes **408 providing for attorneys' fees. E.g. the Water
Pollution Control Act, 1972 U.S. Code Cong. & Adm. News 3747; the Marine Protection
Act, Ia. at 4249-50; and the Clean Air Act, Senate Report No. 91-1196, 91st Cong.,
2d Sess., p. 438 (1970). See also Hutchinson v. William Barry, Inc., 50 F.Supp.
292, 298, (D. Mass. 1943) (Fair Labor Standards Act).

In appropriate circumstances, counsel fees under sections 402 and 403 may be
awarded pendente lite. See Bradley v. School Board of the City of Richmond, 416
U.S. 696 (1974). [FN42a] Such awards are especially appropriate where a party has
prevailed on an important matter in the course of litigation, even when he
ultimately does not prevail on all issues. See Bradly, supra; Mills v. Electric
Auto-Lite Co., 396 U.S. 375 (1970). [FN42b] Moreover, for purposes of the award of
counsel fees, parties may be considered to have prevailed when they vindicate
rights through a consent judgment or without formally obtaining relief. Parham v.
Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970); Richards v. Griffith
Rubber Mills, 300 F.Supp. 338 (D., Ore. 1969); Thomas v. Honeybrook Mines, Inc. 428
F.2d 981 (3d Cir. 1970); Aspira of New York, Inc. v. Board of Education of the City
of New York, 65 F.R.D. 541 (S.D.N.Y. 1975).

In several hearings held over a period of years, the Committee has found that fee
awards are essential if the Constitutional requirements and Federal statutes which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

Page 26

sections 402 and 403 apply are to be fully enforced. [FN43] We find that the
effects of such fee awards are ancillary and incident to securing compliance with
these laws, and that fee awards are an integral part of the remedies necessary to
obtain such compliance.  Fee awards are therefore provided in cases covered by
sections 402 and 403 in accordance with Congress' powers under, inter alia, the
Fourteenth Amendment, Section 5.  As with cases brought under 20 U.S.C. 1617, the
Emergency School Aid Act of 1972, defendants in these cases are frequently state or
local bodies or state or local officials.  In such cases it is intended that the
attorneys' fees, like other items of costs, will be collected either from the
official directly, from funds of his agency, or under his control, or from the
State or local government (whether or not the agency or government is a named
party).

It is intended that the amount of fees awarded under sections 402 and 403 be
governed by the same standards which prevail in other types of equally complex
Federal litigation, and not be reduced because the rights involved may be
nonpecuniary in nature. *42Stanford Daily v. Zurcher, 64 F.R.D. 680 (N.D. Cal.
1974); Davis v. County of Los Angeles, 8 E.P.D. 9444 (C.D. Cal. 1974); Swann v.
Charlotte-Mecklenburg Board of Education (Civil No. 1947, W.D.N.C., order entered
Feb. 24, 1975].

Section 403 allows a court, in its discretion, to award attorneys' fees to a
prevailing party in suits to enforce the civil rights acts which Congress has
passed since 1866.  This section follows the language of section 402 of this Act,
and of Titles II and VII of the 1964 Civil **809 Rights Act.  All of these acts
depend heavily upon private enforcement, and fee awards are an essential remedy if
private citizens are to have a meaningful opportunity to vindicate these important
Congressional policies. [FN44]

Courts have been instructed since the passage of our first civil rights laws, to
use the broadest and most effective remedies available to achieve the goals of
these laws, and these remedies have included awards of attorneys' fees as costs.
The Civil Rights Act of 1866 directed courts to use whatever combination of
federal, state, and common law is most suitable to enforce civil rights.  42 U.S.C.
1988.  In 1870 Congress passed three separate provisions mandating counsel fee
awards to victims of certain election law violations, Enforcement Act of 1870, 16
Stat. 140. [FN45] One year after enacting that law, Congress directed that remedies
provided in such laws should be available in all cases involving official
violations of civil rights. Sec. 1, Klu Klux Klan Act of 1871 (predecessor of 42
U.S.C. 1983).

In several recent civil rights laws, Congress has included the effective remedy
of attorneys fees.  Fee-shifting provisions have been successful in enabling
vigorous enforcement of these laws. Before May 12, 1975, when the Supreme Court
handed down its decision in Alyeska Pipeline Service Co. v. Wilderness Society, 95
S.Ct. 1612 (1975), many lower Federal courts followed these Congressional policies
and exercised their traditional equity powers to award attorneys' fees under
earlier civil rights laws as well. [FN46]

These pre-Alyeska decisions remedied a gap in the specific statutory provisions
and restored an important historic remedy for civil rights violations.  However, in
Alyeska, the Supreme Court held that the federal courts did not have the power to
grant fees to 'private attorneys general,' or private enforcers of civil rights
laws, except under statutes whose language specifically authorizes such fee awards.

The Alyeska decision created an unexpected and anomalous gap in our civil rights
laws whereby awards of fees are barred in the most fundamental civil rights cases.
For instance, fees are now authorized in an employment discrimination suit under
Title VII of the 1964 Civil Rights Act, but not in the same suit brought under 42
U.S.C. 1981, which protects similar rights but involves fewer technical
prerequisites to the filing of an action. Fees are allowed in a suit under *43

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Title II of the 1964 Act challenging discrimination in a private restaurant, but not in suits under 42 U.S.C. 1983, redressing violations of the Federal Constitution or laws by officials who are sworn to uphold the laws.

Section 403, like section 402 provides the specific statutory authorization required by the court in Alyeska. Provision for court awards of reasonable attorneys' fees to prevailing parties is as necessary under the provisions of Secs. 1981-1988, and Title VI of the Civil Rights **810 Act of 1964, Secs. 2000d-2000d-4, as it is under other civil rights statutes which already specifically provide for such awards. [FN47] Section 403 is thus needed to achieve consistency in the Congressional policy of enabling private enforcement of important Federal rights.

The standards and conditions for awarding attorneys' fees under section 403 are intended to be the same as those under section 402. The discussion of those standards and conditions under section 402, supra, should thus be considered as incorporated here.

Section 404 of S. 1279 requires the Director of the Census to collect data on registration and voting by race or color, and national origin. Such data is to be collected for each national election in the covered jurisdictions and for such other elections in any areas, as designated by the U.S. Commission on Civil Rights. Reports of such surveys are to be transmitted to the Congress. The confidentiality and criminal penalties provisions are also applicable to the surveys mandated by S. 1279 except that no one is to be compelled to disclose his race, color, national origin, political party affiliation, or how he voted (or the reasons therefor) and no penalty shall be imposed for the failure or refusal to make such disclosures.

S. 1279 amends Section 5 of the Act to make clear in the statute the Attorney General's authority, upon good cause shown, to provide expedited consideration of Section 5 submissions during the 60 day period following their receipt. In a situation where such expedited consideration is being accorded, the statute is amended to allow the Attorney General to indicate affirmatively, before the running of the full 60-day period, that no objection will be made. However, the statute would further provide that the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the 60-day period. These amendments to Section 5 serve to codify the already existing expedited consideration procedures which the Department of Justice has established in its Section 5 regulations, 28 C.F.R. 51.22. It is noted that, in codifying these procedures, the Committee is not in any way intending to cast doubt upon the legality of the Attorney General's regulations, as already promulgated. See, e.g. Georgia v. United States, 411 U.S. 526 (1973). [FN47a]

S. 1279, as adopted by the Committee, also conforms to Section 10 and Title III of the present Act to reflect the current state of the law and particularly the ratification of the 24th and 26th **44 Amendments. Title III of the current Act, which prohibits the denial of the right to vote of citizens 18 years of age and older in national, state and local elections, was passed by the Congress as part of the 1970 amendments. In Oregon v. Mitchell, 400 U.S. 112 (1970), [FN47b] the Supreme Court upheld the constitutionality of Title III insofar as it lowered the voting age to 18 for national elections. However, the Court held that Title III prohibition was not valid for state and local **811 elections. Subsequently, in 1971, the 26th Amendment to the Constitution was ratified. That amendment, by prohibiting the denial or abridgment of the right to vote of persons 18 years of age and older by the United States or any State, accomplishes the end which Congress had sought to achieve by its enactment of Title III. The Committee's amendment to Title III deletes what are now unnecessary findings and prohibitions. The amendment retains, however, Title III'S enforcement provisions, but modifies them to authorize Attorney General enforcement of the 26th Amendment.

The amendment to Section 10 is intended to conform that section to reflect the ratification of the 24th Amendment and the Supreme Court's decision in Harper v.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295                                                      Page 29
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

inform and 'provide an opportunity for consultation' with the appropriate officials
of the affected state or political subdivision whenever, within a 45- day period
after a submission, the Attorney General has determined that there is a probability
that there will be an objection.


### Section 103

This section  establishes the permanent nationwide ban on literacy tests and
other similar devices as a voting qualification or prerequisite to voting.
Under the provisions of the original 1965 Act, literacy tests and other devices
were suspended in the several states and counties covered at the time of the
original enactment, primarily in the southern part of the United States.  In 1970,
when the Congress extended the temporary provisions of the original 1965 enactment,
it also established a temporary nationwide ban on such tests and devices in areas
not subject to the suspension of the 1965 Act. This section would permanently
prohibit the use of any literacy tests or devices as a prerequisite to voting in
any Federal, state or local election in every jurisdiction in the United States,
both covered and uncovered.


### B.   TITLE II

Title II of the bill expands the coverage of the Voting Rights Act to new
geographic areas which meet certain criteria.


### Section 201

The use of election and registration materials or assistance only in the English
language is suspended in the new jurisdictions which are brought within coverage of
the Act by operation of Sections 202 and 203 of this title. These newly covered
jurisdictions may be exempted *46 from coverage under the Act, if they can
establish before a three-judge District Court for the District of Columbia that
English-only election and registration procedures or any other 'tests or devices'
were not used for the purpose or with the effect of denying the right **813 to vote
on account of race or color or in contravention of the guarantees of Section 4(f)
(2), during the 10 years preceding the filing of the bail-out action. The phrase
'on contravention of the guarantees of Section 4(f) (2)' refers to the prohibition
of the denial or abridgment of the right to vote of any citizen because he is a
member of a language minority group. Language minority group as defined in this
title, means minority persons who have a native language other than English and
includes persons who are Asian American, American Indians, Alaskan Natives or of
Spanish heritage. The Attorney General may consent to a 'bail-out' action if he
determines that there has been no discriminatory purpose or effect in the use of
English-only elections or any other 'tests or devices' in the ten years prior to
the filing of the action.   .

A jurisdiction currently subject to the special provisions of the Act may also be
covered under the separate determinations made in this title. Exemption from
coverage under the Act would require a jurisdiction to satisfy two differing
requirements for bail-out.


### Section 202

This subsection prescribes the conditions for determination of whether a
jurisdiction is covered under the expansion amendments. The formula established
requires certain factual determinations that are final when made and are not
reviewable in court.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295                                                                     Page 30
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295,  1975 U.S.C.C.A.N. 774)

A jurisdiction is covered if:

(a)  The Attorney General determines that a state or political subdivision
maintained a 'test or device' on November 1, 1972 as a qualification for voting;
and

(b)  The Director of the Census determines that less than 50 percent of the
citizens of voting age residing in any state or political subdivision of a state
were registered to vote on November 1, 1972, or voted in the presidential election
of 1972. The Vote in the presidential election of 1972 is the vote cast for
presidential candidates.  Where an entire state falls within this subsection, so
does each and every political subdivision within that state.

Figures showing the probable effects of the bill upon the various states and
political subdivisions have been developed. (See Appendix C for a tentative list of
coverage under this title). Some of these figures represent preliminary estimates
and projections and are, therefore, subject to change when determinations are
finally made by the Bureau of Census.

## Section 203

All of the special remedies of the Voting Rights Act are extended to citizens of
language minority groups based on their right to vote under the Fourteenth and
Fifteenth Amendments.  The Congress finds that these minority citizens are from
environments in which the dominant language is other than English.  These language
minorities experience voting discrimination and exclusion caused by unequal
educational opportunities and by acts of physical, economic and political
intimidation.

*47 States and local governments are prohibited from enacting any voting
procedure to deny or abridge the right to vote of any citizen because he is a
member of a language minority group. To implement **814 this prohibition within the
context of the Voting Rights Act, a jurisdiction is determined to employ a 'test or
device' if:

(a) .The Attorney General determines that a state or political subdivision
provided any registration or voting notices, forms, instructions, assistance, or
other materials or information relating to the electoral process, including
ballots, to eligible voters only in the English language.  The factual
determinations of the Attorney General are final when made and are not reviewable
in any court; and

(b)  The Director of the Census determines that more than five per centum of the
citizens of voting age residing in any state or political subdivision are members
of a single language minority. in making determinations under this subsection, the
five per centum coverage criteria must be met by a single language minority group,
and not by an aggregate population of more than one group. Therefore, in any
specific jurisdiction, the American Indian population and the Spanish heritage
population cannot be added together to meet the five per centum test.  Census
determinations are to be based on the proportion of voting age citizens of each
single language minority group in the population. Citizens data is used to avoid
any question on the proportion of citizens which are actually represented in the
designated language minority groups. The determination of the Director of the
Census under this subsection is effective upon publication in the Federal Register
and is not subject to review in any court.

Whenever any jurisdiction covered under this title provides to the public any
registration or voting notices, forms, instructions, assistance or other materials
or information relating to the electoral process, including ballots, it must
provide them in the language of the minority group which triggered coverage.
States and political subdivisions would be in compliance with the bilingual
procedures affecting the language minorities whose language has no written form or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

is 'extinct' if they provide oral bilingual assistance or assistance in English
respectively. Of course, the implementation of bilingual procedures in covered
jurisdictions amount to changes relating to voting would therefore be subject to
preclearance by the Attorney General or the district court for the District of
Columbia.

### Section 204

The electoral laws and procedures of newly covered jurisdictions are frozen as of
November 1, 1972. Any change relating to voting in these jurisdictions cannot be
enforced unless there is certification by the United States Attorney General of the
United States District Court for the District of Columbia that the change is not
discriminatory in purpose or effect.

### Section 205

The Fourteenth Amendment is added as a constitutional basis for these voting
rights amendments. The Department of Justice and the United States Commission on
Civil Rights have both expressed the *48 position that all persons defined in this
title as 'language minorities' are members of a 'race or color' group protected
under the Fifteenth Amendment. However, the enactment of the expansion amendments
**815 under the authority of the Fourteenth as well as the Fifteenth Amendment,
would doubly insure the constitutional basis for the Act.

### Section 206

The operative provisions of Sections 2, 3, 4, 5, 6, and 13 of the Voting Rights
Act are amended to insure the protection of the voting rights of language minority
citizens.

### Section 207

The classification 'language minorities' or a 'language minority group' is
defined as persons who are Asian Americans, American Indians, Alaskan Natives, or
of Spanish heritage. Each of these is a term of usage or a specific identifier
employed by the Bureau of the Census and each refers to specific classes of
persons.

Provides for the separability of the amendments made by this title from the
existing provisions of the Voting Rights Act, as amended. The separability clause
is of particular importance because it should be the demonstrable intent of
Congress that the extension of the Voting Rights Act of 1965 not be impaired by a
challenge to the constitutionality of the provisions of this title, which would
expand the coverage of the Act. Similarly, the separability clause demonstrates
that it is the intent of Congress that valid portions of the amendments expanding
coverage of the Voting Rights Act be separable from any portions of the expansion
amendments which might be held to be unconstitutional.

### C. TITLE III

Title III of the bill would prohibit, for 10 years, the use of English-only
registration and election materials in certain jurisdictions, without setting into
operation all of the stringent remedies of the Voting Rights Act.

### Section 301

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295

S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

Page 32

Although in some areas language minority group citizens do not appear to suffer severe discrimination, they do experience high illiteracy in the English language, frequently as a result of unequal educational opportunities. The conduct of elections only in English in these jurisdictions, therefore, operates as an impediment to their access to the franchise.

For a period of 10 years, state and local officials are prohibited from providing English-only registration and election materials if (i) more than five percent of the citizens of voting age in the jurisdiction are of a single language minority and (ii) the illiteracy rate of the language minority group citizens is higher than the national illiteracy rate for all persons of voting age.

Illiteracy is defined as the failure to complete the fifth primary grade. Any jurisdiction with five or less percent language minority citizen population is not covered by this Section. The determination of coverage is to be made by the Director of the Census and is not subject to review in any court. A tentative list of the areas covered by this title is attached as Appendix D.

*49 Whenever any jurisdiction covered under this title provides official registration or election materials, those materials must be provided in the language of the applicable language minority group as well as in English.

**816 As in Title II, states and political subdivisions would be in compliance with the bilingual procedures affecting the language minorities whose language has no written form or is 'extinct' if they provide oral bilingual assistance or assistance in English respectively.

Any jurisdiction subject to this title may be removed from coverage if it can demonstrate before the United States District Court for the District of Columbia that the illiteracy rate among voting age members of the language minority group which triggered its coverage is less than the national illiteracy rate. This provision would provide covered jurisdictions with an incentive to educate persons who are members of pertinent language minority groups.

The term 'language minorities' or 'language minority group' is defined as persons who are American Indians, Asian Americans, Alaskan Native or of Spanish heritage.

### Section 302

Sections of the Act are renumbered due to addition of this title.

### Section 303

Section 203 is amended to authorize Attorney General suits whenever he believes that there has been a violation of the prohibitions of Title III. Currently, such suits are authorized by Section 203 for violations of the nationwide literacy test suspension and the residency requirements established for Federal elections.

### Section 304

Section 204 is amended to authorize criminal penalties whenever there are violations of the prohibitions of Title III. Currently, such penalties are authorized by Section 204 for violations of the nationwide literacy test suspension and the residency requirements established for Federal elections.

### D. TITLE IV

Title IV of S. 1279 contains several amendments to facilitate enforcement of the Voting Rights Act.

### Section 401

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975    Page 33
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

Section 3 of the Voting Rights Act provides that the court, in a case brought by the Attorney General to enforce the 15th Amendment (and 14th Amendment under Title II amendments), may grant the special remedies of the Voting Rights Act, i.e., Federal registrars, observers and preclearance of voting changes.  The amendment to Section 3 would allow a court, in a suit brought by a private party, to grant the Act's special remedies.  The sole consequence of this amendment is to broaden the scope of equitable relief which may be requested and granted when such litigation has been filed by private parties.

## Section 402

The proposed amendment would authorize the payment of attorney's fees to prevailing parties, other than the United States, in suits *50 to enforce the voting guarantees of the 14th or 15th Amendment.  A similar attorney's fees provision is already contained in Title II and Title VII of the Civil Rights Act of 1964 and in Section 718 of the **817 Emergency School Aid Act of 1972.The proposed amendment follows the language as it appears in such existing legislation.

## Section 403

The proposed amendment would authorize the payment of attorneys' fees to prevailing parties, other than the United States, in suits brought under Sections 1977, 1978, 1979, 1980, and 1981 of the revised statutes, or title VI of the Civil Rights Act of 1964.

## Section 404

The Director of the Census is directed to collect, after January 1, 1976, following each congressional election, registration and voting statistics by race or color and national origin in every jurisdiction covered by the Voting Rights Act.  The United States Commission on Civil Rights may designate the collection of data in other specific areas for any election.

## Section 405

Section 11(c) of the Voting Rights Act provides for criminal penalties against those who knowingly and willfully provide false information for establishing voting eligibility.  Section 404 is a technical amendment to add the elections of the Delegates of Guam and the Virgin Islands to the list of elections covered by the criminal penalties section.  When the Act was passed in 1965, no Delegates from these areas were in Congress.

## Section 406

Section 5 of the Voting Rights Act currently requires all covered jurisdictions to submit changes in voting laws and practices to the Attorney General for preclearance prior to their implementation.  The statute currently gives the Attorney General 60 days in which to file an objection to the voting change. Section 5 regulations now provide that for good cause shown, the Attorney General can permit enforcement of the voting change within the 60 day period, subject to reexamination upon the receipt of additional evidence during the remainder of the 60 day period.

The purpose of this amendment is to codify the existing regulation enabling the Attorney General to affirmatively indicate, under the circumstances set forth in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295                                                                    Page 34
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

the regulations, that he will not object to a voting change under Section 5 prior
to the expiration of the 60 day period.

## Section 407

Section 203 of the Voting Rights Act is amended to correct a typographical error
in the Code citation, which has appeared in the Act since the 1970 amendments.

## Section 408

Title III of the Voting Rights Act prohibits the denial to vote of citizens 18
years of age or older in national, state and local elections. In Oregon v.
Mitchell, 400 U.S. 112 (1970), [FN47d] the Supreme Court, while upholding the
lowering of the voting age for national *51 **818 elections, held that the
prohibition was invalid for state and local elections. Subsequently, the 26th
Amendment to the Constitution was ratified which accomplishes the end Congress
sought to achieve. The amendment deletes unnecessary findings and prohibitions in
Title III but retains its enforcement provisions while modifying them to authorize
Attorney General enforcement of the 26th Amendment.

## Section 409

The amendment to Section 10 is intended to conform that section to reflect the
ratification of the 24th Amendment and the Supreme Court's decision in Harper v.
Virginia Board of Elections, 383 U.S. 663 (1966), [FN47e] that denial of the right
to vote because of the failure to pay a poll tax was a denial of equal protection.
Section 10(b) is amended by adding Section 2 of the 24th Amendment to the other
enforcement provisions pursuant to which Congress directs the Attorney General to
institute action against poll tax requirements. Section 10(d) is deleted. The 24th
Amendment, and the Supreme Court decision interpreting the 14th Amendment now
clearly prohibit the imposition of poll taxes for all elections.

          *            *            *            *

## *64 COST OF LEGISLATION

According to estimates provided by the Department of Justice, this bill would
have the effect of increasing enforcement expenditures beyond current outlays over
the next ten years.

Rough estimates which have been provided by the Director of the Census indicate
that the cost of each of the surveys which has been mandated by this bill, will
range from $45 to $55 million. It is expected that approximately five such surveys
will be conducted, with one survey to be conducted every two years over the next
ten year period. The Subcommittee believes that such costs, to be spread out over
an approximate ten year period, are modest (It is noted that the provisions of S.
1279 do not provide for any authorizations). Presumably, the Bureau of the Census
will be able to carry out its mandate under this bill within the confines of its
regular budgetary appropriations. If increased authorizations and appropriations
are required, then requests to the appropriate committee(s) can be made. At such
time, more precise estimates would be available and such estimated expenditures
would again be reviewed in terms of their impact on the national economy.

          *            *            *            *

*68 JUNE 27, 1975

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit B**

S. REP. 94-295                                                      Page 35
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

Hon. J. STANLEY POTTINGER,
Assistant Attorney General, Civil Rights Division,
U.S. Department of Justice, Washington, D.C.
DEAR MR. POTTINGER: Certain questions have arisen concerning the approaches
necessary for compliance with Title III of S. 1279 and H.R. 6219. One county
official, for example, has asserted that Title III **819 requires his office to
send out bilingual materials to all registered voters in his jurisdiction,
including those citizens who clearly prefer English language materials. This
interpretation seems unnecessarily restrictive, and it is my feeling that less
costly schemes could be devised to comply with Title III.
One possibility suggested to me is as follows:
1. For future registrants, each person would indicate a language preference at
the time he or she registers, with the understanding that this choice could be
changed at any time. All election materials would be supplied in the chosen
language.
2. For present registrants, that county registrar would send post cards to all
registrants in both English and the appropriate minority language, asking them to
indicate a language preference for election materials.
This plan is sketchy, obviously, and I am assuming that all drafting and
logistical problems could be worked out. It is suggested as only an alternative
approach that would still satisfy the requirements of Title III.
As the official charged with enforcing Title III, should it be enacted, your
opinion on these questions would be most helpful. Any thoughts you have on these
matters would, of course, be appreciated, but please answer specifically:
(a) Is it necessary under Title III for a state or political subdivision to
supply each registered voter with bilingual materials, or is it sufficient if the
citizens needing bilingual materials could be 'targeted'?
(b) Would the plan I mention above satisfy the requirements of Title III?
**69 (c) Would you suggest any other approaches for implementation of Title III?
Thank you for your assistance in this matter. Your office has been most helpful
to the Subcommittee these past several months, and I am grateful.
Sincerely,

JOHN V. TUNNEY, CHAIRMAN

              *        *        *        *

DEPARTMENT OF JUSTICE

Washington, D.C., July 8, 1975.
Hon. JOHN V. TUNNEY,
Chairman, Subcommittee on Constitutional Rights, Committee on the Judiciary, U.S.
Senate, Washington, D.C.
DEAR CHAIRMAN TUNNEY: This is in response to your letter of June 27, 1975
regarding the implementation of Title III of S. 1279. Please excuse my delay in
responding.
Title III provides in relevant part that:
(c) Whenever any State or political Subdivision subject to the prohibition of
subsection (b) of this Section provides any registration or voting notices, forms,
instructions, assistance, or other materials or information relating to the
electoral process, including ballots, it shall provide them in the language of the
applicable minority groups as well as in the English language.
**820 I am in agreement with your conclusion that the language of Title III does
not require election officials to provide the specified election and registration
materials bilingually to each registered voter regardless of that voter's language

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295                                                      Page 36
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295,  1975 U.S.C.C.A.N. 774)

preference.  What Title III would appear to require is that each registered voter
have equal access to the specified materials in whichever language designated that
he prefers.

Thus, in a covered jurisdiction, a system for the dissemination of election and
registration materials which guarantees that a Spanish speaking voter, for example,
would receive his or her election or registration materials in Spanish and in the
same fashion as English speaking individuals, would, in my judgment meet the
requirements of Title III.

It is difficult to discuss hypothetical methods of implementation of Title III in
the abstract, and there are likely to be many different alternatives devised to
carry out the purposes of this Title.  I believe however that an acceptable
approach generally patterned on the plan outlined in your letter could be devised.
It is my view that a system which is designed to assure access to bilingual
materials, and which does not place an unequal burden upon those voters requiring
information and materials in a language other than English, would meet the
requirements of Title III.

I hope that this information is of assistance to you.
Sincerely,

    J. STANLEY POTTINGER,

    Assistant Attorney General,

    Civic Rights Division.


                    *70 MINORITY VIEWS

            INDIVIDUAL VIEWS OF SENATOR ROMAN L. HRUSKA TO S. 1279


I have long been an advocate of civil rights legislation during my membership in
the Senate.  In 1965 I supported the original Voting Rights Act and in 1970
supported the proposal to apply this Act on a nationwide basis.  Nevertheless, I do
not support S. 1279 as reported from Committee as it greatly expands the original
coverage of this Act and extends its provisions for another 10 years.

The results under the 1965 Act were impressive, and all thoughtful men recognize
that the Act served the extraordinary purposes for which it was enacted.  It must
also be recognized, however, that the facts and circumstances for which the Act was
a response have changed dramatically 10 years after its original enactment.

When the Act was passed in 1965 it was done so with the thought that it was a
temporary measure designed to apply unusual remedies to a few States of the Union
where voting discrimination seemed prevalent.  The Act's provisions were a
departure, I believe, from the general rules of good legislation in that they
produced a troublesome precedent of Federal interference in State matters. This
departure was tolerated by this Senator, and by at least some others in this body,
in the belief that the discrimination which existed at that time was of the
proportion that serious remedies were required.

Ten years have now passed since the Act was implemented.  A review of the voter
registration figures of the six Southern States originally**821 covered under the
1965 Act indicate a tremendous increase in minority voter registration, in some
cases the totals being higher than in many States of the Union.

Nevertheless, the legislation as presently drafted seems to ignore the reversal
of discriminatory practices in those States and their large gains in voter
registration.  Under the terms of the bill, the six States originally covered would
continue to be covered for an additional 10 years no matter how successful they are
in removing all vestiges of discrimination.  I do not believe the regional onus

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit B

S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

which these States have been under for the past few years should be continued in
view of their performance in the past decade.

While I do not favor the extension of this Act in the form contemplated by S.
1279, I would find it less objectionable if the extension was for a period of 5
years rather than the proposed 10 years. In keeping with the spirit of the initial
Act and the 1970 amendment, a 5-year extension would provide Congress more
flexibility to automatically review the changing circumstances of voter
registration.

In light of the advances made in the past 10 years it would seem to be better
policy to provide an additional review in the not so distant future at which time
Congress could determine what additions or extensions should be made as to best
improve voter registration. This is so particularly in light of the fact that the
present danger of discrimination in the States covered by the Act is presently
considerably less than it was in 1970.

*71 I am also concerned with the extension of the Act into the area of language
minorities. As I have indicated, it is my thought that legislation of this nature
should be employed only in those extraordinary instances where grievous wrongs
exist for which there are not other remedies.

The strongest argument made in favor of such extension is the indication that in
some areas of this country the voter turnout level of this minority has been at a
low percentage level. It should be noted, I believe, that a low voter turnout is
often the result of factors other than discrimination. For example, in the 1974
Presidential election overall voter turnout, across the country, was considerably
lower than 50 percent.

It is my thought that a strong showing should be made of actual discriminatory
practices, in addition to low voter turnout, before the drastic step is taken to
extend this legislation to language minorities. The record which has been compiled
on this subject does not convince me that the alleged discrimination against the
non-English-speaking individuals covered by S. 1279 is of sufficient weight to
justify the application of the Voting Rights Act.

It is with these thoughts in mind that I have voted not to report S. 1279 to the
Senate.

ROMAN L. HRUSKA,

U.S. Senator.

**822 *73 SEPARATE VIEWS OF SENATORS EASTLAND, MCCLELLAN, THURMOND, AND
WILLIAM L. SCOTT

All of the undersigned recognize that the right to vote is an indispensable
characteristic of a functioning democracy and fully support the provisions of the
15th amendment that no citizen shall be denied the right to vote because of race or
color or previous condition or servitude. We also feel that our republican form of
Government cannot reach its full potential without the right of participation in
the affairs of Government by all of our citizens, but we do not believe that the
temporary provisions of the Voting Rights Act of 1965 should be extended for an
additional 10 years and are opposed to punitive legislation directed against States
because of past wrongs dating back as far as the Civil War. Under the permanent
portions of the Voting Rights Act the Attorney General is authorized to take
positive action to eliminate any violation of the 15th Amendment and may retain
jurisdiction to assure that no citizen is denied the right to vote because of his
race or color, including the right to appoint Federal examiners. However, the
burden of proof of wrongdoing under the permanent legislation rests with the
Government, as it should, but the portions of the legislation to be extended

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295                                                        Page 28
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295,  1975 U.S.C.C.A.N. 774)

Virginia Board of Elections, 383 U.S. 663 (1966), [FN47c] the latter having been
decided after the 1965 enactment of Section 10.  The 24th Amendment prohibits the
denial or abridgment of the right to vote in Federal elections because of the
failure to pay any poll or other tax.  In Harper, supra, the Court held that it is
a denial of the equal protection clause of the 14th Amendment for a state to deny
the right to vote in state elections because of the failure to pay a poll tax.
Section 10(b) is amended by adding Section 2 of the 24th Amendment to the other
enforcement provisions, pursuant to which Congress directs the Attorney General to
institute actions against poll tax requirements.  Section 10(d) is deleted.  That
provision provides for the eligibility of voters in covered jurisdictions upon
payment of current year poll taxes to either Federal examiners or local election
officials.  The 24th Amendment to the Constitution and the Supreme Court's decision
interpreting the 14th Amendment now clearly prohibit the imposition of poll taxes
for all elections.

     The provisions of 11(c) of the Act are amended to reflect the recent addition to
Congress of Delegates from Guam and the Virgin Islands. The amendment made by
Section 406 of S. 1279 corrects what is apparently a typographical error which has
appeared in the Act since the adoption of the 1970 amendments.

                              ANALYSIS OF THE BILL


                              A.   TITLE I


   Title I of the bill amends the Voting Rights Act to extend certain provisions for
an additional ten years and to make permanent the ban against certain prerequisites
to voting.


                              Section 101


     Sections 4 through 9, the temporary provisions of the Voting Rights Act of 1965,
as they apply to covered jurisdictions, are extended for ten years.  Essentially,
Section 4 provides a nondiscretionary, automatic formula, or 'trigger,' by which
states or their political subdivisions (collectively called jurisdictions) are
covered, or made *45 subject to the Act's temporary remedies.  Section 4 prohibits
the use of 'tests and devices' as a prerequisite to registering or voting in any
jurisdiction that maintained such tests or devices on November 1, 1964 or November
1, 1968, and whose voter registration or turnout in the **812 1964 or 1968
presidential election was less than 50 percent of the voting age population.

     Section 5 freezes the electoral laws and procedures of such jurisdictions as of
November 1, 1964 or 1968 and prohibits enforcement of any changes in the covered
jurisdictions unless there is certification by the United States Attorney General
or the United States District Court for the District of Columbia that the changes
are not discriminatory in purpose or effect.  This process is often called
'preclearance.'

     Sections 6 through 9 provide for, but do not require, the assignment of Federal
examiners to 'list' eligible persons for registration by state and local officials
in the covered jurisdictions.  These sections further permit the assignment of
Federal observers to monitor and report on the conduct of elections in any
jurisdictions which have been designated by the Attorney General for Federal
examiners.


                              Section 102


     This section is essentially a codification of the present procedures of the
Justice Department.  It simply says that the Attorney General or his designee must

Exhibit B
Page 28 of 45

S. REP. 94-295                                                    Page 38
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295,  1975 U.S.C.C.A.N. 774)

assumes wrongdoing and shifts the burden of proof as to the covered States to the States to prove that they have not been guilty of any violation of an individual's right to vote, a burden almost impossible to achieve.

The primary provisions of the act scheduled to expire August 6, 1975, are sections 4 and 5. These contain the triggering provision indicating that the temporary provisions of the act apply to any State which maintained any test or device on November 1, 1964, and with respect to which the Director of the Census determines that less than 50 per centum of the persons of voting are residing in a covered State or political subdivision were registered on November 1, 1964, or that less than 50 percentum of such persons voted in the Presidential election in 1964. In our view the base date is of little evidential value and we do not believe it furnishes an objective standard for current and prospective enforcement of the 15th amendment. All of us would support a voting rights law applying equally to all citizens throughout the country in which the presumptions were the same for all States and political subdivisions, but believe it is unfair to make the States covered by the temporary legislation assume the burden of proof of their innocence of any violation of voting rights while the Government must prove violations on behalf of the States and political subdivisions in the permanent legislation. This is a double standard and contrary to general Federal law.

*74 In summary, the Southern States covered by the 1965 act have made significant gains that deserve recognition and encouragement rather than 10 more years of punitive sanctions. More minority citizens are registered, voting, and holding office in these States than at any time in American history. Congress should recognize this and respond accordingly. **823 For these reasons we respectfully submit that sections 4 and 5 should be allowed to expire on August 6, 1975.

    JAMES O. EASTLAND.

    JOHN L. McCLELLAN.

    STROM THURMOND.

    WILLIAM L. SCOTT.


    FN1  In those jurisdictions where literacy tests are suspended by operation of Section 4(a) of the Act, enforcement of voting qualifications or procedures different from those in force and effect on November 1, 1964 or November 1, 1968 (by virtue of the 1970 amendments), is prohibited unless and until judicial approval or acquiescence of the Attorney General of the United States is obtained (Section 5). (This procedure will be referred to hereinafter as Section 5 preclearance or preclearance). The Act also authorizes the Attorney General to provide for the appointment of Federal examiners to list qualified applicants to vote and Federal election observers to monitor the casting and counting of ballots in such jurisdictions (Sections 6 and 8).

    FN2  The automatic availability of this exemption, of course, assumes compliance with the test or device suspension since its imposition in 1965.

    FN3  Section 201(b) of the Act defines the term 'test or device' as 'any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295                                                    Page 39
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295,  1975 U.S.C.C.A.N. 774)

FN4  Of these covered jurisdictions, the following successfully sued to exempt
themselves or 'bail out' from the Act's special coverage: Alaska v. United
States, Civil No. 101-66 (D.D.C. Aug. 17, 1966)); Wake County, North Carolina (Wake
County v. United States, Civil No. 1198-66 (D.D.C. Jan. 23, 1967)); Elmore County,
Idaho (Elmore County v. United States, Civil No. 320-66 (D.D.C. Sept. 22, 1966));
and Apache, Navajo and Coconino Counties, Arizona (Apache County v. United States,
256 F.Supp. 903 (D.D.C. 1966)).  It is important to note that the Voting Rights Act
does in fact provide for such bailout or exemption on the part of a covered
jurisdiction.  Under existing provisions if the jurisdiction can demonstrate
nondiscriminatory use of 'tests or devices' during the ten years preceding the
exemption request, it is removed from the Act's special provisions. The
jurisdictions listed above, as well as others referred to in subsequent discussion,
have successfully met this burden.

FN5  The State of Alaska; Elmore County, Idaho, and Apache, Coconino and Navajo
Counties in Arizona had been covered in 1965 and subsequently, released from the
Act's coverage.  The 1970 amendments resulted in these areas being recovered.
However, with respect to the State of Alaska only certain election districts were
recovered and not the entire state.  The election districts in Alaska were
subsequently exempted in 1972 (Alaska v. United States, Civil No. 2122-71 (D.D.C.
July 2, 1972)).  The three New York counties were exempted in April 1972, but the
exemption was rescinded and the three counties recovered two years later (New York
v. United States, Civil No. 2419-71 (D.D.C.) (orders of April 13, 1972, January 10,
1974, and April 30, 1974), aff'd 95 S.Ct. 166 (1974) (per curiam)).

It should be noted that, unlike the earlier covered jurisdictions,  the
jurisdictions brought under the Act's coverage by the 1970 amendments will not be
eligible for exemption beginning in August 1975. Rather, those jurisdictions will
not be eligible for such exemption until 1980 and thereafter.

FN6  For this most recent data on Louisiana and North Carolina, see Hearings,
1037.

FN7  Hereinafter referred to as 'TYA'.

FN7a  86 S.Ct. 803, 15 L.Ed.2d 769.

FN7b  89 S.Ct. 817, 22 L.Ed.2d 1.

FN7c  91 S.Ct. 431, 27 L.Ed.2d 476.

FN8  36 Fed.Reg. 18186 (September 10, 1974), 28 C.F.R.Part 51. Issuance of the
regulations was approved in Georgia v. United States, 411 U.S. 526 (1973).

FN9  While covered jurisdictions have the option of seeking court review rather
than the approval of the Attorney General, few have chosen to pursue the judicial
remedy.

FN9a  84 S.Ct. 1362, 12 L.Ed.2d 506, reh. den. 85 S.Ct. 12, 379 U.S. 870, 13
L.Ed.2d 76.

FN10  See Parker, County Redistricting in Mississippi: Case Studies in Racial
Gerrymandering, 44 Miss.L.J. 391 (1973).

FN11  See also Harper v. Kleindienst, 362 F.Supp. 742 (D.D.C. 1973).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295                                                    Page 40
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295,  1975 U.S.C.C.A.N. 774)


FN11a  91 S.Ct. 1760, 29 L.Ed.2d 268, on remand 330 F.Supp. 521 rehearing denied
91 S.Ct. 2220, 403 U.S. 924, 29 L.Ed.2d 702, vacated 91 S.Ct. 656, 404 U.S. 549, 30
L.Ed.2d 704.

FN11b  See previous discussion.

FN12  Section 4(c) states that 'Tests of devices' shall mean 'any requirement
that a person as a prerequisite for voting or registration for voting (1)
demonstrate the ability to read, write, understand, or interpret any matter, (2)
demonstrate any educational achievement or his knowledge of any particular subject,
(3) possess good moral character, or (4) prove his qualifications by the voucher of
registered voters or members of any other class.

FN12a  96 S.Ct. 803, 15 L.Ed. 769.

FN13  In 1890 over two-thirds of the adult Negroes in each of those states were
illiterate, while fewer than one-quarter of the adult Whites were unable to read or
write.

FN13a  74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2D 1180, supplemented 75 S.Ct. 753,
349 U.S. 294, 99 L.Ed. 1083.

FN13b  89 S.Ct. 1720, 23 L.Ed.2d 309.

FN13c  91 S.Ct. 260, 27 L.Ed.2d 272.

FN14  Based on usage by the Bureau of Census, the category of Asian American
includes persons who indicated their race as Japanese, Chinese, Filipino, or
Korean.  The category or American Indian includes persons who indicated their race
as Indian (American) or who did not indicate a specific race category but reported
the name of an Indian tribe.  The population designated as Alaskan Native includes
persons residing in Alaska who identified themselves as Aleut, Eskimo or American
Indian.  Persons of Spanish heritage are identified as (a) 'persons of Spanish
language' in 42 States and the District of Columbia; (b) 'persons of Spanish
language' as well as 'persons of Spanish surname' in Arizona, California, Colorado,
New Mexico and Texas; and (c) 'persons of Puerto Rican birth of parentage in New
Jersey, New York and Pennsylvania.'  Letter from Meyer Zitter, Chief, Population
Division, Bureau of the Census, to House Judiciary Committee, April 29, 1975.

FN14a  47 S.Ct. 446, 71 L.Ed. 759.

FN14b  52 S.Ct. 484, 76 L.Ed. 984.

FN14c  55 S.Ct. 622, 79 L.Ed. 1292, 97 A.L.R. 680.

FN14d  64 S.Ct. 757, 88 L.Ed. 987, 151 A.L.R. 1110, rehearing denied 64 S.Ct.
1052, 322 U.S. 769, 88  L.Ed. 1594.

FN14e  73 S.Ct. 809, 97 L.Ed. 1152, rehearing denied 73 S.Ct. 1128, 345 U.S.
1003, 97 L.Ed. 1408.

FN14f  93 S.Ct. 2332, 37 L.Ed.2d 314.

FN15  U.S. Commission on Civil Rights, Staff Memorandum.  'Survey of Preliminary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295                                                                                        Page 41
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295,  1975 U.S.C.C.A.N. 774)

Research on the Problems of Participation by Spanish Speaking Voters in the
Electoral Process.'  April 23, 1975, S. hearings page 997.

FN15a  94 S.Ct. 2191, 40 L.Ed.2d 566.

FN16  Ibid.

FN17  A majority run-off is a requirement that a candidate receive a majority of
the votes for victory and provides for a run-off between the two top candidates if
no one receives a majority. A system of numbered places divides the field into at-
large elections with as many separate races as there are vacancies to be filled.
This is most commonly done through the use of numbered posts.  When numbered posts
are combined with a majority vote requirement, the chance for a minority candidate
becomes practically impossible unless minorities are in a voting majority (Federal
Review of Voter Changes).

FN17a  93 S.Ct. 2332, 37 L.Ed.2d 314.

FN18  Census of Population:  1970.  General Social and Economic Characteristics.
United States Summary, pc (1)0C1.  Table 88, page 386.

FN19  U.S. Commission on Civil Rights, The Excluded Student, Mexican American
Education Study, Report III, May 1972, at 23.

FN20  Id., at 14.

FN21  Discrimination against Asian Americans is a well known and sordid part of
our history.  See generally Korematsu v. United States, 65 S.Ct. 193, 323 U.S. 214,
89 L.Ed. 194 (1944); Hirabayashi v. United States, 63 S.Ct. 1375, 320 U.S. 81, 87
L.Ed. 1774 (1943); Yu Cong Eng v. Trinidad, 46 S.Ct. 619, 271 U.S. 500, 70 L.Ed.
1059 (1926); Yick Wo v. Hopkins, 6 S.Ct. 1064, 118 U.S. 356, 30 L.Ed. 220 (1886).

FN22  U.S. Commission on Civil Rights.  The Unfinished Education, Mexican
American Education Study, Report II, October, 1971.  See also Keyes v. School
District No. 1, 413 U.S. 189, 197-198 (1973).

FN22a  93 S.Ct. 2686, 37 L.Ed.2d 548.

FN23  See U.S. Commission on Civil Rights, Ethnic Isolation of Mexican Americans
in the Public Schools of the Southwest (1971); The Unfinished Education (1971); The
Excluded Student: Educational Practices Affecting Mexican Americans in the
Southwest (1971); Mexican American Education in Texas:  A Function of Wealth
(1972); Teachers and Students (1973); Toward Quality Education for Mexican
Americans (1974).

FN24  Mexican Americans and the Administration of Justice in the Southwest
(1970); Hearing, San Antonio, Texas (1968); The Navajo Nation:  An American Colony
(1975); The Southwest Indian Report (1973); Hearing, Washington, D.C. (1971);
Hearing, New York (1972); Hearing, Newwark, N.J. (1962); See also Texas State
Advisory Committee to the U.S. Commission on Civil Rights, Employment Practices at
Kelly Air Force Base, San Antonio, Texas (1969); The Civil Rights Status of Spanish
Speaking Americans in Kleberg, Neuces, and San Patricio Counties, Texas (1967); and
Asian Americans and Pacific Peoples:  A Case of Mistaken Identity.

FN25  See also Letter from J. Stanley Pottinger, Assistant Attorney General,

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295                                                          Page 42
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295,  1975 U.S.C.C.A.N. 774)

Civil Rights Division, Department of Justice, to House Judiciary Committee, May 6,
1975.

FN25a   93 S.Ct. 2332, 37 L.Ed.2d 314.

FN26   Current Population Reports:  1972.  Population Characteristics, Voting and
Registration Statistics in the Election of November 1972.  Series p. 20, No. 263,
Table 1, page 22.

FN27   Ibid.

FN28   Unpublished data from the Current Population Survey:  1974, provided by the
Bureau of the Census.

FN29   1972 Current Population Reports, supra n26.

FN30   A discussion of the formula used to trigger coverage in Title III is set
forth hereinafter.

FN31   The five percent figure is one which has been established as a relevant
cut-off in judicial decisions mandating bilingual materials and assistance in
Philadelphia.  Arroyo v. Tucker, 372 F.Supp. 764 (E.D. Pa. 1974), and in New York,
Torres v. Sachs, 381 F.Supp. 309 (S.D.N.Y. 1974).

FN32   With reference to elections for the school board of Community School
District One in Manhattan, see Lopez v. Dinkins, 73 Civ. 695 (S.D.N.Y. February 14,
1973).  The court invalidated the election because the bilingual assistance was not
adequately provided. Coalition for Education in School District One v. Board of
Elections of the City of New York, 370 F.Supp. 42 (S.D.N.Y. 1974), aff'd 495 F.2d
1090 (2d Cir. 1974).  With reference to city elections, see Torres Sachs, 381
F.Supp. 309 (S.D.N.Y. 1974).

FN33   381 F.Supp. 312.  The criticism of New York's monolingual elections in the
Torres decision prompted the Justice Department to move to recover the New York
counties which previously bailed out from under the Act's special provisions.
Arguing that such monolingual elections constituted discriminatory 'tests or
devices', the Department succeeded in bringing these counties back under the Act's
special provisions. New York v. United States, Civil No. 2419-71 (D.D.C., Orders
of Jan. 10, 1974 and April 30, 1974), aff'd 95 S.Ct. 166 (1974) (per curiam).

FN34   Puerto Rican Organization for Political Action v. Kusper, 490 F.2d 575 (7th
Cir. 1973) (Chicago); Marquez v. Falcey, Civil No. 1447-73 (D. N.J. Oct. 9, 1973);
Ortiz v. New York State Board of Elections, Civil No. 74-455 (W.D.N.Y. Oct. 11,
1974) (Buffalo); and Arroyo v. Tucker, 372 F.Supp. 764 (E.D. A. 1974)
(Philadelphia).

FN35   New Jersey has adopted a statute requiring bilingual sample ballots and
registration forms in election districts with 10 percent or more Spanish speaking
registered voters (N.J. Laws, 1974, Ch. 51). Dade County, Florida, has provided all
registration and election materials in English and Spanish for two years.
Massachusetts provides sample ballots and instructions in English and Spanish in
any precinct with more than 700 persons of Spanish speaking background.  Bilingual
assistance, including ballots, is provided in Pennsylvania in areas of significant
concentrations of non-English speaking persons.  In Connecticut, bilingual
assistance is supplied in towns and cities where Spanish speaking comprise 5

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295                                                                 Page 43
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295, 1975 U.S.C.C.A.N. 774)

percent of the population.  Library of Congress, Congressional Research Service,
Memorandum on Fifty-State Survey Relating to Bilingual Voter Assistance, March 11,
1975, and Staff telephone survey of state election officials.

   FN36  Castro v. California, 85 Cal.Rptr. 20, 466 P.2d 244, 258 (1970).

   FN37  A 1974 study by the California Secretary of State on enforcement of its
bilingual requirements found that, on the basis of a poll of all 58 counties, 'the
vast majority of County Clerks and/or registrars, of voters in this state have not
responded to the mandate of section 1611 (bilingual assistance act) and have made
little progress in assisting voters who have difficulty in voting in English.'
(H.R. Report No. 94-196, p. 25, n. 41.)

   FN38  H.R. Rep. No. 93-1211, 93d Congress, 2d Sess. 149 (1974).

   FN38a  89 S.Ct. 1720, 23 L.Ed.2d 309.

   FN38b  79 S.Ct. 985, 3 L.Ed.2d 1072.

   FN38c  90 S.Ct. 21, 24 L.Ed.2d 19, rehearing denied 90 S.Ct. 437, 396 U.S. 976,
24 L.Ed.2d 447.

   FN38d  90 S.Ct. 608, 24 L.Ed.2d 477.

   FN39  In reviewing Section 5 submissions from the jurisdictions covered by Title
II, S. 1279, the Attorney General or the district court will be required, as they
are now under the present Act, to evaluate the proposal for its impact on each
racial, ethnic, or language minority group encompassed by the phrase 'race of
color,' and by the prohibitions of Title II (the new Section 4(f) (2)).

   FN39a  25 L.Ed. 676.

   FN39b  86 S.Ct. 803, 15 L.Ed.2d 769.

   FN39c  86 S.Ct. 1717, 16 L.Ed.2d 828.

   FN39d  49 S.Ct. 336, 73 L.Ed. 722.

   FN39e  55 S.Ct. 570, 79 L.Ed. 1086.

   FN39f  75 S.Ct. 461, 99 L.Ed. 563.

   FN39g  91 S.Ct. 260, 27 L.Ed.2d 272.

   FN39h  54 S.Ct. 840, 78 L.Ed. 1434.

   FN39i  94 S.Ct. 786, 39 L.Ed.2d 1.

   FN40  Section 205 of S. 1279 also amends Section 3 to authorize courts to apply
the Act's special remedies in suits brought to enforce the guarantees of the 14th
Amendment.  This amendment was adopted in part because the Committee is aware of
the significant numbers of suits brought under the 14th Amendment to enforce the
voting rights of Spanish-speaking citizens.

   FN40a  93 S.Ct. 364, 34 L.Ed.2d 415.

            ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN40b  83 S.Ct. 328, 9 L.Ed.2d 405.

FN41  The attorney's fee provisions of Titles II and VII of the 1964 Civil Rights
Act are codified at 42 U.S.C. 2000a-3(b) and 2000e-5(k).

FN42  In the large majority of cases the party or parties seeking to enforce such
rights will be the plaintiffs and/or plaintiff-intervenors.  However, in the
procedural posture of some cases (e.g. a declaratory judgment suit under Sec. 5 of
the Voting Rights Act) the parties seeking to enforce such rights may be the
defendants and/or defendant-intervenors.

FN42a  94 S.Ct. 2006, 40 L.Ed.2d 476.

FN42b  90 S.Ct. 616, 24 L.Ed.2d 593.

FN43  See, e.g., Hearings on the Effect of Legal Fees on the Adequacy of
Representation Before the Subcomm. on Representation of Citizen Interests of the
Senate Comm. on the Judiciary, 93rd Cong., 1st Sess., pt. III.

FN44  As former Justice Tom Clark said, in a union democracy suit, 'Not to award
counsel fees in cases such as this would be tantamount to repealing the Act itself
by frustrating its basic purpose.... Without counsel fees the grant of Federal
jurisdiction is but an empty gesture...'  Hall v. Cole, 412 U.S. 1 (1973), quoting
462 F.2d 777, 780-81 (2d Cir. 1972).

FN45  The causes of action established by these provisions were eliminated in
1894.  28 Stat. 36.

FN46  These civil rights cases are too numerous to cite here. See, e.g., Sims v.
Amos, 340 F.Supp. 691 (MD Ala.), aff'd 409 U.S. 942 (1972); Stanford Daily v.
Zurcher, 366 F.Supp. 18 (N.D. Cal. 1973). Many of the relevant cases are collected
in Hearings on the Effect of Legal Fees, supra, at pp. 888-1024, and 1049-50.

FN47  If a ''private attorney general,' vindicating a policy that Congress
considered of the highest priority . . . were routinely forced to bear his own
attorneys' fees, few aggrieved parties would be in a position to advance the public
interest by invoking the injunctive powers of the federal courts.' Newman v. Piggie
Park Enterprises, Inc., supra, at 402.  See also Bradley v. School Board of the
City of Richmond, 416 U.S. 696 (1974); Northcross v. Board of Education of the
Memphis City Schools, 412 U.S. 427 (1973).

FN47a  93 S.Ct. 1702, 36 L.Ed.2d 472.

FN47b  91 S.Ct. 260, 27 L.Ed.2d 272.

FN47c  86 S.Ct. 1079, 16 L.Ed.2d 169.

FN47d  91 S.Ct. 260, 27 L.Ed.2d 272.

FN47e  86 S.Ct. 1079, 16 L.Ed.2d 169.

(Note:  1.  PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE
DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS,
ARE OMITTED.  OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS:  *****.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S. REP. 94-295                                                    Page 45
S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975
U.S.C.C.A.N. 774, 1975 WL 12400 (Leg.Hist.)
(Cite as: S. REP. 94-295,  1975 U.S.C.C.A.N. 774)


        2.  TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD SEARCH
USING THE PUBLIC LAW NUMBER, e.g., TO(99-495))

 S. REP. 94-295, S. Rep. No. 295, 94TH Cong., 1ST Sess. 1975, 1975 U.S.C.C.A.N.
774, 1975 WL 12400 (Leg.Hist.)

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit B
Page 45 of 45

# Multilingual Ballot Requirements Need Clarification
### Supervisor Chris Norby, County of Orange, California

The multilingual ballot sections of the Voting Rights Act perpetuate negative stereotypes, are outdated, vague and violate the spirit of assimilation that holds our country together.

Naturalized voters pass a citizenship test in English. Immigrants study for months to and take special classes to prepare for this test. Should the law presume they are incapable of voting in English?

According to the current interpretation of the VRA, my County of Orange must provide translations in Spanish, Vietnamese, Chinese and Korean.

Multilingualism perpetuates the false stereotype that immigrants are not learning English, either by lack of desire or ability. Today's naturalized citizens have higher education and income levels than in past generations.

Complex ballot propositions are difficult enough to explain in English, let alone other languages. Chinese uses over 20,000 characters, with a simplified system (on the mainland) and a traditional system (in Taiwan and Hong Kong) that is distinctly different. Not surprisingly, most Chinese-American voters in Orange County are well-educated professionals who overwhelmingly in English.

The original Voting Rights Act of 1965 empowered African-Americans to vote, which they had long been denied in the Jim Crow-era South. The law ended blatant race-based political discrimination. It had nothing to do with multilingual voting. It was only in renewals of the Voting Rights Act that multilingual ballot requirements crept in, and those rules have become onerous.

The method for determining which voters are non-English speaking is highly suspect. Census forms ask us whether we speak English "Very Well, Well, Not Well or Not at All." Only those checking "Very Well" are judged capable of voting in English. Speaking English "Well" should be good enough. It was obviously good enough to pass the citizenship test. In addition, all immigrants who have not finished the fifth grade are presumed illiterate. When more than 5 percent or 10,000 people of the voting-age population in a county meet both these criteria, the non-English-ballot requirements take effect.

If these standards are left unchanged, after the 2010 census my county could be required to print ballots in Tagalog, Hindi, Punjabi, Urdu, and Farsi, depending on future immigration patterns.

Such confusing rules allow DOJ agents to push us far beyond what the law actually requires. Last year, we were required send 118,856 "outreach" letters offering voters foreign-language ballots. We got hundreds of angry responses back from voters who were insulted at the suggestion they couldn't speak English. *(Attachment 1)*

All of our voter pamphlets will soon be required to contain all five languages, even those sent to native English speakers. This would cost us over $20 million per election, incite anti-immigrant feelings and give the voter pamphlet the bulk of a phone book.

DOJ agents have given our Registrar a list of Spanish, Vietnamese, Korean and Chinese surnames. Based on surnames alone, we are to assume that 25% of voters with these names are limited English-speaking. *(Attachment 2)*

**LIS - 6**



Exhibit C
Page 1 of 24

Most of our voters with Spanish, Vietnamese, Korean and Chinese surnames were born in this country, while others took these names upon marriage. The rest all took the citizenship test in English. It is insulting to stereotype people's language ability based on their names!

The multilingual requirements are now creeping into court decisions. A recent recall election in Santa Ana was placed in doubt by the Ninth Circuit Court because the petitions were written only in English. Similar petitions are being challenged all over the state, limiting citizens' right to petition for recall and state and local initiative elections. Yet, the Voting Rights Act has no mandate whatsoever for multilingual petitions.

I urge a total reexamination of the need for multilingual ballots. If they are kept, five simple clarifications that would greatly improve the Voting Rights Act and these have submitted these in writing for your consideration: *(Attachment 3)*

1) Accept the naturalized voters' self-description of their own English ability. Speaking English "well" or "very well" should both be considered adequate.

2) Non-English voting material should only be provided to those who request them.

3) Delete the numerical threshold of 10,000 and raise the 5% threshold to 10%.

4) English fluency assumptions must never be based on a voter's surname.

5) Any multilingual ballot provisions do not apply to petitions.

Let the values of the Voting Rights Act reflect that of civic assimilation, not static schisms. Let voting be a tool for unity, not division.

(800) 566-1917

LEGISLATIVE INTENT SERVICE

Exhibit C
Page 2 of 24



Exhibit C
Page 3 of 24



Exhibit C
Page 4 of 24

# Permanent Absentee Voter (Vote-by-Mail) Application
## Solicitud de Votante Ausente Permanente (Votación por correo)

Please mail this by **October 4th** to become a Permanent Absentee Voter for the November 2004 General Election.
Envíe esta solicitud por correo para el **4 de octubre**, o antes, para ser Votante Ausente Permanente en las Elecciones Generales de noviembre de 2004.

**Please Print [Escriba en letra de molde]**

| First Name (Nombre) | Middle Name (Segundo nombre) | Last Name (Apellido) | Telephone Number (Número de teléfono) |
|---|---|---|---|
| | | | |

| Residence Address (Dirección/donde vive) | Mailing Address (Dirección postal) |
|---|---|
| | |

| City (Ciudad), State (Estado), Zip (Código postal) | City (Ciudad), State (Estado), Zip (Código postal) |
|---|---|
| | |

This application will not be accepted without the proper signature of the applicant. I hereby apply for Permanent Absentee Voter status. Esta solicitud no se aceptará sin la firma debida del solicitante. Por la presente solicito condición de Votante Ausente Permanente.

| Signature (Firma) | Date (Fecha) |
|---|---|
| | |

(800) 665-1917

---

# Permanent Absentee Voter (Vote-by-Mail) Application
## Solicitud de Votante Ausente Permanente (Votación por correo)

Please mail this by **October 4th** to become a Permanent Absentee Voter for the November 2004 General Election.
Envíe esta solicitud por correo para el **4 de octubre**, o antes, para ser Votante Ausente Permanente en las Elecciones Generales de noviembre de 2004.

**Please Print [Escriba en letra de molde]**

| First Name (Nombre) | Middle Name (Segundo nombre) | Last Name (Apellido) | Telephone Number (Número de teléfono) |
|---|---|---|---|
| | | | |

| Residence Address (Dirección/donde vive) | Mailing Address (Dirección postal) |
|---|---|
| | |

| City (Ciudad), State (Estado), Zip (Código postal) | City (Ciudad), State (Estado), Zip (Código postal) |
|---|---|
| | |

This application will not be accepted without the proper signature of the applicant. I hereby apply for Permanent Absentee Voter status. Esta solicitud no se aceptará sin la firma debida del solicitante. Por la presente solicito condición de Votante Ausente Permanente.

| Signature (Firma) | Date (Fecha) |
|---|---|
| | |

LEGISLATIVE INTENT SERVICE

**Exhibit C**
**Page 5 of 24**



Exhibit C
Page 6 of 24

ATTACHMENT E

(🜨) County of Orange     MEMO

To:        Chairman Bill Campbell, 3rd District
           Vice-Chairman Chris Norby, 4th District
           Supervisor Lou Correa, 1st District
           Supervisor James Silva, 2nd District
           Supervisor Tom Wilson, 5th District

From:      Neal Kelley, Acting Registrar of Voters

CC:        Tom Mauk, CEO
           Bill Mahoney, Deputy CEO
           Rob Richardson, Assistant to the CEO
           Benjamin de Mayo, County Counsel

Re:        Department of Justice Developments and Surname Lists

As per a request from Vice Chairman Chris Norby I have attached the surname lists we have been using to conduct an analysis of registered voters in the county. The need to conduct this analysis arose out of recent meetings with the Department of Justice. They have expressed a desire to see additional efforts from Orange County at providing language assistance to voters. These discussions are preliminary and they have not provided official direction as of this time.

When meeting with Department of Justice officials they have indicated a possible move towards the use of surnames when identifying voters likely to need assistance with voting (although as stated previously, there has been no official direction at this time). The assumption, according to these Department of Justice enforcement attorneys, is that 25% of registered voters within an identified surname list are "less than English-proficient". Therefore, what they have developed as criteria for providing additional poll workers uses the following information (as outlined in consent decrees with other jurisdictions):

| Surname[1] | Number of Registered Voters in a Precinct[2] | Bilingual Poll Worker |
|---|---|---|
| Spanish surnames | 100-249 | 1 |
|  | 250-499 | 2 |
|  | 500 or more | 3 |
| Asian surnames | 35-79 | 1 |
|  | 80-159 | 2 |
|  | 160 or more | 3 |

---

[1] The Spanish surnames are from the U.S. Census Bureau; the Asian surnames are from the Population Research and Policy Review
[2] With identified surname

(800) 566-1917

LEGISLATIVE INTENT SERVICE

Exhibit C
Page 7 of 24

The reason they give for the higher threshold in Spanish surnames is due to the large number of registered voters with Spanish surnames that are more likely to not speak English as a second language.

Department of Justice officials will be back in contact with me next month after we have had a chance to compare their analysis to our own assessment. These are still the early phases of discussions, however, I feel it is important that we conduct our own examination to provide you with as much information as possible. We should have our own analysis complete in the near future (which will show a comparison of surname requirements versus our current method of outreach).

Respectfully submitted,

LEGISLATIVE INTENT SERVICE   (800) 666-1917

Exhibit C
Page 8 of 24

korean-namelist.txt

```
lastname
park
kia
choi
cho
chung
kang
yi
han
pak
hong
song
shin
oh
yoon
hwang
yoo
choe
kwon
ahn
chai
yun
suh
son
an
cha
min
nam
bae
im
chon
rhee
won
yim
kwak
shim
hes
sin
paik
seo
bang
jang
hyun
kuh
chun
sun
no
sin
sohn
p
```



LEGISLATIVE INTENT SERVICE   (800) 666-1917

Exhibit C
Page 9 of 24

chinese-namelist.txt

lastname
wong
chen
chan
wang
chang
liu
wu
lin
huang
li
ng
yu
cheng
yen
yang
chu
chin
he
tan
hsu
lau
feng
tsang
deng
cheung
tang
lo
sun
wu
zhang
chiu
lai
tso
lo
tsai
liang
woo
chou
hu
chiang
yuen
chao
lam
tong
shen
kuo
lewis
soy
eng
kiang



LEGISLATIVE INTENT SERVICE   (800) 666-1917

Exhibit C
Page 10 of 24

spanish-namelist.txt

| lastname | rank |
|---|---|
| Abeyta | 476 |
| Abrego | 534 |
| Abreu | 416 |
| Acevedo | 112 |
| Acosta | 60 |
| Acuna | 370 |
| Adame | 326 |
| Adorno | 549 |
| Agosto | 597 |
| Agosto | 489 |
| Aguilar | 45 |
| Aguilera | 243 |
| Aguirre | 104 |
| Alanis | 598 |
| Alaniz | 267 |
| Alarcon | 364 |
| Alba | 404 |
| Alcala | 424 |
| Alcantar | 567 |
| Alcaraz | 599 |
| Alejandro | 550 |
| Aleman | 347 |
| Alfaro | 207 |
| Alicea | 303 |
| Almanza | 387 |
| Almaraz | 553 |
| Almeida | 614 |
| Alonso | 238 |
| Alonzo | 264 |
| Altamirano | 466 |
| Alva | 568 |
| Alvarado | 56 |
| Alvarez | 27 |
| Amador | 241 |
| Amaya | 265 |
| Anaya | 195 |
| Angeliano | 472 |
| Angulo | 438 |
| Aparicio | 535 |
| Apodaca | 273 |
| Aponte | 236 |
| Aragon | 230 |
| Arana | 581 |
| Aranda | 285 |
| Arce | 288 |
| Archuleta | 289 |
| Arellano | 190 |
| Arenas | 525 |
| Arevalo | 321 |
| Arguello | 569 |
| Arias | 166 |
| Armas | 615 |
| Armendariz | 447 |
| Armenta | 417 |
| Armijo | 337 |
| Arredondo | 212 |
| Arreola | 365 |
| Arriaga | 397 |
| Arroyo | 132 |
| Arteaga | 332 |
| Atencio | 496 |
| Avalos | 250 |

Page 1

LEGISLATIVE INTENT SERVICE   (800) 666-1917

Exhibit C
Page 11 of 24

spanish-namelist.txt

```
Avila      86
Aviles     245
Ayala      65
Baca       157
Badillo    515
Baez       193
Baeza      456
Babega     616
Balderas        359
Ballesteros     552
Banda      339
Banuelos        376
Barajas    229
Barela     405
Barragan        526
Barraza    381
Barrera    111
Barreto    437
Barrientos      432
Barrios    200
Batista    418
Becerra    226
Beltran    158
Benavides       260
Benavidez       310
Benitez    172
Bermudez        227
Bernal     158
Berrios    299
Betancourt      290
Blanco     163
Bonilla    153
Borrego    358
Botello    516
Bravo      194
Briones    457
Brisexo    433
Brito      333
Bueno      316
Burgos     209
Bustamante      274
Bustos     399
Caballero       268
Caban      439
Cabrera    205
Cadena     440
Caldera    582
Calderon        107
Calvillo        617
Camacho    96
Camarillo       425
Campos     84
Canales    260
Candelaria      366
Cano       167
Cantu      102
Caraballo       317
Carbajal        367
Cardenas        106
Cardosa    214
Carmona    252
Carranza        269
Carrasco        210
```

Page 2

LEGISLATIVE INTENT SERVICE   (800) 866-1917

Exhibit C
Page 12 of 24

spanish-namelist.txt

```
Carrasquillo    570
Carreon 583
Carrera 517
Carrero 618
Carrillo        77
Carrion 540
Carvajal        478
Casanova        419
Casares 600
Casarez 458
Casas    341
Casillas        271
Castaneda       125
Castellanos     261
Castillo        25
Castro  37
Cavazos 228
Cazares 406
Caballos        498
Cedillo 571
Ceja    410
Centeno 459
Cepeda  467
Cerda   296
Cervantes       59
Cervantez       479
Chacon  213
Chapa   247
Chavarria       306
Chavez  22
Cintron 348
Cisneros        235
Collado 536
Collazo 318
Colon   53
Cotunga 494
Concepcion      426
Contreras       71
Cordero 180
Cordova 142
Cornejo 441
Corona  186
Coronado        221
Corral  353
Corrales        601
Correa  158
Cortes  175
Cortez  64
Cotto   468
Covarrubias     528
Crespo  276
Cruz    17
Cuellar 246
Curiel  572
Davila  129
Deanda  584
Dejesus 131
Dejesus         151
Delafuente      585
Delagarza       371
Delao   602
Delapaz 537
Delarosa        164
```

Page 3

LEGISLATIVE INTENT SERVICE   (800) 666-1917

Exhibit C
Page 13 of 24



spanish-namelist.txt

| | |
|---|---|
| Delatorre | 237 |
| DeJeon | 81 |
| Delgadillo | 422 |
| Delgado | 46 |
| Delrio | 399 |
| DelValle | 334 |
| Diaz | 14 |
| Dominguez | 83 |
| Dominguez | 448 |
| Duarte | 201 |
| Duenas | 499 |
| Duran | 76 |
| Echevarria | 394 |
| Elizondo | 379 |
| Enriquez | 173 |
| Escalante | 349 |
| Escamilla | 275 |
| Escobar | 139 |
| Escobedo | 244 |
| Esparza | 169 |
| Espinal | 500 |
| Espino | 489 |
| Espinosa | 143 |
| Espinoza | 68 |
| Esquibel | 480 |
| Esquivel | 231 |
| Estevez | 619 |
| Estrada | 52 |
| Fajardo | 312 |
| Farias | 428 |
| Feliciano | 205 |
| Fernandez | 29 |
| Ferrer | 360 |
| Fierro | 395 |
| Figueroa | 59 |
| Flores | 13 |
| Florez | 429 |
| Fonseca | 335 |
| Franco | 126 |
| Frias | 461 |
| Fuentes | 97 |
| Gaitan | 573 |
| Galarza | 449 |
| Galindo | 329 |
| Gallardo | 232 |
| Gallegos | 73 |
| Galvan | 325 |
| Galvez | 307 |
| Gamboa | 354 |
| Gamez | 302 |
| Gaona | 501 |
| Garay | 538 |
| Garcia | 1 |
| Garibay | 527 |
| Garica | 620 |
| Garrido | 430 |
| Garza | 26 |
| Gastelum | 506 |
| Gaytan | 462 |
| Gil | 262 |
| Giron | 411 |
| Godinez | 388 |
| Godoy | 621 |

LEGISLATIVE INTENT SERVICE   (800) 666-1917

Page 4

Exhibit C
Page 14 of 24

spanish-namelist.txt

```
Gomez    15
Gonzales      12
Gonzalez       6
Gracia   389
Granado  519
Granados       350
Griego   435
Grijalva       470
Guajardo       308
Guardado       587
Guerra   55
Guerrero       54
Guevara  211
Guillen  311
Gurule   539
Gutierrez      24
Guzman   43
Haro     471
Henriquez      480
Heredia  336
Hermandez      528
Hernandez      520
Hernandez       5
Herrera  33
Hidalgo  282
Hinojosa       229
Holguin  372
Huerta   128
Hurtado  253
Ibarra   114
Iglesias       489
Irizarry       235
Jaime    442
Jaimes   588
Jaquez   593
Jaramillo      171
Jasso    472
Jimenez  35
Jimenez  490
Juarez   78
Jurado   603
Laboy    540
Lara     94
Laureano       604
Leal     176
Lebron   480
Ledesma  300
Leiva    622
Lemus    297
Leon      51
Lerma    372
Leyva    258
Limon    313
Linares  368
Lira     401
Llamas   554
Loera    412
Lomeli   555
Longoria       192
Lopez     4
Lovato   502
Loya     420
Lozada   541
```

page 5

(800) 869-4917   LEGISLATIVE INTENT SERVICE

Exhibit C
Page 15 of 24

spanish-namelist.txt



| | |
|---|---|
| Lozano | 122 |
| Lucero | 124 |
| Lucio | 483 |
| Luevano | 491 |
| Lugo | 137 |
| Lujan | 215 |
| Luna | 66 |
| Macias | 115 |
| Madera | 542 |
| Madrid | 185 |
| Madrigal | 270 |
| Maestas | 384 |
| Magana | 248 |
| Malava | 571 |
| Maldonado | 51 |
| Manzanares | 623 |
| Mares | 402 |
| Maria | 177 |
| Marquez | 61 |
| Marrero | 178 |
| Marroquin | 312 |
| Martinez | 2 |
| Mascarenas | 589 |
| Mata | 138 |
| Mateo | 503 |
| Matias | 529 |
| Matos | 202 |
| Maya | 558 |
| Mayorga | 605 |
| Medina | 30 |
| Medrano | 191 |
| Mejia | 93 |
| Melendez | 109 |
| Melgar | 624 |
| Mena | 323 |
| Menchaca | 482 |
| Mendez | 39 |
| Mendoza | 32 |
| Menendez | 337 |
| Meraz | 543 |
| Mercado | 103 |
| Merino | 557 |
| Mesa | 542 |
| Meza | 156 |
| Miramontes | 606 |
| Miranda | 79 |
| Miralem | 298 |
| Mojica | 343 |
| Molina | 67 |
| Mondragon | 450 |
| Monroy | 544 |
| Montalvo | 254 |
| Montanez | 286 |
| Montano | 203 |
| Montemayor | 564 |
| Montenegro | 505 |
| Montero | 351 |
| Montes | 154 |
| Montez | 451 |
| Montoya | 70 |
| Mora | 119 |
| Morales | 18 |
| Moreno | 32 |

page 6

LEGISLATIVE INTENT SERVICE   (800) 666-1917

Exhibit C
Page 16 of 24



spanish-namelist.txt

```
Mota      483
Moya      179
Manguria  506
Muniz     160
Munoz     40
Murillo   183
Muro      625
Mujara    319
Naranjo   473
Narvaez   474
Nava      190
Navarreta           389
Navarro   75
Nazario   545
Negrete   324
Negron    236
Nevarez   369
Nieto     251
Nieves    130
Nino      626
Noriega   344
Nunez     58
Ocampo    355
Ocasyo    361
Ochoa     91
Ojeda     255
Olivares            272
Olivarez            305
Olivas    291
Olivera   558
olive     475
Olmos     507
Olvera    276
Oltiveros           361
Oquendo   538
Ordonez   421
Orellana            443
Ornelas   283
Orosco    452
Orozco    147
Orta      436
Ortega    50
Ortiz     16
Osorio    338
Otaro     174
Ozuna     559
Pabon     590
Pacheco   92
Padilla   57
Padron    508
Paez      607
Pagan     148
Palacios            181
Palomino            627
Palomo    591
Pastora   356
Paredos   352
Parra     217
Partida   453
Patino    345
Paz       327
Pedraza   592
Pedroza   422
```

Page 7

spanish-namelist.txt

```
Pelayo    146
Pena       42
Perales   384
Peralta   263
Perea     390
Peres     560
Perez      7
Pichardo          608
Pina      196
Pineda    163
Pizarro   628
Polanco   320
Ponce     150
Porras    547
Portillo          253
Posada    593
Prado     294
Preciado          531
Prieto    313
Puente    351
Puga      609
Pulido    444
Quesada   484
Quezada   292
Quinones          146
Quinonez          433
Quintana          140
Quintanilla       222
Quintero          162
Quiroz    218
Rael      463
Ramirez    10
Ramon     407
Ramos      20
Rangel    333
Rascon    628
Raya      561
Razo      492
Regalado          403
Rendon    287
Renteria          256
Resendez          485
Reyes      79
Reyna     349
Reynoso   325
Rico      295
Riojas    522
Riojas    574
Rios       46
Rivas      88
Rivera     9
Rivero    373
Robledo   509
Robles     82
Rocha     321
Rodarte   493
Rodriguez         629
Rodriguez          3
rodriquez         38
Rojas      74
Rojo      510
Roldan    391
Rolon     611
```

Page 8

LEGISLATIVE INTENT SERVICE    (800) 666-1917

Exhibit C
Page 18 of 24

spanish-namelist.txt



| | |
|---|---|
| Romero | 21 |
| Romo | 222 |
| Roque | 486 |
| Rosado | 144 |
| Rosales | 333 |
| Rosario | 126 |
| Rosas | 152 |
| Roybal | 498 |
| Rubio | 128 |
| Ruelas | 630 |
| Ruiz | 21 |
| Ruvalcaba | 575 |
| Saavedra | 314 |
| Saenz | 199 |
| Saiz | 487 |
| Salas | 180 |
| Salazar | 44 |
| Salcedo | 532 |
| Salcido | 309 |
| Saldana | 239 |
| Saldivar | 445 |
| Salgado | 384 |
| Salinas | 80 |
| Samaniego | 511 |
| Samaria | 454 |
| Sanches | 431 |
| Sanchez | 8 |
| Sandoval | 55 |
| Santacruz | 631 |
| Santana | 117 |
| Santiago | 41 |
| Santillan | 562 |
| Sarabia | 632 |
| Sauceda | 512 |
| Saucedo | 239 |
| Sedillo | 594 |
| Segovia | 523 |
| Segura | 241 |
| Sepulveda | 288 |
| Serna | 249 |
| Serrano | 89 |
| Serrato | 612 |
| Sevilla | 613 |
| Sierra | 187 |
| Sisneros | 563 |
| Solano | 515 |
| Solis | 90 |
| Soliz | 345 |
| Solorio | 446 |
| Sollerzano | 564 |
| Soria | 437 |
| Sosa | 118 |
| Sotelo | 328 |
| Soto | 34 |
| Suarez | 103 |
| Tafoya | 455 |
| Tamayo | 414 |
| Tanez | 595 |
| Tapia | 141 |
| Tejada | 513 |
| Tejeda | 464 |
| Tellez | 352 |
| Tello | 565 |

LEGISLATIVE INTENT SERVICE   (800) 666-1917

Exhibit C
Page 19 of 24

spanish-namelist.txt

| | |
|---|---|
| Teran      613 | |
| Terrazas | 533 |
| Tijerina | 362 |
| Tirado    329 | |
| Toledo    363 | |
| Toro      346 | |
| Torres     11 | |
| Torrez    242 | |
| Tovar     204 | |
| Trejo     206 | |
| Trevino    72 | |
| Trujillo | 69 |
| Ulibarri | 566 |
| Ulloa     494 | |
| Urbina    374 | |
| Ureno     634 | |
| Uribes  - 576 | |
| Uribe     284 | |
| Urrutia   635 | |
| Vaca      634 | |
| Valadez   336 | |
| Valdes    240 | |
| Valdez     47 | |
| Valdivia | 524 |
| Valencia | 122 |
| Valentin | 257 |
| Valenzuela | 110 |
| Valladares | 577 |
| Valle     235 | |
| Vallejo   386 | |
| Valles    396 | |
| Valverde | 548 |
| Vanegas   687 | |
| Varela    223 | |
| Vargas     36 | |
| Vasquez    23 | |
| Vazquez    62 | |
| Vega       49 | |
| Vela      182 | |
| Velasco   299 | |
| Velasquez | 96 |
| Velazquez | 130 |
| Velez      83 | |
| Veliz     578 | |
| Venegas   375 | |
| Vera      167 | |
| Verdugo   529 | |
| Verduzco | 638 |
| Vergara   495 | |
| Viera     415 | |
| Vigil     136 | |
| Villa     134 | |
| Villagomez | 463 |
| Villalobos | 225 |
| Villanueva | 596 |
| Villarreal | 145 |
| Villareal | 423 |
| Villarreal | 67 |
| Villasenor | 382 |
| Villegas | 155 |
| Yanez     266 | |
| Ybarra    119 | |
| Zambrano | 483 |

Page 10

LEGISLATIVE INTENT SERVICE   (800) 666-1917

Exhibit C
Page 20 of 24

spanish-namelist.txt

```
Zamora    306
Zamudio   639
Zapata    224
Zaragoza       376
Zarate    311
Zavala    170
Zayas     516
Zelaya    540
Zepeda    234
zuniga    355
rodriguez      999
ramirez 999
gonzales       599
gonsales       999
de la torre    999
```



LEGISLATIVE INTENT SERVICE   (800) 666-1917

Exhibit C
Page 21 of 24

viet-namelist.txt

lastname
Nguyen
Tran
Le
Pham
Huynh
Vu
Phan
Truong
Hoang
Ngo
Dang
Do
Bui
Vo
Ly
Duong
Luong
Dinh
Trinh
Lam
Doan
Dao
Thai
Mai
Van
Cao
Vuong
Phung
Quach
Ta
Diep
Ton
La
Thach
Tri
Thanh
Dam
Vong
Trieu
Hua
Ma
Vinh
Quang
Tieu
Ha
Trang
Giang
Luc
Banh
Nghiem



LEGISLATIVE INTENT SERVICE   (800) 666-1917

Exhibit C
Page 22 of 24

ATTACHMENT III

42 USCS § 1973aa-1a

§ 1973aa-1a.  Bilingual election requirements

(a) Congressional findings and declaration of policy. The Congress finds that, through the use of various practices and procedures, citizens of language minorities have been effectively excluded from participation in the electoral process. Among other factors, the denial of the right to vote of such minority group citizens is ordinarily directly related to the unequal educational opportunities afforded them, resulting in high illiteracy and low voting participation. The Congress declares that, in order to enforce the guarantees of the fourteenth and fifteenth amendments to the United States Constitution [USCS Constitution, Amendments 14, 15], it is necessary to eliminate such discrimination by prohibiting these practices, and by prescribing other remedial devices.

(b) Bilingual voting materials requirement.
   (1) Generally. Before August 6, 2007, no covered State or political subdivision shall provide voting materials only in the English language.
   (2) Covered States and political subdivisions.
      (A) Generally. A State or political subdivision is a covered State or political subdivision for the purposes of this subsection if the Director of the Census determines, based on census data, that—
      (i) (I) more than 5 10 percent of the citizens of voting age of such State or political subdivision are members of a single language minority and are limited-English proficient;
      ────────(II) more than 10,000 of the citizens of voting age of such political subdivision are members of a single language minority and are limited-English proficient; or
      (III) in the case of a political subdivision that contains all or any part of an Indian reservation, more than 5 10 percent of the American Indian or Alaska Native citizens of voting age within the Indian reservation are members of a single language minority and are limited-English proficient; and
      (II) the illiteracy rate of the citizens in the language minority as a group is higher than the national illiteracy rate.
      (B) Exception. The prohibitions of this subsection do not apply in any political subdivision that has less than 5 10 percent voting age limited-English proficient citizens of each language minority which comprises over 5 10 percent of the statewide limited-English proficient population of voting age citizens, unless the political subdivision is a covered political subdivision independently from its State.
   (3) Definitions. As used in this section—
      (A) the term "voting materials" means registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots;
      (B) the term "limited-English proficient" means unable to speak or understand

LEGISLATIVE INTENT SERVICE    (800) 666-1917

**Exhibit C**
**Page 23 of 24**

English adequately enough to participate in the electoral process <u>as derived from respondents to the most recent United States Census reporting that they speak English "Not well" or "Not at all";</u>

(C) the term "Indian reservation" means any area that is an American Indian or Alaska Native area, as defined by the Census Bureau for the purposes of the 1990 decennial census;

(D) the term "citizens" means citizens of the United States; and

(E) the term "illiteracy" means the failure to complete the 5th primary grade.

(4) Special rule. The determinations of the Director of the Census under this subsection shall be effective upon publication in the Federal Register and shall not be subject to review in any court.

(c) Requirement of voting notices, forms, instructions, assistance, or other materials and ballots in minority language. Whenever any State or political subdivision subject to the prohibition of subsection (b) of this section provides any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, <u>but not including initiative, referendum or recall petitions</u>, it shall provide them in the language of the applicable minority group as well as in the English language; <u>except provided, that such materials and information shall not be required to be provided based on surname alone</u> and shall be provided only on request by limited English proficient voters.   That wi<u>W</u>here the language of the applicable minority group is oral or unwritten or in the case of Alaskan natives and American Indians, if the predominant language is historically unwritten, the State or political subdivision is only required to furnish oral instructions, assistance, or other information relating to registration and voting.

(d) Action for declaratory judgment permitting English-only materials. Any State or political subdivision subject to the prohibition of subsection (b) of this section, which seeks to provide English-only registration or voting materials or information, including ballots, may file an action against the United States in the United States District Court for a declaratory judgment permitting such provision. The court shall grant the requested relief if it determines that the illiteracy rate of the applicable language minority group within the State or political subdivision is equal to or less than the national illiteracy rate.

(e) Definitions. For purposes of this section, the term "language minorities" or "language minority group" means persons who are American Indian, Asian American, Alaskan Natives, or of Spanish heritage.

42 USCS § 1973aa-1a

LEGISLATIVE INTENT SERVICE   (800) 666-1917

Exhibit C
Page 24 of 24

RANCHO SAN JUAN REFERENDUM #1

| SEGMENT: | 1 | SECTION NO: | | 1b | 2s. |
| 3iSS·SEC | 2 | PAGE: 1 | | | 1 3 |
| | | TO: 1 | | | 1 3 |

000518

# REFERENDUM AGAINST A RESOLUTION PASSED BY THE BOARD OF SUPERVISORS

We, the undersigned, eligible, registered voters of Monterey County, hereby protest
the Board of Supervisors' adoption of Resolution No. 05-305, entitled

Resolution No. 05-305 Resolution of the Monterey County Board of Supervisors to Amend the Monterey County
General Plan Goal No. 30 and Policy Nos. 28.1.1; 30.8.3; and 39.2.1; and the Greater Salinas Area Plan Land Use
Plan (Figure 23); Policy Nos. 26.1.4.1; 39.1.4.1; 48.1.1.1; Part II, Chapter V Defining Commercial Land Use
Designations in the Area Plan; and Amend certain Guidelines in the Rancho San Juan Area of Development
Concentration (ADC) Development Guidelines and Principles Adopted pursuant to Policy 26.1.4.1.
We request that the entire text of Resolution No. 05-305, as reproduced herein, be repealed by
the Board of Supervisors or submitted to a vote of the people as prescribed by law.

| MONTEREY COUNTY REGISTERED VOTERS ONLY | NOTICE TO THE PUBLIC: THIS PETITION MAY BE CIRCULATED BY A PAID SIGNATURE GATHERER OR A VOLUNTEER. YOU HAVE THE RIGHT TO ASK. | THIS COLUMN FOR OFFICIAL USE ONLY |
|---|---|---|
| | | |

Declaration of Circulator (to be completed in the circulator's own hand after all signatures on this page and the reverse side of this section of the petition have been obtained): I, _____ Tom ____ Mraz ____ 3/4/1936 _____, circulated this section of the petition and witnessed each

of the appended signatures being written. Each signature on this petition is, to the best of my information and belief, the genuine signature of the person whose name it purports to be. All signatures on this document were obtained between the dates of _1/23/06_ and _2/1/06_

I am a registered voter of the State of California, or am qualified to register to vote in the State of California.
My residence address is _____ 734 N ____ King ____ Ave ____ Salinas, ____ CA ____ 93727 ____

I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct. Executed on _2/2/06_ at
_____ Salinas _____, California.   Signed: _____

FINDINGS & EVIDENCE
GENERAL PLAN/GREATER SALINAS AREA PLAN AMENDMENTS

Before the Board of Supervisors in and for the
County of Monterey, State of California

Resolution No. 05-305                                  )
Resolution of the Monterey County Board of             )
Supervisors to Amend the Monterey County               )
General Plan Goal No. 30 and Policy Nos.               )
25.1.5; 30.0.3; and 39.2.1; and the                    )
Greater Salinas Area Plan Land Use Plan                )
(Figure 13); Policy Nos. 26.1.4.1;                     )
39.1.4.1; 40.1.1.1; Part II, Chapter V                 )
Defining Commercial Land Use Designations              )
in the Area Plan; and Amend certain                    )
Guidelines in the Rancho San Juan Area of              )
Development Concentration (ADC)                         )
Development Guidelines and Principles                   )
Adopted pursuant to Policy 26.1.4.1.                    )

Amendments to the Monterey County General Plan and the Greater Salinas Area Plan
came on for public hearing before the Board of Supervisors on November 7, 2005.
Having considered all the written and documentary evidence, the administrative record,
the staff report, oral testimony, and other evidence presented, the Board of Supervisors
hereby finds and decides as follows:

## I.   RECITALS

1.   Section 65300 et seq. of the California Government Code requires each county to
     adopt a comprehensive, long-term General Plan for the physical development of
     each county.

2.   On September 30, 1982, the Board of Supervisors of the County of Monterey
     ("County") adopted a county-wide General Plan ("General Plan").

3.   On October 14, 1986, the Board of Supervisors adopted the Greater Salinas Area
     Plan ("Area Plan") as an amendment to the General Plan.

4.   The Greater Salinas Area Plan "Land Use Plan" (Figure 13) provides a graphic
     representation of the general distribution, location, extent and intensity of land
     uses and transportation routes in this planning area.

5.   Pursuant to Government Code sections 65350 et seq., the County may amend the
     adopted General Plan provided the County follows certain procedures, including
     that the County Planning Commission hold a noticed public hearing and make a

Page 1 of 14

written recommendation to the Board of Supervisors on the proposed amendment of the General Plan.

6.  Section 65860(a) of the Government Code requires that zoning be consistent with the General Plan.

7.  Consistent with the General Plan and the Area Plan the County prepared the first draft of the Specific Plan for the Rancho San Juan Area of Development Concentration (ADC) on July 21, 2003. An amended draft was prepared and circulated for public review on March 15, 2004. Subsequently, an "errata" sheet with additional changes to the Specific Plan was developed and circulated for review and comments on May 17, 2004.

8.  All policies of the General Plan and the Area Plan have been reviewed by the Planning and Building Inspection Department staff to ensure that the proposed amendments maintain the compatibility and internal consistency of the General Plan and the Area Plan. This level of staff review also ensures that the draft Revised Rancho San Juan Specific Plan is consistent with the General Plan and Area Plan. Appendix C (Revised, as attached to the November 7, 2005 Board of Supervisors Staff Report) of the Revised Specific Plan includes a consistency analysis for the Rancho San Juan Specific Plan as it relates to goals and policies in the Monterey County General Plan and the Greater Salinas Area Plan.

9.  The Final Environmental Impact Report (Final EIR 04-01) ("Final EIR") prepared for the Rancho San Juan Specific Plan and HYH Property Projects included and analyzed the environmental impacts associated with the General Plan and Area Plan amendments.

10. On November 15, November 16, November 29, December 1 and December 2, 2004, the Monterey County Planning Commission held a duly noticed public hearing to consider and make recommendations to the Board of Supervisors regarding certification of the FEIR, the proposed General Plan and Area Plan amendments, the proposed Rancho San Juan Specific Plan, proposed related amendments to the County's zoning and subdivision ordinances, the proposed Combined Development Permit for HYH Property Project (Butterfly Village), and a proposed ordinance approving a development agreement. At least 10 days before the first public hearing date, notices of the hearing before the Planning Commission were published in both the Monterey County Herald and the Salinas Californian, and were also posted on and near the property and mailed to property owners within 300 feet of the subject property.

11. On December 2, 2004, the Planning Commission adopted a resolution recommending that the Board:  (1) Not certify the Final EIR and associated Mitigation Monitoring and/or Reporting Plan;  (2) Not approve the proposed amendments to the Monterey County General Plan and Monterey County Greater Salinas Area Plan;  (3) Not adopt the proposed Rancho San Juan Specific Plan;  (4)

Page 2 of 14

Not approve the proposed amendments to Titles 19 and 21 of the Monterey County Code; (5) Deny the Combined Development Permit; and (6) Not approve the proposed Development Agreement between the HYH Corporation and the County of Monterey.

12. Prior to adopting the General Plan amendments, the Board of Supervisors certified the Rancho San Juan Final EIR.

13. On December 14, 2004, the Monterey County Board of Supervisors approved the Rancho San Juan Specific Plan Project and HYH Property Project and certified an environmental impact report (EIR) for the Projects in accordance with the California Environmental Quality Act, Public Resources Code section 21000 et seq. (CEQA). In its resolution adopting the Specific Plan, the Board of Supervisors recognized the public controversy regarding continuing to have an Area of Development Concentration (ADC) designated in the Rancho San Juan area. The Board directed staff to return to the Board within six months with various recommendations, including consideration of the following: 1) removal of the ADC from the General Plan; 2) amendment or rescission of the adopted Specific Plan, as appropriate; and/or 3) amendment of the adopted Specific Plan boundaries. In an effort to address the Board's direction, the County prepared a Revised Specific Plan, which reduced the scope of the Specific Plan to the boundaries of the HYH property (Butterfly Village, PLN020470). At least 10 days before the first public hearing date, notices of the hearing before the Board were published in both the Monterey County Herald and the Salinas Californian and were also posted on and near the property and mailed to property owners within 300 feet of the subject property.

14. On September 30, 2005, the County released the Revised Specific Plan for Rancho San Juan. The revised Rancho San Juan Specific Plan (GP2050005) establishes new land use designations that are intended to replace the existing land use designations in the Area Plan and establishes zoning classifications consistent with proposed land use designations in the specific plan area. The Revised Specific Plan responds to directives contained in the resolution approved by the County Board of Supervisors on December 14, 2004 adopting the Rancho San Juan Specific Plan (Resolution No. 04-424). The boundaries of the Revised Specific Plan would correspond to the 671-acre HYH Property (Butterfly Village) approved Vesting Tentative Subdivision Map. The land uses would include 1,147 residential units including single- and multi-family, 45,000 square feet of retail commercial, an 18-hole golf course including 71 guest villas/timeshares, 11.8 acres of public parks, 141.2 acres of designated conservation open space, a wastewater treatment plant and police and fire stations.

15. On October 7, 2005, the County released an EIR Addendum for the Revised Specific Plan for Rancho San Juan pursuant to the requirements of Section 15164 of the CEQA Guidelines.

16. On October 19, 2005 the Monterey County Planning Commission held a duly noticed public hearing to consider and make recommendations to the Board of Supervisors regarding certification of the EIR Addendum, the proposed General Plan and Area Plan amendments, the Rancho San Juan Revised Specific Plan and proposed amendments to the County's Zoning Ordinance. At least 10 days before the first public hearing date, notice of the hearing before the Planning Commission was published in the Salinas Californian, and was also posted on and near the property and mailed to property owners within 500 feet of the subject property.

17. On October 19, 2005, the Planning Commission recommended that the Board of Supervisors certify the EIR Addendum, adopt the General Plan Amendments, zone the HYH property with a Specific Plan district, and adopt the Revised Specific Plan while rescinding the Specific Plan approved on December 14, 2001.

18. On November 7, 2005 the Monterey County Board of Supervisors held a duly noticed public hearing to consider certification of the EIR Addendum, the proposed General Plan and Area Plan amendments, the Rancho San Juan Revised Specific Plan and proposed amendments to the County's Zoning Ordinance. At least 10 days before the first public hearing date, notice of the hearing before the Board of Supervisors was published in the Salinas Californian and Monterey Herald and was also posted on and near the property and mailed to property owners within 300 feet of the subject property.

19. On October 28, 2005, the County prepared a Revised General Plan Consistency Analysis (Revised Appendix C of the Revised Specific Plan). The Revised Appendix C contains an analysis of the Specific Plan's compatibility with the 1982 General Plan, the Greater Salinas Area Plan, and the Area of Development Concentration (ADC) by examining its consistency with General Plan goals, objectives, policies, guidelines, general land uses and programs selected for relevancy to the RSJ Revised Specific Plan. A copy of the Revised Appendix C is available at the Planning and Building Inspection Department, 168 W. Alisal St., 2nd Floor, Salinas, CA  93901.

## II.   DECISION

NOW THEREFORE, BE IT RESOLVED that the Board of Supervisors hereby considers the Revised General Plan Consistency Analysis (Revised Appendix C of the Revised Specific Plan), and adopts the following amendments to the Monterey County General Plan and the Greater Salinas Area Plan:

*NOTE: The entire policy for each amendment is included below. Added language is* *underlined* *and language to be deleted is identified with a* *strikethrough.*

A.   Amendments to the Monterey County General Plan

Page 4 of 14

A-1.   Goal 30 (General Plan): Agricultural Viability of Farmland

> "To protect all viable farmlands designated as prime, of statewide importance, unique, or of local importance from conversion to and encroachment of non-agricultural uses, *including the adoption of a Specific Plan for Rancho San Juan which implements an alternative farmland preservation strategy.*"

A-2.   Policy 35.1.1 (General Plan): Economic Agricultural Activities.

> "The County shall establish the preservation, enhancement, and expansion of viable or potentially viable prime farmlands, farmlands of statewide importance, unique farmlands, and farmlands of local importance as the top land use priority for guiding further economic development unless there is a satisfactory showing that such farmlands are not viable or potentially viable. *The preservation, enhancement, and expansion of viable or potentially viable prime farmlands, farmlands of statewide importance, unique farmlands, and farmlands of local importance may be addressed through the adoption of a Specific Plan for Rancho San Juan which implements an alternative farmland preservation strategy.*"

A-3.   Policy 38.4.3 (General Plan): Subdivisions and Impacts on Neighboring Properties

> "The County shall allow division of viable farmland designated as prime, of statewide importance, unique, or of local importance only for exclusive agricultural purposes, when demonstrated not to be detrimental to the agricultural viability of adjoining parcels, *or in accordance with the policies of a Specific Plan for Rancho San Juan which implements an alternative farmland preservation strategy.*"

A-4.   Policy 39.2.1 (General Plan): Road and Highway Transportation

> "All new road and interior circulation systems shall be designed, developed, and maintained according to adopted County standards, *or in accordance with the comprehensive road and circulation standards contained in an adopted Specific Plan for Rancho San Juan.*"

B.   Amendments to the Greater Salinas Area Plan (Area Plan)

B-1.   Land Use Plan Map (Area Plan): Figure 13

Amend the Land Use Plan map (Figure 13) to show only the letters RSJ-SPA (Rancho San Juan – Specific Plan) Area for the Revised Rancho San Juan Specific Plan area. Amend the legend on the map to identify the area as the Revised Rancho San Juan Specific Plan Area

Board of Supervisors Resolution
GP & GSAP Amendments
Revised RSJ Specific Plan

and refer to the Revised Rancho San Juan Specific Plan (Figure 2-1) for land use details.

B-2.   Policy 26.1.4.3 (Area Plan):  Boundaries of ADC

"The general *approximate 671-acre* area *generally* located *north of Russell Road between Harrison Road, San Juan Grade Road, and the boundary between Rancho Bolsa Nueva y Moro Cojo and Rancho Bolsa de Escarpines, and identified on Figure 1-6* shall be designated as an Area of Development Concentration. Area Plan land uses shown within the ADC shall only be developed after a specific plan on the entire ADC has been prepared and adopted. The specific plan shall incorporate all of *be compatible with the Development Guidelines and Principles for the Rancho San Juan ADC adopted as part of the Greater Salinas Area Plan.*"

B-3.   Policy 39.1.4.1 (Area Plan): Land Use and Traffic Impacts

"Implementation of all land uses within the Greater Salinas Area Plan shall occur only if there will be no significant *unmitigated* impact on traffic circulation, *or in accordance with a comprehensive traffic mitigation program contained in an adopted Specific Plan for Rancho San Juan.*

B-4.   Policy 40.1.1.1 (Area Plan) Scenic Highways

"The Highway 101 bypass shall be designated a scenic highway and subject to the same scenic standards held in the North County Area Plan. The design of the Highway 101 bypass shall include a minimum of two interchanges within the ADC area as specified within the ADC Specific Plan *if considered necessary by CalTrans and TAMC. One interchange shall be located north of Russell Road and west of Harrison Road.* The bypass design shall also incorporate sound deflection berms with appropriate landscaping and such measures shall be held consistent with its 'scenic highway' designation."

B-5.   Part II, Chapter V (Area Plan) Commercial

"This category applies to areas which are suitable for the development of retail and service commercial uses, including visitor accommodation and professional office uses. In general, building intensity for commercial areas shall conform to standards which limit building height to a maximum of 35 feet and lot coverage to a maximum of 50 percent, excluding parking and landscaping requirements *or in accordance with the commercial development standards contained in an adopted Specific Plan for Rancho San Juan*

Page 6 of 14

B-6.   Rancho San Juan Area of Development Concentration
         Guidelines and Principles

*NOTE. The Guidelines are included in entirety below.  Each guideline to be amended is identified by italicized font.  Added language is underlined and language to be deleted is identified by a strikethrough.*

### RANCHO SAN JUAN AREA OF DEVELOPMENT CONCENTRATION
### DEVELOPMENT GUIDELINES AND PRINCIPLES*

*NOTE:     This body of Development Guidelines and Principles for guiding the preparation of the Rancho San Juan ADC Specific Plan was adopted in conjunction with Policy 36.1.6.1 (GS).*

## GENERAL DEVELOPMENT GUIDELINES

The Salinas North Area of Development Concentration shall be developed as a planned community with industrial, residential, commercial, public, and open space uses.

The ADC Specific Plan shall include phasing of development, transportation improvements and other traffic mitigation for Highway 101 and adjacent arterial roadways.

The adopted Highway 101 bypass right of way traverses the ADC area and shall be addressed within the ADC specific Plan in conjunction with internal and external traffic circulation improvements.

*The Highway 101 freeway bypass should provide the major access route to the site; major arterials within the site will directly connect to freeway interchanges.*

Any parcel within the ADC which contains any portion of the proposed right-of-way of the Highway 101 bypass shall have conveyed such right-of-way to the County or Caltrans before development approval. *Even if all the right-of-way lots bear conveyed development which has any significant unmitigated impact shall not commence until the Highway bypass construction date has been set.*

*Residential developments of the ADC shall be developed in three phases (shown in Figure 13). These projects closest to industry (Phase I) should be developed within the first 1-3 years of Specific Plan adoption. The upland residential development (Phase II) should be developed 6-10 years after Specific Plan adoption. Phase III slated residential land uses and should be built out 10-20 years after Specific Plan adoption. If housing growth exceeds the County's ability to provide needed jobs, some Phase III residential land uses should be redesignated to industrial to cover the demand for jobs phased in a sequence that provides for a balance between housing and jobs as count as specified in the Specific Plan.*

Page 7 of 14

Board of Supervisors Resolution
GP & GSAP Amendments
Revised RSJ Specific Plan

~~The majority of the flat areas, particularly those closest to Highway 101, within the site should be reserved for light industrial uses.~~

The rolling hill areas of the site should be designated for clustered residential, commercial, office, and public uses.

*The valleys of the rolling hill areas should generally be used for circulation, flood control, recreation, and open space uses.*

The steep north facing slopes within the site should be reserved for open space and conservation uses.

The south and west facing slopes within the site should be used for compactly clustered, terraced residential uses to take maximum advantage of views and sun exposure.

Neighborhood serving commercial and public uses should be integrated into the community to maximize easy access and create community activity centers.

Runoff from the site shall be controlled to alleviate downstream flooding potential.

Wastewater treatment, storage and disposal shall be provided on lands within and adjacent to the site.

Completed Master Plans for sewer and water systems prepared as part of the ADC Specific Plan shall first require approval from the Director of Environmental Health before such Master Plans can be considered a part of the ADC Specific Plan. Such Master Plans shall specify the method of treatment and disposal and include a 120 day storage requirement for all treated wastewater.

*Services in the ADC shall be provided through the use of a Community Facilities District (CFD) or other appropriate funding mechanism to finance and carry out the construction of police, fire, flood and storm protection, parks and any other facilities which may be found by the Board of Supervisors to be appropriate under Chapter 2.5 of the California Government Code. A Community Services District (CSD)* ~~or County Service Area (CSA)~~ *shall be used to provide for the operations and maintenance for those facilities not already provided for under a CFD and/or for those services not already provided for under existing County Special Districts. These services may include sewer, water, roads and transportation, street lighting utility undergrounding, and any other facilities which may be found by the Board of Supervisors to be appropriate under Section 61000 et. Seq. of the California Government Code.* ~~The CFD and CSD — CSA shall be considered "dependent" Districts with the Board of Supervisors acting as the District's Board of Directors.~~

*INDUSTRIAL DEVELOPMENT PRINCIPLES*

~~high clean industrial uses that offer long term employment opportunities to the region shall be encouraged to locate within the site.~~

Page 8 of 14

Board of Supervisors Resolution
GP & CSAP Amendments
Revision RSJ Specific Plan

~~Industrial uses that need large quantities of water for production could cause groundwater contamination or significant point-source air pollution emissions shall not be permitted within the ADC area.~~

~~Industrial development will be planned in clusters to maximize external landscaped open space and make efficient use of parking facilities, pedestrian-road-automobile circulation systems, and internal courtyards and common spaces.~~

~~Industrial development will be attractively designed and landscaped in a park-like manner in conformance with design criteria associated with "planned industrial parks". Industrial buildings and parking facilities should be set-back with 100 foot open space buffers from adjacent incompatible land uses to minimize potential conflicts.~~

~~A maximum overall ground coverage of generally 35% is allowed for buildings within designated industrial areas.~~

~~A visitor serving accommodation such as a hotel should be encouraged as part of the ADC. The nature and extent of such a facility should be determined only after the proper marketing and feasibility studies have been prepared and evaluated.~~

## RESIDENTIAL DEVELOPMENT PRINCIPLES

*The average gross density of the planned residential area* ~~(including the mixed use areas)~~ *will be* ~~at least 5.1 units per acre~~ *4.8 units per acre.*

*High-density residential development should be clustered at a net density of* ~~at least~~ *15 units per acre to maximize external landscaped open space areas and internal courtyards and common spaces and leave valley floors open for drainage, circulation, and recreation.*

A mixture of housing types at various densities will be provided on the site according to site conditions and clustering opportunities.

~~The highest net densities of residential development should be located on south and west-facing slopes and adjacent to open space recreation areas.~~

Residential development shall be attractively designed and landscaped in conformance with design criteria associated with "planned residential areas."

The design of housing should incorporate private, semi-private, and public outdoor areas.

Clustered housing areas should be planned to encourage a sense of neighborhood community through provision of common open space, recreation, and public facility areas.

Board of Supervisors Resolution
GP & OSAP Amendments
Revised ESI Specific Plan

*Fifteen A minimum of fifteen percent of the total housing units developed shall be affordable to low and moderate income households and provided within the site and integrated into the overall development as the project is built out. Deed restrictions will be used to ensure that affordable units are retained.*

## COMMERCIAL DEVELOPMENT PRINCIPLES

Neighborhood serving commercial uses should be integrated into the planned residential area.

Commercial uses should be located to be highly accessible by automobile, bicycle, and walking.

A mixture of neighborhood serving commercial uses will be located along with facilities such as street furniture which maximize opportunities for social interaction and enjoyment of the natural beauty of the site.

~~Commercial uses that serve employees of industrial areas should be located within or adjacent to planned industrial parks.~~

Mixed use development of ground floor commercial and upper floor residential should be provided in selected areas of the site.

Commercial and public uses should be integrated into a community center for the site.

Commercial area will be developed in conformance to design criteria associated with planned commercial and residential areas.

## PUBLIC FACILITIES DEVELOPMENT PRINCIPLES

~~Public uses including a fire station, library, schools, community centers and, if needed, a police station should be provided within the site.~~

~~Schools should be located to provide convenient access to the community.~~

~~School Districts will be consulted when enrollment projections are made and Planning Department Staff will consult with School Districts in locating new schools.~~

~~Fire and police stations should be located in areas adjacent to major arterials and freeway interchanges.~~

~~Other public community facilities should be located in the community center with neighborhood serving commercial uses.~~

Public facilities should be developed in phases as part of a master facilities plan as the

Board of Supervisors Resolution
GP & CSAP Amendments
Revised RSI Specific Plan

project area is built out to respond to community needs.

*A community facility such as a major religious institution is considered appropriate and desirable for inclusion within the boundaries of the ADG. The facility should be about 15-20 acres in size and should be located adjacent to the proposed Community Park. If a Church site has been purchased and planned for development, then the specific plan map show 18 acres of "High Density Residential" adjacent to the church site. Both uses are to be included within the ADG boundary and are to receive waste disposal services from within the ADG. If a church site is not secured by the time the specific plan is adopted, then the area shall be shown as "Industrial" and the residential provision shall be deleted.*

## OPEN SPACE, RECREATION, AND CONSERVATION DEVELOPMENT PRINCIPLES

Community open space areas shall be provided in the planned residential area for recreation, visual aesthetics, drainage, flood control, conservation, noise buffer, and circulation uses.

Open spaces areas shall separate and define clustered residential neighborhoods and other distinct land uses from each other.

Recreation facilities including hiking and equestrian trails, bicycle paths, picnic areas, playgrounds and an 18-hole golf course shall be provided in open space areas.

*Open space should be provided in the planned industrial area for aesthetics, temporary flood control ponds, recreation, and noise buffers.*

Open space areas should be provided within clustered residential areas as internal public spaces for neighborhood use and enjoyment.

Existing stands of native oak trees shall be retained to the maximum extent possible and left in open space. Additional stands of oaks and other native vegetation shall be planted in appropriate open space areas.

Flood control ponds should enhance and restore wildlife habitats and provide recreation opportunities.

Riparian vegetation should be established or re-established in appropriate areas of the site.

## CIRCULATION DEVELOPMENT PRINCIPLES

*Arterial streets should connect industrial and residential areas to the Highway 101 bypass and to County arterial roads such as Russell Road and San Juan Grade Road.*

Board of Supervisors Resolution
UP & GSAP Amendment
Revised RSI Specific Plan

Collector streets should connect to arterial streets from residential clusters and industrial development areas.

All residential clusters shall have two routes to enter and exit for emergency situations.

On street parking should generally be discouraged for arterial streets and major collector streets. Off street parking areas will be provided in industrial, commercial, and high density residential areas.

Most roadways should be developed in a phased manner as development of the site proceeds. Arterial roadways will be developed at the outset of the project.

Roadways should be designed to discourage the flow of through traffic that does not have destinations within the site.

Roadways shall be located to minimize the need for grading of slopes and filling of natural drainage ways.

*INFRASTRUCTURE DEVELOPMENT PRINCIPLES*

Wastewater treatment, storage, and disposal shall be provided to serve development of the site. The capacity of those facilities will be expanded incrementally as part of a master facilities plan as development proceeds.

The wastewater treatment, storage, and disposal facilities and other facilities and services shall be operated through a newly formed County Sanitation District, Community Facilities District or Community Services District.

Wastewater shall be treated to a level appropriate for spray irrigation in the open space areas of the industrial area and noise buffer areas along the freeway.

*At the onset of the project, wastewater treatment, storage, and disposal facilities will be located within the site. As development proceeds an additional disposal area shall be provided adjacent to the site in the Rancho San Juan North.*

*Water service will be provided from wells located within the site. A public or private water utility or other appropriate entity shall be formed to supply water and maintain the facilities. In emergency circumstances, a public or private water utility may supply water from a mixture of onsite wells and offsite sources."*

*FLOOD CONTROL, GRADING, AND DRAINAGE DEVELOPMENT PRINCIPLES*

Flood control ponds shall be provided for each drainage basin in the site to hold peak

Board of Supervisors Resolution
GP & GSAP Amendments
Revised RSJ Specific Plan

runoff flows and reduce downstream flooding.

Flood control ponds shall be designed to mitigate peak runoff increases resulting from development of the site.

Open space areas and parking lots should be planned to serve as temporary overflow areas during heavy rainfall periods.

Grading of the site shall be conducted to follow the topography of the site and maintain its rolling hill character. Cut and fill grading on steep slopes shall be limited.

Whenever feasible, prominent natural drainage ways should be maintained. These drainage ways will enhance the open space recreation and trails system of the site.

### WATER CONSERVATION DEVELOPMENT PRINCIPLE

Development within the site will use flow reduction devices and other water conservation fixtures. Residential open space areas should be landscaped with vegetation that has low irrigation requirements. Industrial landscaping should be irrigated with reclaimed water except immediately adjacent to outdoor activity areas.

### DESIGN REVIEW PRINCIPLES

As the planning for the Rancho San Juan ADC progresses, detailed design criteria will be developed to guide industrial, commercial, public, and residential development. The guidelines will provide both a standard for guidance and evaluation while leaving flexibility for creative architectural concepts.

A design review committee will be formed by the County to evaluate proposed projects.

*Development in the Rancho San Juan ADC shall occur under the guidance of specific development standards and criteria and shall employ such concepts as natural, or earth-tone exterior treatments, articulated facades, and landscaping amenities. The standards should be approved by a design review committee composed of architects and design professionals formed by the County to evaluate proposed projects. the County Board of Supervisors through the Specific Plan and Site Plan approval process."*

### AREA LAND USE PLAN

*Area of Development Concentration*

*The area bounded by Harrison, Russell, San Juan Grade Road, and the Planning Area Boundary has been designated as the Rancho San Juan Area of Development Concentration according to criteria specified in the County's adopted Growth Management Policy (an ADC study area designation is specified for this area in the*

Page 13 of 14

countywide General Plan). The Land Use Plan (Figure 13) shows mostly industrial and high-density residential land uses for areas to be developed.

As noted in Policy 26.1.1.1 (GE), land uses within this area are illustrative only and a specific land use configuration as well as plans for sewers, circulation, drainage, and other factors will be determined at a more detailed planning level through a Specific Plan (Specific Plans are defined in Gov. Code Pro. 65450-65457). No development in the SDC will take place until a specific plan is adopted. Furthermore, the Specific Plan will include the development guidelines and principles adopted as part of this Area Plan.

The 7,000-acre Rancho San Juan SDC is intended to provide for the County's long-term (15-20 years) need for residential and economic growth. It is anticipated the SDC will accept about 3,500 new residences, which averages about 180 new dwelling units per year. This rate is about half the current annual rate of household growth for the unincorporated area. The residential growth pattern departs from the prevailing pattern in Monterey County because it proposes residential clustering rather than subdivision into 1-10 acre minimums. Development guidelines specify a cluster/open space pattern allowing better land utility and reducing the occurrence of hillsides scarred by the access and site development needs of individual estates.

The SDC will also accept about 500 acres of planned industrial development. Industrial land uses were judged appropriate here because of the perceived need to add new industry to the current economic base and because the State Highway 101 bypass route through the SDC effectively linked this area to other regional light-industry networks.

After the Rancho San Juan SDC has been established the foothills/ranch area east of Old Stage Road should be designated as an SDC study area for the next planning cycle.

PASSED AND ADOPTED on this 7th day of November 2005, upon motion of Supervisor Calcagno, seconded by Supervisor Smith, by the following vote, to-wit:

      AYES: Supervisors Armenta, Calcagno, Lindley, and Smith
      NOES: Supervisor Potter
      ABSENT: None

I, Lew Bauman, Clerk of the Board of Supervisors of the County of Monterey, State of California, hereby certify the foregoing is a true copy of the original order of said Board of Supervisors duly made and entered in the minutes thereof Minute Book 73, on November 1, 2005.

Dated: November 8, 2005

                Lew Bauman, Clerk of the Board of Supervisors
                County of Monterey, and State of California.

                By _____
                      Cynthia Juarez, Deputy

                Page 14 of 14

Board of Supervisors Resolution
GP & GSAP Amendments
Revised RSJ Specific Plan

# REFERENDUM AGAINST A RESOLUTION PASSED BY THE BOARD OF SUPERVISORS
## PROTESTING THE ADOPTION OF RESOLUTION NO. 05-305
## AMENDING THE COUNTY GENERAL PLAN
## AND THE GREATER SALINAS AREA PLAN

| MONTEREY COUNTY REGISTERED VOTERS ONLY | NOTICE TO THE PUBLIC: THIS PETITION MAY BE CIRCULATED BY A PAID SIGNATURE GATHERER OR A VOLUNTEER. YOU HAVE THE RIGHT TO ASK. | THIS COLUMN FOR OFFICIAL USE ONLY |
|---|---|---|
| | | |