1  OFFICE OF THE MONTEREY COUNTY COUNSEL
   CHARLES J. MCKEE (SBN 152458), COUNTY COUNSEL
2  LEROY W. BLANKENSHIP (SBN 065233), ASSISTANT COUNTY COUNSEL
   168 W. ALISAL, 3RD FLOOR
3  SALINAS, CA  93901-2680
   Telephone: (831) 755-5045
4  Facsimile: (831) 755-5283

5  NOSSAMAN, GUTHNER, KNOX & ELLIOTT, LLP
   STEPHEN N. ROBERTS (SBN 062538)
6  50 CALIFORNIA STREET, 34TH FLOOR
   SAN FRANCISCO, CALIFORNIA 94111-4799
7  Telephone: (415) 398-3600
   Facsimile: (415) 398-2438
8  Email: montereycase@nossaman.com

9  NOSSAMAN, GUTHNER, KNOX & ELLIOTT, LLP
   JOHN J. FLYNN III (SBN 076419)
10 18101 VON KARMAN AVENUE
   IRVINE, CA  92612-0177
11 Telephone: (949) 833-7800
   Facsimile: (949) 833-7878
12 Email: montereycase@nossaman.com
   Attorneys for Defendants

13

14                    UNITED STATES DISTRICT COURT

15                   NORTHERN DISTRICT OF CALIFORNIA

16                         SAN JOSE DIVISION

17

18 In re:  County of Monterey Initiative Matter    )  NO:  C 06-01407 JW
                                                   )  NO:  C 06-02202 JW
19         and                                     )  NO:  C 06-02369 JW
                                                   )  NO:  C 06-01730 JW
20 In re:  Monterey Referendum                     )
                                                   )  **DEFENDANTS' OPPOSITION TO**
21                                                 )  **PLAINTIFFS' MOTIONS FOR AWARDS OF**
                                                   )  **ATTORNEYS' FEES AND COSTS**
22                                                 )
                                                   )  Date:  October 22, 2007
23                                                 )  Time:  9:00 a.m.
                                                   )  Place:  Courtroom 8
24                                                 )  Judge:  Honorable James Ware
                                                   )
25 _____)

26

27

28

# TABLE OF CONTENTS

I.      INTRODUCTION .......................................................................................... 1

II.     STATEMENT OF FACTS ............................................................................ 2

III.    THE UNIQUE CIRCUMSTANCES OF THIS CASE DO NOT JUSTIFY A
        REWARD, OR JUSTIFY AT MOST A NOMINAL REWARD .............................. 5

        A.      Special Circumstances Justify Reduction Of Any Award ...................... 5

                1.      An Award Of Almost $1 Million Does Not Further The Purposes
                        Of The Federal Voting Rights Act.............................................. 5

                2.      The Balance Of Equities Favors A Reduced Award – And Not A
                        Windfall To Plaintiffs' Attorneys ............................................. 8

        B.      Plaintiffs Are Not Entitled To Any Fees In the Initiative Case Because
                They Were Not The Prevailing Parties Under The Law .................................. 9

IV.     IF PLAINTIFFS ARE ENTITLED TO FEES, PLAINTIFFS' FEE
        CALCULATION IS INAPPROPRIATE AND PLAINTIFFS DO NOT
        JUSTIFY THE AMOUNT OF FEES CLAIMED ..................................................... 10

        A.      Federal (Not State) Law Governs Any Fee Determination This Court
                Might Make—Plaintiffs Have Largely Cited Inappropriate Authority to
                this Court................................................................................... 10

        B.      The Claimed Lodestar Must Be Reduced As a Matter of Federal Law ......... 13

                1.      Reduction Of The Lodestar Is Warranted Because Plaintiffs'
                        Attorneys Block Billed Their Time ........................................... 14

                2.      Further Reduction Of The Lodestar Is Warranted Because
                        Strumwasser & Woocher Billed At Higher Than the Reasonable
                        Rate In This District................................................................ 15

        C.      Plaintiffs' Attorneys Are Not Entitled To A Multiplier .......................... 18

V.      MR. YEATES' TIME WAS DUPLICATIVE OF STRUMWASSER &
        WOOCHER'S TIME..................................................................................... 21

VI.     THE COSTS CLAIMED ARE UNREASONABLE ................................................. 21

VII.    CONCLUSION............................................................................................ 22

i

1

TABLE OF AUTHORITIES

2

**Cases**

3

*Alyeska v. Pipeline Serv. Co. v. Wilderness Society*

4
    421 U.S. 240 (1975)...............................................................11, 12

5

*Barrios v. California Interscholastic Federation*
    277 F.3d 1128 (9th Cir. 2002) ...........................................................9

6

7

*Blum v. Stenson*
    465 U.S. 886 (1984)...........................................................8, 20

8

*Bouman v. Block*

9
    940 F.2d 1211 (9th Cir. 1991) ...........................................................11, 12

10

*Buckhannon Board and Care Home, Inc. v. West Virginia Depatment of Health and
    Human Services*, 532 U.S. 598 (2001) ...........................................................9

11

*Campuzano v. Ill. State Bd. of Elections*

12
    241 F.Supp.2d 892 (N.D.Ill. 1003) ...........................................................6

13

*City of Burlington v. Dague*
    505 U.S. 557 (1992) ...........................................................19

14

*Control Data v. S.C.S.C Corp.*

15
    53 F.3rd 930 (8th Cir. 1995) ...........................................................12

16

*Cummins v. Campbell*

17
    44 F. 3d 847 (10th Cir. 1994). ...........................................................13

18

*Cunningham v. County of Los Angeles*
    879 F. 2d 481 (9th Cir. 1988) ...........................................................19

19

*Davis v. Mason County*

20
    927 F.2d 1473 (9th Cir. 1991) ...........................................................16

21

*Democratic Party of Wash. State v. Reed*

22
    388 F.3d 1281 (9th Cir. 2004) ...........................................................2, 5, 7

23

*Farrar v. Hobby*
    506 U.S. 103 (1992) ...........................................................8, 9

24

*Ferland v. Conrad Credit Corp.*

25
    244 F.3d 1145 (9th Cir. 2001) ...........................................................13

26

*Finkelstein v. Bergna*
    804 F. Supp. 1235 (N.D.CA 1992) ...........................................................13, 16, 17

27

*Guimond v. Trans Union Credit Information Co.*

28
    45 F.3d 1329 (9th Cir. 1995) ...........................................................12

ii

*Halderman v. Pennhurst State Sch. & Hosp.*
   49 F. 3d 939 (3d Cir. 1995). ................................................................................... 15

*Keith v. Volpe*
   858 F.2d 467 (9th Cir. 1988) ................................................................................ 12

*Kerr v. Screen Extras Guild, Inc.*
   527 F.2d 67 (9th Cir. 1975) ............................................................................ 13, 19

*King v. Ill. State Bd. of Elections*
   410 F.3d 404 (7th Cir. 2005) .................................................................................. 6

*Mangold v. California Public Utilities Comm.*
   67 F.3d 1470 (9th Circuit 1995) ...................................................................... 10, 11

*McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund*
   450 F.3d 91 (2d Cir. 2006) ..................................................................................... 15

*Padilla v. Lever*
   429 F.3d 910 (9th Cir. 2005) ........................................................................ *passim*

*Padilla v. Lever,*
   463 F.2d 1046 (9th Cir. 2006) ...................................................................... *passim*

*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*
   478 U.S. 546 (1986) ...................................................................................... 8, 11, 19

*Stewart v. Gates*
   987 F.2d 1450 (9th Cir. 1993) ........................................................... 13, 16, 17, 19

*Welch v. Metropolitan Life Ins. C.*
   480 F.3d 942 (9th Cir. 2007) ................................................................... 13, 14, 15

**Statutes**

42 U.S.C. § 1973*l*(e) .................................................................................... 4, 5, 11, 21

California Code of Civil Procedure § 1021.5 ................................................................ 11

**Other Authorities**

Black's Law Dictionary (7th ed. 1999) at 1594.......................................................... 8

C.J.S. Civil Rights § 503................................................................................................. 5

Moore's Federal Practice:  (3d Ed.) Vol. 10, § 54.171 [5] ........................................ 12

Moore's Fed. Practice: (3d Ed.) Vol. 10, § 54.171[3][d][ii] .................................... 5, 6

## I.   INTRODUCTION

This motion involves four cases that were combined into two sets of consolidated cases:  (1) *Madrigal v. County of Monterey,* C 06-01407 JW and *Melendez v. Board of Supervisors of the County of Monterey,* C-06-1730, consolidated as *In re County of Monterey Initiative Matter* (the "Initiative cases"); and (2) *Rangel v. County of Monterey,* C 06-02202 JW and *Rancho San Juan Opposition Coalition v. Board of Supervisors of the County of Monterey*, C 06-02369 JW, consolidated as *In re Monterey Referendum* (the "Referendum cases").  These lawsuits were later consolidated as one matter by this Court for purposes of cross-summary judgment motions.

In both the Initiative cases and the Referendum cases, the defendants were sued by competing sets of interests.  One group of plaintiffs sued in federal court and asserted that the underlying initiative and the underlying referendum had not been circulated properly under the Federal Voting Rights Act as interpreted by the Ninth Circuit in *Padilla v. Lever,* 429 F.3d 910 (9th Cir. 2005) (original *Padilla* decision).  Another group, the plaintiffs here seeking attorneys' fees, sued in state court seeking to force the elections; these two cases, *Melendez* and *Rancho San Juan,* were removed and then consolidated as describe above.  Caught in the middle, the County was forced to choose (or guess) proper course of action: Comply with the original *Padilla* decision or not?  After examining the law, the County initially concluded that the petitions had not been circulated properly under the original *Padilla* decision and declined to put the measures on the ballot.  This Court originally agreed that the County's actions were proper and issued an injunction to prohibit the County from placing the measures on the ballot.

Ultimately, the Ninth Circuit reversed its own 2005 ruling in an *en banc* decision.  *Padilla v. Lever,* 463 F.2d 1046 (9th Cir. 2006) .  Following the *en banc* decision, the County concluded that the change in law required it to put the initiative on the ballot, and it did so.  This action removed the need for any further court proceedings in the Initiative cases and gave plaintiffs what they wanted.  In the Initiative cases. In the Referendum Cases, the County left the decision to the Court because there were other issues which were not resolved following the *en banc* decision.  Upon this Court's ultimate conclusion that the Ninth Circuit's reversal required the election to go forward, the County immediately placed the referendum on the ballot as well.

Now plaintiffs seek almost $1 million in attorneys fees as the "winner" of the litigation. This figure includes a request for enhancement based on factors that the federal courts have roundly rejected, including the allegedly contingent nature of their representation. Close reading reveals that plaintiffs, though cloaking their award in federal authority, are in fact improperly seeking compensation under state law.

There are two general sets of reasons the requested fees in these two consolidated cases should be lowered dramatically. First, there are the equitable reasons that are within the discretion of the Court, characterized by the Ninth Circuit as "special circumstances," and which support this outcome. *Democratic Party of Wash. State v. Reed*, 388 F.3d 1281, 1285 (9th Cir. 2004). Specifically, there are special circumstances that call for a dramatic lowering of the lodestar number because the County (not plaintiffs) was seeking to enforce the Federal Voting Rights Act and correctly followed the law throughout the litigation. Moreover, with respect to the Initiative cases, it was the change of law resulting from the *Padilla en banc* decision that led to the change in course, not an order or judgment or settlement resulting from plaintiffs actions. Thus any amount awarded should be nominal, at best.

Second, (and even if the Court does not agree that only a nominal sum should be awarded), any award plaintiffs receive should be vastly reduced. The equitable considerations, when combined with clear Ninth Circuit precedent, apply to reduce the lodestar number. Specifically, the lodestar number is no more than $231,446.84 for the two cases, not the nearly $500,000 sought by plaintiffs. In addition, it is not proper under federal law to apply a multiplier to the lodestar amount. Plaintiffs are confusing their case with state law.

In sum, the County submits that the amount to be awarded should be only a nominal sum, in view of the special circumstances and equitable considerations in this case. But even if the Court should determine to award something more than a nominal sum, it should be only a fraction of the $231,446.84 lodestar ceiling, not the exorbitant windfall that plaintiffs demand.

## II.    STATEMENT OF FACTS

The facts of these cases are well-known to the Court, and thus only the facts relevant to the instant attorneys' fee motion are summarized herein.

2

218494_2.DOC

*In re Initiative Matter*, Cases Nos. C 06-01730 JW; C 06-02369 JW
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR AWARDS OF ATTORNEYS' FEES AND COSTS

1    *In re County of Monterey Initiative Matter.*  A group circulated an initiative petition which, if

2    passed, would amend certain zoning and land development provisions of the Monterey General Plan and

3    would require a public election for future zoning changes.  The initiative proponents filed a notice of

4    their intent to circulate the petition; all initiative materials were in English only.  A group of Spanish-

5    speaking citizens (the *Madrigal* plaintiffs) filed a lawsuit against the County in this Court, asking for

6    declaratory judgment that the English-only materials violated the Federal Voting Rights Act.  The

7    County's Board voted not to place the initiative on the ballot on the basis that the initiative was not

8    circulated in both English and Spanish, as required by the Federal Voting Rights Act and the then-

9    current, Ninth Circuit opinion in *Padilla.*

10    Subsequently, proponents of the initiative brought a mandamus action in State Court (*Melendez*

11    action) to compel the County to place the initiative on the ballot; the County removed the case to this

12    Court and it was consolidated with *Madrigal.*  In their State Court Petition, the *Melendez* plaintiffs,

13    represented by Strumwasser & Woocher, did not pursue enforcement of the Federal Voting Rights Act.

14    In their prayer for relief, the *Melendez* plaintiffs pray for attorneys' fees, but do not cite any statute,

15    much less the civil rights enforcement fee statute at 42 USC § 1973 *l*(e).  Thus, although the action was

16    removed to this Court on the basis of a federal question jurisdiction, as the County Defendants' defense

17    was based on the Federal Voting Rights Act, the action was not brought by plaintiffs under the Federal

18    Voting Rights Act.  The Court agreed with the County's decision to enforce the Federal Voting Rights

19    Act, relying in part on the initial decision in *Padilla*, and issued an order enjoining the County from

20    processing, certifying or adopting the Initiative and from placing it on the ballot for a future County

21    election unless or until first properly circulating it in compliance with the Federal Voting Rights Act.

22    Plaintiffs appealed.  While on appeal, an *en banc* panel of the Ninth Circuit reversed that Court's prior

23    decision and this case was remanded to this Court for a decision in light of its new decision.  *Padilla v.*

24    *Lever,* 463 F.3d. 1046 (9th Cir. 2006) (*en banc*).  While on remand, the County's Board determined to

25    put the measure on the June ballot.  Ultimately, the initiative was defeated by the voters.

26    *In re Monterey Referendum Matter.*  On November 7, 2005, the County passed a resolution to

27    amend certain provisions of the Monterey County General Plan, the Greater Salinas Area Land Use

28

3

1  Plan, and the Rancho San Juan Area of Development Concentration Guidelines and Principles.  The

2  Rancho San Juan Opposition Coalition, represented herein by Strumwasser & Woocher, and other

3  opponents to the Resolution began circulating a referendum against the Resolution.  The Referendum

4  materials were printed in English only.  The County initially placed the Referendum on the June 2006

5  ballot.  The *Rangel* plaintiffs filed an action in Federal Court seeking a declaration that the Referendum

6  was invalid under the Federal Voting Rights Act.  The County withdrew the referendum from the June

7  ballot citing the original *Padilla* decision.

8         In April 2006, the *Rancho San Juan Opposition Coalition v. Board of Supervisors Of the County*

9  *of Monterey* action was filed in State Court, seeking declaratory and injunctive relief to compel the

10  Board to put the Referendum to the voters at the next election.  In their Petition, the *Rancho* plaintiffs

11  did not allege any violation of voting rights, or pursue enforcement of federal voting rights guarantees.

12  The action was removed to Federal Court by the County Defendants on the federal question and

13  consolidated with *Rangel*.  For a short period, it was stayed, awaiting the *en banc* decision in *Padilla*.

14  When that decision was issued, the defendants left it to this Court to apply it to a referendum in the

15  cross-summary judgment motions.  This Court determined that, as a result of the *en banc* decision in

16  *Padilla*, translation was not required, and ordered that the referendum be put on the ballot.  The County

17  therefore put it on the ballot, and the election was held in June, 2007.  The referendum measure did not

18  pass

19         On March 29, 2007, the Court decided the parties' cross-motions for summary judgment.  As to

20  the Initiative motion, it was no longer a "summary judgment" motion, as the County had already placed

21  the matter on the ballot.  The only issue was whether to remand the case back to state court as plaintiffs'

22  suggested or to remain within this Court's jurisdiction.  The Court ultimately retained jurisdiction and

23  issued summary judgment in the Referendum case in plaintiffs' favor.  The Court also awarded

24  attorneys' fees to plaintiffs under 42 U.S.C. § 1973*l*(e).

25         The County asked for clarification of the Court's award of fees in a motion to alter judgment,

26  arguing that a party in plaintiffs' position – that is opposing the Federal Voting Act – should not be

27  entitled to attorneys' fees as a matter of law.  The Court disagreed, and on May 17, 2007 denied the

28

4

1  motion. In its order, the Court held plaintiffs were entitled to fees under federal law, 42 U.S.C §

2  1973*l*(e).

3  **III.    THE UNIQUE CIRCUMSTANCES OF THIS CASE DO NOT JUSTIFY A REWARD,**

4  **OR JUSTIFY AT MOST A NOMINAL REWARD**

5  **A.    Special Circumstances Justify Reduction Of Any Award**

6        Before turning to the details of plaintiffs' fee calculations, the County submits that there are

7  several equitable reasons why this Court should consider either awarding plaintiffs no fees at all, or

8  vastly reducing any award plaintiffs receive. Simply stated, any award would be unjust – and contrary

9  to public policy.

10       Under the civil rights fee shifting statutes, a court has discretion to decline to award attorneys

11  fees to a "prevailing party" if there are "special circumstances [to] make an award unjust." Moore's Fed.

12  Practice, § 54.171[3][d][ii]; *see, also,* C.J.S. Civil Rights § 503 ("The amount of the fee to be awarded

13  under" civil rights statutes "must be determined on the facts of each case, and the court is given broad

14  authority in determining" the fee.) Interpreting this rule, the Ninth Circuit has articulated "a two-

15  pronged test for determining when special circumstances exist: (1) whether allowing attorneys' fees

16  would further the purposes of [the civil rights statute at issue]; and (2) whether the balance of the

17  equities favors or disfavors the denial of fees." *Democratic Party of Wash. State v. Reed*, 388 F.3d

18  1281,1285 (9th Cir. 2004). In this case, there are several reasons why any award would be unjust under

19  this test – and why any award should be vastly reduced.

20       **1.    An Award Of Almost $1 Million Does Not Further The Purposes Of The**

21            **Federal Voting Rights Act**

22       Because the County acted at all times to further the purposes of the Federal Voting Rights Act,

23  this Court should exercise its discretion to either deny a fee or limit any fee award to only a nominal

24  amount.[1]

25

26  _____

27  [1] In its motion to alter judgment, the County asserted that as a matter of law the plaintiffs are not
    entitled to a fee award because it was the County, and not the plaintiffs, who were working to advance
    the Federal Voting Rights Act. The Court denied that motion, and the County will not repeat those
28  arguments herein. The alternative point being made here is that the County's actions and the relative

1    Section 1973*l*(e) is designed to reward those enforcing the federal voting guarantees in the

2    fourteenth and fifteenth Amendments to the U.S. Constitution.  42 U.S.C. 1973 *l*(e); *see, also, King v.*

3    *Ill. State Bd. of Elections,* 410 F.3d 404, 412 (7th Cir. 2005); *Campuzano v. Ill. State Bd. of Elections,*

4    241 F.Supp.2d 892, 1895 (N.D.Ill. 1003).  Plaintiffs in this case never set out to <u>enforce</u> these

5    guarantees. As this Court recognized in its Order Denying Defendants' Motion for Clarification or

6    Reconsideration, the cases brought by plaintiffs become Federal Voting Rights Act cases only because

7    of defendants' assertion of these rights.  In fact, nothing in the plaintiffs' original complaints was

8    designed to <u>enforce</u> these **federal** guarantees – let alone the Federal Voting Rights Act itself.  To the

9    contrary, plaintiff's pleadings contained solely state law causes of action that have no bearing at all on

10    the Federal Voting Rights Act issues that were actually litigated in this case.  Rather, their position

11    throughout most of this litigation – from March, 2006 when the *Melendez* complaint was filed until

12    September, 2006 when the *en banc* decision was issued – was spent opposing the Ninth Circuit's

13    interpretation of the very guarantees for which they now want a reward for "enforcing."  This ignores

14    the fact that, prior to September 26, 2006, it was the County, and not plaintiffs, who was complying with

15    the law and enforcing the Federal Voting Rights Act as interpreted by the Ninth Circuit.  Accordingly,

16    allowing attorneys' fees for any litigation prior to September 26, 2006 when *Padilla* was issued would

17    not further the purposes of the Federal Voting Rights Act.

18    Furthermore, in the Initiative case, the County worked at all times to comport with the Federal

19    Voting Rights Act – and to <u>enforce</u> it.  Even after the *en banc* decision was issued, the County still tried

20    to follow the law – even without a Court order to do so.  Specifically, in January, 2007, the County

21    Board of Supervisors voted independently to put the Initiative on the June, 2007 ballot.  This was not in

22    response to any order from the Court, and without obtaining any concession from plaintiffs in any

23    settlement—the Board simply did so in response to the change of the law effected by the *en banc*

24    decision.  In this regard, it should be noted that even if the County had done what plaintiffs wanted

25    originally and placed the Initiative on the ballot without following the initial *Padilla* decision, it is likely

26

27

28    position of the parties give rise to strong reasons for the Court to exercise its discretion not to give an
award, or if it gives one, to limit it.

6

1  that the County would have been sued by a Hispanic rights group such as that represented by Mr. Avila.

2  Certainly history bears this out.  Thus the County was caught in a classic Catch 22 situation:  <u>enforce</u> the

3  law, and get sued; or fail to <u>enforce</u> the law, and get sued.  Nor would an award advance the purposes of

4  the Federal Voting Rights Act.  *Democratic Party of Wash. State v. Reed*, *supra*, at 1285.  To the

5  contrary, it would have a chilling effect on a government seeking to follow the law.  The County chose

6  to obey the law.  Together, these are "special circumstances [that would] make an award unjust."

7  Moore's Fed. Practice, *supra*, § 54.171[3][d][ii].  Accordingly, in the Initiative case, the award plaintiffs

8  now request should not include any fees incurred prior to September 26, 2006 – and the overall award

9  should be vastly reduced to account for the County's behavior in adhering to the law in every respect as

10  the law was changing.

11       The same is true in the Referendum case.  Until the time of the *en banc* decision, the County was

12  in the position of following clear precedent from the Ninth Circuit.  After the *en banc* decision was

13  issued on September 26, 2006, the County still believed it was a close question and left the decision up

14  to the Court in the cross-summary judgment motions.  Notably, however, that did not change what

15  occurred, because the plaintiffs in *Rangel* continued in the consolidated action and still continued to sue

16  the County, insisting that the Referendum had not been circulated properly.  Upon the Court's decision,

17  the Board placed the Referendum on the ballot as well.  Thus, in the Referendum case, the only period

18  for which plaintiffs could argue the County was not proceeding in accordance with the law as it existed

19  was the brief period prior to the summary judgment motion, where the County left the decision for the

20  Court.  To assess attorneys' fees for the work done in this case during any other time would be

21  inequitable, illogical, unwarranted, unsupported by precedent, and  inconsistent with public policy.

22       To summarize, the plaintiffs' position boils down to the proposition that there is no way for a

23  government to behave responsibly and avoid paying attorneys fees if there are two opposing interest

24  groups fighting over the law.  No matter what the County did, it was going to be sued by one of these

25  groups.  And, even though the County followed the existing law for virtually every period of the

26  litigation, plaintiffs nevertheless argue they are entitled to all of their fees, for all of those periods, and

27  with a large multiplier.  Adding insult to injury, it was the County – not plaintiffs – who was

28

7

1  consistently asserting the right of people who do not speak English well enough to understand initiative

2  and referendum petitions.  This is exactly the kind of voting guarantee that the Federal Voting Rights

3  Act was designed to protect.  If there were ever a case where no fees or a reduction of fees for an

4  equitable reason was warranted, this is it.

5  **2.     The Balance Of Equities Favors A Reduced Award – And Not A Windfall To**

6  **Plaintiffs' Attorneys**

7  There are two reasons why the balance of equities also weighs in favor of a reduced award, or no

8  award.  First, and as discussed above, it was the County, not plaintiffs, which was working to <u>enforce</u>

9  the Federal Voting Rights Act to begin with; and it also tried to comply at all times with the Federal

10  Voting Rights Act by voluntarily placing the Initiative on the ballot without any prompting from the

11  Court.  The County would thus be penalized for enforcing and/or complying with the law at all times if

12  fees are awarded for any litigation.  This is unfair.

13  Second, federal fee-shifting statutes such as this one were designed to reward and attract

14  competent counsel – and to prevent injury from <u>federal</u> law – but not to provide windfalls to attorneys.

15  *Blum v. Stenson,* 465 U.S. 886, 893-894 (1984); *Pennsylvania v. Delaware Valley Citizens' Council for*

16  *Clean Air,* 478 U.S. 546, 565 (1986).  While the definition of term "windfall" is not readily apparent

17  from case law, it is defined in Black's Law Dictionary as an "unanticipated benefit, usually in the form

18  of a profit and not caused by the recipient."  Black's Law Dictionary (7[th] ed. 1999) at 1594.  This

19  definition makes sense in light of cases like *Farrar v. Hobby,* in which the Supreme Court implied that a

20  fee award of $280,000 in a case where only nominal damages were awarded was a "windfall," since the

21  relationship between the award of fees and the extent of success in the case was vastly over-inflated.

22  *Farrar v. Hobby,* 506 U.S. 103, 115-16 (1992).

23  Here, an award of attorneys fees under section 1973*l*(e) would be an inequitable windfall to

24  litigants who were advocating a position contrary to the law which existed prior to the *en banc* reversal.

25  Though plaintiffs make much of their "extraordinary" successes in this case, they only won because the

26

27

28

1  Ninth Circuit *reversed* itself in a separate case.[2]  Put differently, there would not have been any success

2  at all without the *en banc* reversal.  Plaintiffs argue that their amicus assistance in getting *Padilla*

3  overruled somehow contributes to their success in this case.  But even if that were true, that does not

4  change the fact that this case would never have been decided in their favor without the Ninth Circuit

5  reversing itself.  The County did not have the luxury of ignoring and disobeying the original *Padilla*

6  decision until the law changed.  When viewed in this light, it appears that plaintiffs' "successes" here

7  were in fact <u>nominal</u>, and wholly dependent upon a *en banc* reversal (nothing short of a stroke of luck).

8  *See, generally, Farrar, supra.*  In short, rewarding plaintiffs for these efforts is simply inequitable –

9  particularly since <u>their original lawsuits never sought to enforce federal voting guarantees</u>.

10  **B.    Plaintiffs Are Not Entitled To Any Fees In the Initiative Case Because They Were**

11  **Not The Prevailing Parties Under The Law**

12  In the Initiative case, there is yet another reason why plaintiffs' requested attorneys' fees should

13  be denied in part and/or reduced:  they were not the "prevailing parties" in the Initiative case under the

14  law.  As such, they are not entitled to fees in that case as a matter of law.

15  It is axiomatic that only a "prevailing party" can recover attorneys' fees.  *See, e.g., Buckhannon*

16  *Board and Care Home, Inc. v. West Virginia Depatment of Health and Human Services,* 532 U.S. 598,

17  602-03 (2001).  A "prevailing party" is one whom has obtained a "judicially sanctioned change in the

18  legal relationship of the parties."  *Id.,* at 605.  It is not simply a party who acts as a "catalyst" for change,

19  e.g., one who reaches the "sought after destination" or end result of a lawsuit - or even a policy change -

20  "without obtaining any judicial relief."  *Id.,* at 606; *see, also, Barrios v. California Interscholastic*

21  *Federation,* 277 F.3d 1128, 1134 (9th Cir. 2002) (recognizing the limited applicability of a "catalyst"

22

23

---

24  [2] Plaintiffs' argument is essentially the same as the "catalyst theory."  The catalyst theory states that "a

25  party is considered prevailing so long as he or she can prove that the pending litigation was a catalyst that brought about the policy change."  *Barrios v. California Interscholastic Federation,* 277 F.3d 1128, 1134 n. 5 (9th Cir. 1992).  This theory  has been used in the past by plaintiffs to obtain fees even where

26  "voluntary action by the defendant affords the plaintiff all or some of the relief sought," *Buckhannon Bd.*

27  *and Care Home, Inc. v. West Virginia Department of Health and Human Resources,* 532 U.S. 598, 603 n. 5 (2001).  However, more recently it has been roundly rejected by the Supreme Court and limited by

28  the Ninth Circuit in ways prohibiting the plaintiffs' recovery of fees in this case.  *See, id.,* 622 (rejecting catalyst theory as basis for attorneys' fees); *Barrios,* at 1134 n. 5.

9

1  theory or argument when parties enter into a settlement agreement; a settlement agreement is a legally

2  enforceable instrument and with this instrument, fees can be awarded if a party is a catalyst for change).

3  In the Initiative case, the "sought after destination" or the entire object of plaintiffs' lawsuit was to place

4  the initiative on the ballot without circulating it in Spanish as well as English.  This occurred <u>without</u>

5  <u>any judgment or other "judicially sanctioned change"</u> in the legal relationship of the parties in question.

6  Rather, the County voted to place the Initiative on the ballot in January, 2007 of its own accord - well

7  before the Court issued its March, 2007 summary judgment ruling - and in response to the *en banc*

8  decision in *Padilla*.  Therefore, there is no basis to award plaintiffs any fees at all for the Initiative

9  proceeding.

10  **IV.    IF PLAINTIFFS ARE ENTITLED TO FEES, PLAINTIFFS' FEE CALCULATION IS**

11  **INAPPROPRIATE AND PLAINTIFFS DO NOT JUSTIFY THE AMOUNT OF FEES**

12  **CLAIMED**

13  Assuming plaintiffs are entitled to fees, then there are two basic questions for the Court.  First,

14  which law governs the award of fees in this case?  Second, how much should plaintiffs be awarded?

15  The answers to these questions are as follows:  In light of the Court's May 17, 2007 order denying the

16  County's Motion to Clarify or Alter Judgment and the relevant law, it is federal law that governs any fee

17  award here.  As to the fees sought – which total together almost $1 million ($966,778.82) at this point –

18  they are vastly over-inflated and unjustified.  The lodestar is inaccurate, and the multiplier requested

19  runs contrary to federal law.  As set forth below, any fees awarded should be reduced to less than

20  $231,446.84 -- and the multiplier should not be awarded at all.

21  **A.    Federal (Not State) Law Governs Any Fee Determination This Court Might Make—**

22  **Plaintiffs Have Largely Cited Inappropriate Authority to this Court**

23  This Court, in its order denying the County's Motion to Clarify or Alter Judgment, made it clear

24  that it was awarding fees under federal law, not California state law.  (*See, e.g.,* Doc. No. 67, Case No.

25  01730 JW, May 17, 2007).  Recognizing this, the plaintiffs spend part of their brief purporting to argue

26  that the <u>federal</u> lodestar standard should be used to calculate the reasonable fees and hourly rates.

27  However, their entire argument as to why they are entitled to a multiplier is based upon <u>state</u> law.  Then,

28

218494_2.DOC

*In re Initiative Matter,* Cases Nos. C 06-01730 JW; C 06-02369 JW

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR AWARDS OF ATTORNEYS' FEES AND COSTS

1  plaintiffs add a footnote on page 3 of their brief in which they reiterate their argument that they are

2  entitled to recover their fees and costs under California Code of Civil Procedure section 1021.5, contrary

3  to this Court's ruling and contrary to federal law.<u>3</u>   The reason why plaintiffs switch back and forth

4  between federal and state law is because they apparently think state law might be more generous to

5  them.  *See, e.g., discussion in Mangold v. California Public Utilities Comm.,* 67 F.3d 1470,1478 (9th

6  Circuit 1995) (noting that enhancements for contingency fee cases are prohibited under federal law, but

7  allowed under California state law).  If that is not the reason, and instead the plaintiffs are simply

8  waiting until the Reply brief to assert their federal arguments so that Defendants have no opportunity to

9  respond, then it is respectfully requested that any such arguments in the reply brief be stricken.

10         If plaintiffs are entitled to any fees in the first place, there are many reasons why federal law –

11  and not California law – governs the resolution of the attorneys' fee question.  First, in its order, the

12  Court awarded plaintiffs attorneys' fees under Federal law – 42 U.S.C. § 1973*l*(e) – and not under state

13  law.  The purpose of the federal fee shifting statutes "was to enable private parties to obtain legal help in

14  seeking redress for injuries resulting from the actual or threatened violation of <u>specific federal laws.</u>"

15  *Pennsylvania, supra,* at 565 (emphasis added).  Since plaintiffs were not awarded any fees under

16  California law, this should end the inquiry.

17         Second, federal law governs any award of fees that the Court might make in this case because the

18  only claim ever litigated to judgment in this action was the Federal Voting Rights Act defense

19  promulgated by the County.  Put differently, <u>plaintiffs never succeeded on the merits of their state law</u>

20  <u>claims</u>.  Ninth Circuit law is consistent:  If a state law issue is <u>successfully litigated</u> in federal court, then

21  a federal court has discretion to award attorneys' fees under any applicable statute.  *See, e.g., Mangold,*

22  *supra,* 1478 (awarding attorneys fees under state law when plaintiffs <u>succeeded</u> on "<u>both federal and</u>

23  <u>state statutory</u>" claims "(which <u>both</u> provide for fee awards to prevailing parties)") (emphasis added);

24  *Bouman v. Block,* 940 F.2d 1211, 1237 (9th Cir. 1991) ("When a plaintiff proceeds under multiple

25

26  _____

27  <u>3</u> Similarly, the federal courts have <u>rejected</u> the equitable private attorney general fee doctrine – and as

28  such plaintiffs cannot make the arguments they make in support of a fee enhancement if state law does
    not apply.  *Alyeska v. Pipeline Serv. Co. v. Wilderness Society,* 421 U.S. 240 (1975).

11

theories <u>and prevails on her [state law] claims</u>, she is entitled to attorney's fees under" the applicable state law fee-shifting statute) (emphasis added); *Keith v. Volpe*, 858 F.2d 467, 485-86 (9th Cir. 1988) (by "<u>successfully litigating his state law claims</u>," the plaintiff enforced important rights affecting the public interest," thereby entitling him to a fee award under the California Code of Civil Procedure section 1021.5) (emphasis added, citations omitted).)<u>4</u>  Unlike the claims in *Keith, Bouman* and *Mangold*, none of the state issues here were ever litigated to conclusion.  Moreover, plaintiffs never prevailed on them or had any success on their state law claims whatsoever.  Thus there is no right to any attorneys' fees under state law.

Third, with respect to section 1021.5, the state fee statute that plaintiffs cite, opportunities to use section 1021.5 in federal court are severely limited, and do not encompass cases such as this one.  As Moore's treatise states:

> "In cases within the district courts' federal question jurisdiction, state fee shifting statutes <u>generally are inapplicable</u>."

Moore's Federal Practice: (3d Ed.) Vol. 10, § 54.171 [5] (emphasis added).  The exceptions are diversity cases (*Alyeska, supra*, at 259, n. 31) and derivative claims (*See, e.g., Control Data v. S.C.S.C Corp.*, 53 F.3rd 930, 938 (8th Cir. 1995).  These were not diversity cases, nor were there any pendent claims – the only issue was a federal question issue, the Federal Voting Rights Act.  Other than section 1973*l*(e), there is no federal statute, nor general decisional law, that would permit application of a state fee shifting statute to this case.

Finally, the plaintiffs are trying to use state law here to defeat federal policy.  That is, the federal courts, interpreting the Federal Voting Rights Act, have developed federal policy with respect to attorneys fees awarded thereunder.  To substitute a state law scheme, which does not consider the federal policy, would be improper.  *Guimond v. Trans Union Credit Information Co.*, 45 F.3d 1329, 1336 (9th Cir. 1995).

---

<u>4</u> Plaintiffs fail to cite any authority to the contrary; indeed, all of the cases cited above are also cited in plaintiffs' brief.

218494_2.DOC

*In re Initiative Matter*, Cases Nos. C 06-01730 JW; C 06-02369 JW

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR AWARDS OF ATTORNEYS' FEES AND COSTS

**B.    The Claimed Lodestar Must Be Reduced As A Matter Of Federal Law**

"District courts must calculate awards for attorneys' fees using the 'lodestar' method.  The 'lodestar' is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *Ferland v. Conrad Credit Corp.,* 244 F.3d 1145, 1149 n. 4 (9th Cir. 2001).  Although a district court may adjust the lodestar upwards or downwards by reference to the factors set forth in *Kerr v. Screen Extras Guild, Inc.,* 527 F.2d 67, 70 (9th Cir. 1975), "the generally accepted wisdom now is that most (if not all) of the *Kerr* factors are taken into account (either explicitly or implicitly) during the initial calculation of the lodestar." *Finkelstein v. Bergna,* 804 F. Supp. 1235, 1241 (N.D.C.A 1992).[5]

There are other, independent factors which warrant a downward adjustment in the calculation of the lodestar.  For example, it is well-established that, "in deciding the number of hours reasonably expended, the district court should consider whether the applicant already has excluded hours that were excessive, redundant, or otherwise unnecessary." *Stewart v. Gates,* 987 F.2d 1450, 1452 (9th Cir. 1993) (citations omitted).  As such, if a court finds that hours are in fact excessive, redundant, or otherwise unnecessary – the lodestar may in fact be reduced.  *See, e.g., Cummins v. Campbell,* 44 F. 3d 847, 854 (10th Cir. 1994).  A downward adjustment may also be warranted if services are inefficiently performed, and where a particular fee claimant block bills instead of itemizing each task at issue.  *Welch v. Metropolitan Life Ins. Co.,* 480 F.3d 942, 945 n. 2, 948 (9th Cir. 2007).  Finally, an adjustment to the rate may be warranted if the court determines that there is something "unusual" or out of sync with the market to which comparison is invited, and thereby concludes that the services for which compensation is being sought are somehow overvalued.  *See, e.g., Finkelstein, supra,* at 1246 (adjusting a sole

---

[5] The *Kerr* factors include:  "(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.  *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir. 1975).  Since *Kerr* was decided, however, one of the factors has been prohibited in playing any role in the basic fee determination:  Courts can no longer consider whether the fee was fixed or contingent.  *Stewart, supra,* at 1453.

13

1  practitioner's rate downward to reflect the fact that he was charging a premium, or the "prevailing

2  market rate" of a large law firm, for doing by himself much of the "legwork," such as reviewing

3  documents and transcripts, taking routine depositions, doing factual or legal research, drafting discovery,

4  etc.)

5       As set forth below, plaintiffs' counsel block-billed and charged a much higher rate than prevalent

6  in this District to calculate lodestar.  Further, the rate requested for Mr. Woocher's compensation - $550

7  per hour - should not be applied to many of the tasks Mr. Woocher performed because they were tasks

8  that a person more junior, such as Mr. Gee, generally performs in a large law firm.  Accordingly, the

9  lodestar must be reduced extensively in following clear Ninth Circuit jurisprudence.

10       **1.    Reduction Of The Lodestar Is Warranted Because Plaintiffs' Attorneys**

11            **Block Billed Their Time**

12       Courts may reduce awards by a percentage across the board if the attorneys have engaged in

13  "block billing," a "time-keeping method by which each lawyer . . . enters the total daily time spent

14  working on a case, rather than itemizing the time expended on specific tasks." *Welch, supra* at 945 n. 2,

15  and 948.  As the Ninth Circuit explained in *Welch,* block billing can warrant as much as a 30% reduction

16  across the board on all requested compensated hours because it "makes it more difficult to determine

17  how much time was spent on particular activities" and "'may increase time'" billed "by 10%-30%." *Id.,*

18  at 948 (citing report on block billing and fees by California State Bar's Committee on Mandatory Fee

19  Arbitration, Arbitration Advisory 03-01 (2003)). The County's expert, Mr. Gary Greenfield, has

20  provided a declaration that confirms and explains this nature of this particular problem as well:

21

22       Law firm billing practices impact the ability of the Court and of the party
        being asked to pay the fees to determine whether the requested fees reflect
23       work and time spent that was reasonable, appropriate and necessary.
        Because [block billing] . . . has been the subject of such widespread
24       discussion and publicity in the legal community, as well as court decision,
        it is generally understood within that community and particularly among
25       lawyers and law firms that regularly seek fees in fee-shifting or other
        litigation where legal fees are at issue that the practice leaves the Court
26       and opponent unable to precisely quantify the time billed for any of the
        activities within block entries and makes the analysis of the time and fees
27       far more time-consuming and expensive.  Greenfield Dec., ¶¶ 11, 12.

28

14

In this case, a 30% reduction of all fees requested, as discussed in *Welch* (exclusive of the multiplier), is warranted, since <u>all of the fees at issue are block billed</u>. *See, generally,* Ex. A to both Docs. Nos. 75 and 101, in cases nos. C 06-01730 JW and C 06-02369 JW, respectively, and Exs. 2 and 3 to Greenfeld Dec. As *Welch* holds and Mr. Greenfield's declaration illustrates, the block billing done here makes it impossible for the Court, and the County, to tell whether the legal fees billed are in fact justified. This is particularly true where, as here, there are many tasks that Mr. Woocher performed which either Mr. Gee or a secretary or clerk should have performed – and they are being billed at an unreasonably high rate of $550 per hour, as discussed below. Accordingly, in the initiative case, a reduction of 30% on the total block billed fees of $327,414.36 is appropriate under the authority of *Welch*. [$327,414.36 minus $98,224.31 yields $229,190.05.] Similarly, in the Referendum case, under the authority of *Welch*, a reduction of 30% on the total block billed fees of $155,975.05 is appropriate. [$155,975.05 minus $46,792.52 yields $109,182.53.]

### 2.    Further Reduction Of The Lodestar Is Warranted Because Strumwasser & Woocher Billed At Higher Than the Reasonable Rate In This District

"Absent clear proof to the contrary," a court "must infer that fee paying clients simply would not tolerate being charged a premium rate for work done by a senior lawyer that could be done on a much more cost-effective basis by less senior and less pricey counsel." *Finkelstein, supra,* at 1246. Similarly, if an attorney bills for ministerial tasks or tasks which could have been performed by a non-attorney, courts may reduce rates accordingly. *See, e.g., Halderman v. Pennhurst State Sch. & Hosp.,* 49 F. 3d 939, 942 (3d Cir. 1995).

Here, Mr. Woocher performed many tasks that were either clerical in nature, such as calling to find out the procedures for ex parte hearings, (Doc. No. 75, Case No. C 06-01730, at 27), or numerous tasks that should have been assigned to a more junior associate such as drafting ex parte applications and performing legal research on removal proceedings in federal court, (Doc. No. 75, Case No. C 06-01730, at 26-27). *See, also,* Greenfield Dec., ¶¶ 21-24. The rate of $550 per hour should be reduced to reflect the level of skill necessary to perform the given task. Specifically, none of the associate-level tasks should be billed at the rate of $550 per hour.

1    So at what rate then should these "high priced" tasks be billed? It is extraordinarily difficult to

2    do this on an item by item basis because the details are lacking in plaintiffs' attorneys' bills, and because

3    they utilized block billing. Recognizing these and other problems, case law suggests that the remedy in

4    a case like this is to calculate a blended rate. A "blended rate" is "meant to account for the different

5    billing rates of partners and associates by taking an average of the two." *McDonald v. Pension Plan of*

6    *the NYSA-ILA Pension Trust Fund*, 450 F.3d 91, 97 (2d Cir. 2006). This practice is followed in cases

7    where rates are shown to be too high for "lower-level" associate tasks and clerical tasks. *See, e.g.,*

8    *Finkelstein, supra,* at 1246; Greenfield Dec., ¶¶ 13-24.

9    The expert retained by the County, who has studied comparable cases with more than 217,000

10   hours, shows that the blended rates in this District range from $234 to $374 per hour. Greenfield Dec., ¶

11   18 (setting forth the range of blended rates in cases analyzed). The average is $288 per hour. *Id.* The

12   median is $315 per hour. *Id.* However, as Mr. Greenfield points out, the higher numbers tend to be for

13   patent cases, which are significantly different. *Id.* at n. 7. Therefore the average is a more appropriate

14   number to use here. The $288 average compares to a $421 blended rate for the actual bills submitted

15   here.

16   There are several reasons for the disparity. Fundamentally, the plaintiffs seek to compare their

17   fees to the highest rates of San Francisco attorneys at the largest commercial firms. See Rubin Dec., at

18   ¶¶ 6, 12.[6] But there is no rule that states reasonable rates for a case involving the County of Monterey is

19   that of the most expensive firm in San Francisco. Rather, "[t]he reasonable hourly rate must be

20   determined by reference to the prevailing market rates in the relevant community." *Stewart, supra,* at

21   1453. "Generally, the relevant community is one in which the district court sits." *Davis v. Mason*

22   *County*, 927 F.2d 1473, 1488 (9th Cir. 1991). While San Francisco is in the Northern District, so is

23   Monterey and many more rural areas. Rather than simply picking the highest rates they can find all over

24   California, a more encyclopedic study in other places in the District is necessary, as has been performed

25

26   _____

27   [6] Actually, the declaration of their expert, Mr. Rubin, is somewhat unclear in that regard. At ¶ 6 of his declaration he appears to premise his declaration on rates at Los Angeles law firms as well, which would be irrelevant to the Northern District of California. *Davis v. Mason County*, 927 F.2d 1473, 1488 (9th Cir. 1991).

28

1   by Mr. Greenfield.

2       Further, while comparing themselves to the very large firms, the plaintiffs' attorneys failed to

3 take advantage of the economies that those large firms have, which offset the high rates.  They can

4 utilize more junior people and staff to lower the fee, instead of having the most expensive billing person

5 do the more basic tasks.  As set forth in Mr. Greenfield's declaration, that is exactly the problem here.

6 Virtually all of the tasks have been performed by a very high billing partner, or by a mid-level associate,

7 when many could be handled by lower level billing personnel  Had counsel compared themselves to

8 smaller firms, with lower rates but fewer attorneys, then the more limited number of personnel to handle

9 tasks might be more reasonable.  But if they are going to compare themselves to the economic model of

10 the large firm, then for the fee to be reasonable they need to take advantage of the same economies.

11 *Finkelstein, supra,* at 1246-1248.  The proof is in the pudding—the average blended rate in those firms

12 is $288, not the $421 claimed. This average blended rate should be the reasonable rate used by the

13 Court.

14       Applying the average blended rate of $288 per hour, the percentage that would be applied to the

15 fees is 68.4 %.  For the Initiative matter, the proper fee, after first accounting for the block billing as

16 above, would be $156,765.99 [$229,190.05 times .684].  For the Referendum case, it would be

17 $74,680.85 [$109,182.53 times .684].  For the two cases, the total would be $231,446.84 before taking

18 into account any reductions for the reasons set forth in Section III.  The amount of $231,446.84 there is

19 the absolute ceiling, and only a fraction of that should be awarded because of the equitable and other

20 considerations set forth in Section III above.

21       Notably, plaintiffs' declarations concerning the fees they seek lack critical specific evidence to

22 support them.  For example, there is nothing in Mr. Rubin's declaration that contradicts this analysis.

23 To begin, Mr. Rubin premises the reasonableness of the rates (and the multiplier) on the fact these were

24 in whole or in part contingency cases.  However, the fact these were contingency case is irrelevant under

25 federal law in the Ninth Circuit. *Stewart,* supra, at 1453.  Mr. Rubin apparently has built a premium into

26 these fees for the contingency, or he would not have mentioned it.  Also, the Strumwasser declaration

27 (Doc. no. 75, Case No. C 06-01730) states that the Initiative case was only partly a contingency and Mr.

28

218494_2.DOC

*In re Initiative Matter,* Cases Nos. C 06-01730 JW; C 06-02369 JW

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR AWARDS OF ATTORNEYS' FEES AND COSTS

1  Rubin fails to take this into account.  Further Mr. Rubin's declaration is it is simply a beginning point

2  for the Court's calculations—he merely tells the Court what the most expensive large firms in San

3  Francisco and (apparently Los Angeles) charge.  It is hard to dispute that large firms in these cities

4  charge high rates, but that is only one small fact to begin the analysis.  He does not take that analysis to

5  the end as to how that might generate a reasonable fee.  Further, he seems to be premising his opinions

6  in part upon on state law rather than federal.  Rubin Decl., ¶¶ 6, 10, 15.

7       Similarly, there is nothing else in the other evidence presented by plaintiffs that is supports the

8  rates they seek.  For example, they purport to put into evidence some summaries of fees copied from the

9  Internet.  But this evidence lacks foundation, and it is hearsay; and as such, it is admissible.  *See,*

10  *generally,* Objections to Declarations of Michael Strumwasser and Michael Rubin.  Moreover, these

11  exhibits are irrelevant insofar as they pertain to markets all over the United States.  Further, plaintiffs

12  fail to show how (or if) the evidence was ever applied in any situation in this District.  Plaintiffs also

13  attach a copy of a fee declaration from the County's law firm, in another context, from a different period

14  of time, for a type of law different from that here and for a case which originated in Southern California.

15  That declaration was submitted in a case filed in and litigated pursuant to state law (Code of Civil

16  Procedure section 1021.5), and the rules for fee calculations are different than federal law.  In the end,

17  this declaration proves nothing other than that the fees claimed in that case were at a lower rate than the

18  ones claimed here.

19       In sum, there is a fundamental lack of evidence that the fees are reasonable and clear evidence

20  that they are not.  In view of that complete lack of evidence, the court should lower the average blended

21  hourly rate to $288.[7]

22      **C.**    **Plaintiffs' Attorneys Are Not Entitled To A Multiplier**

23       Strumwasser & Woocher seeks to enhance any fee award it may receive, and asks the Court to

24  apply a multiplier on the grounds that it produced high-quality service for its clients; that it achieved

25

26  _____

27  [7] If the plaintiffs' plan is simply to present such evidence on Reply, when defendants will not have the

28  chance to review and respond to it, then defendants hereby ask that such declarations be struck as untimely.

1   excellent or exceptional results; that it incurred a "contingency risk"; and that it was precluded from

2   other employment by their engagement in this case. *See,* Doc. No. 73, pp. 10:3-12:7)  But none of these

3   factors justify the imposition of a multiplier as a matter of law – and equity.

4   　　　"Once determined, the basic fee leaves very little room for enhancement." *Stewart, supra,* at

5   1453; *City of Burlington v. Dague,* 505 U.S. 557, 562 (1992) ("The federal courts have established a

6   "strong presumption that the lodestar represents the reasonable fee.")  That is, the lodestar is presumed

7   to be reasonable – and any adjustments to it are disfavored. *Pennsylvania, supra, at* 565.  "To overcome

8   the strong presumption that the basic fee is reasonable, the applicant must satisfy stringent requirements.

9   Foremost, the applicant must show that the requested enhancement is *necessary* to the determination of a

10  reasonable fee.  In carrying this heavy burden, the applicant may not rely on many of the *Kerr* or other

11  factors. *Stewart, supra,* at 1453.  For example, contrary to plaintiffs' approach, enhancement for

12  contingent risk of nonpayment of fees is not permitted. *Id.*  Other factors, including the novelty and

13  complexity of the issues, the special skill and experience of counsel, the quality of the representation and

14  the results obtained form the litigation, are fully reflected within the basic fee, and thus cannot serve as

15  an independent bases for enhancement." *Id.*  In addition, the "applicant must present specific evidence

16  demonstrating that any factor relied upon is not <u>subsumed</u> within the fee." *Id.* (emphasis added).

17  　　　Here, plaintiffs' attorneys cannot carry the burden of proving that an enhancement is necessary

18  to the determination of a reasonable fee.  As an initial matter, <u>all</u> of the factors upon which they seek to

19  enhance the fee and justify the multiplier – including the quality of the work, the allegedly "exceptional"

20  results and the preclusion of other employment – are either generally subsumed within the original fee

21  assessment or not permitted at all (in the case of the contingency fee) and therefore cannot justify a

22  multiplier as a matter of law. *See, e.g., Stewart, supra,* at 1453.  There are only a few, narrow

23  exceptions to this rule – and none of them apply here. *See, e.g., Cunningham v. County of Los Angeles,*

24  879 F. 2d 481 (9th Cir. 1988).  To the extent the Court considers any additional factors, however, the

25  County addresses them below.

26  　　　First, with respect to the quality of Mr. Woocher's representation and the results (both of which

27  encompass his expertise and skill), these factors are certainly reflected in his hourly rate of $550.

28

218494_2.DOC

*In re Initiative Matter,* Cases Nos. C 06-01730 JW; C 06-02369 JW

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR AWARDS OF ATTORNEYS' FEES AND COSTS

1    Indeed, plaintiffs argue as much in their moving papers, and their expert, Michael Rubin, confirms this.

2    *See*, Doc. No. 75, Case No. C 06-01730, at 10:3-18; Doc. No. 102, Case No. C 06-02369 at ¶¶ 10-15. In

3    this regard, it must be remembered that Mr. Woocher's hourly rate is nearly $300 more than the average,

4    reasonable blended rate for law firms in the Northern District of California. Greenfield Dec., ¶ 19. In

5    short, the quality of the representation does not justify an enhancement because it is already subsumed in

6    the lodestar calculation.

7       Second, and as explained above, neither plaintiffs' efforts in this case nor the results obtained

8    were "extraordinary" or exceptional so as to warrant an additional award. When plaintiffs' initiative and

9    referendum were originally submitted to the County for certification and placement on the ballot, neither

10    measure was circulated in Spanish. At that time, the first *Padilla* decision was the law in the Ninth

11    Circuit – and as this Court recognized, plaintiffs' measures violated this Ninth Circuit ruling. The only

12    reason that plaintiffs achieved success in these cases was because the Ninth Circuit subsequently

13    changed the law. To award them a multiplier of 2.0 based upon this kind of windfall runs contrary to the

14    express intent of the fee-shifting statutes. *See, e.g., Blum, supra,* 893-94. Accordingly, Mr. Woocher's

15    expertise, skill and the results generally are already accounted for in the lodestar – and there is no

16    specific factual basis upon which to enhance it further.

17       Third, to the extent that plaintiffs' attorneys argue that they deserve enhanced fees because their

18    efforts to get the original *Padilla* case overruled by filing an amicus brief in the *en banc* proceeding

19    were successful and "extraordinary," no enhancement should be awarded for this reason either.

20    Rewarding plaintiffs' counsel for allegedly assisting in overturning the law that the County was

21    <u>obligated</u> to comply with (and which the Court originally ordered the County to comply with!) – flies in

22    the face of common sense and equity. This is particularly true since it was the County – and not

23    plaintiffs – that was trying to <u>enforce</u> the guarantees of the Federal Voting Rights Act as interpreted by

24    the Ninth Circuit <u>throughout the entire case</u>. When the Ninth Circuit said the County could not place a

25    citizens' sponsored measure on the ballot unless it was circulated in English and Spanish, the County

26    complied. When the Ninth Circuit reversed itself, the County moved to put the Initiative measure on the

27    June, 2007 ballot; and after the Court's ruling, the County moved to do the same with the referendum

28

218494_2.DOC

*In re Initiative Matter,* Cases Nos. C 06-01730 JW; C 06-02369 JW

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR AWARDS OF ATTORNEYS' FEES AND COSTS

1   measure as well.  In any event, if plaintiffs want some award or recognition for their amicus efforts in

2   the *en banc Padilla* case, this is not the forum in which to seek it.

3   **V.    MR. YEATES' TIME WAS DUPLICATIVE OF STRUMWASSER & WOOCHER'S**

4   **TIME**

5   There is a separate request for fees by a second law firm, that of J. William Yeates.[8]  If is

6   difficult to understand from the materials presented why the Court should award such fees.  About half

7   the hours are from an associate named Jason Flanders, including 14 hours on February 27 and February

8   28, 2006 to write two unidentified letters.  But virtually all of Mr. Flanders time occurred prior to the

9   lawsuits, the first being filed March 1, 2006.  The exception is one part of a block entry on March 1 that

10  says "gathered documents for Fred's suit."  The next day he appears, in another block billing, to be

11  working on his letters again.  Similarly, the first several entries of Mr. Yeates do not appear to pertain

12  the law suits.

13  As for the rest of the entries, virtually all deal with reading a few  documents and requests from

14  Mr. Woocher, the occasional and the even make occasional brief conversation.  There do not appear to

15  be any substantive contributions to the litigation.

16  Thus the Yeates request should be disregarded.  To the extent the Court is inclined to consider it

17  at all, then the rules discussed earlier relating to block billing should be applied, and a reduction should

18  be made.

19  **VI.    THE COSTS CLAIMED ARE UNREASONABLE**

20  Plaintiffs' are not entitled to the gross amount of litigation expenses they seek, either.  As

21  plaintiffs themselves note, 42 U.S.C. § 1973*l*(e) authorizes recovery of "reasonable litigation expenses"

22  as part of the costs to which a prevailing party is entitled.  *See,* Doc. No. 99, Referendum Case, at 9:2-7.

23  Here, certain of the costs sought are not reasonable, namely, the cost of faxing per page (a dollar per

24  page!) and the cost of copies per page (.20 cents per page).  Indeed, plaintiffs do not even try to justify

25  the costs for faxing and show no evidence of actual time; thus the only evidence before the court is that

26  _____

27

28  [8] Notably, Mr. Yeates, does not seek any fees in C06-02369 JW, just in C06-01730.  Any citations and
    references herein are to the one declaration, Doc. No. 76, in Case C06-01730.

$1 per page is excessive. Greenfield Dec., ¶ 26. Similarly, the cost of copying one black and white 8"x11" piece of paper at a standard copy store is only .09 cents per page. Froelich Dec., ¶ 2. That represents the "going market rate" for costs of copies - and thus the copying costs - which total almost $4,000 in the Initiative case - are overinflated. Further, this is an efiling case, and why nearly 20,000 copies were needed is not explained or justified. Copying costs therefore should either be disregarded or vastly reduced.

## VII.   CONCLUSION

For the reasons set forth above and in the County's accompanying declarations, the Court should exercise its discretion and award no fees or nominal fees. Further, if the Court awards plaintiffs any attorneys' fees at all, the fees should be awarded pursuant to federal law and in an amount much less than what plaintiffs request. There are strong reasons under Ninth Circuit precedent why the lodestar should be reduced; and no multiplier is warranted as a matter of law.

Dated: October 1, 2007                          NOSSAMAN, GUTHNER, KNOX & ELLIOTT, LLP


                                                By:  _____/S/_____
                                                          STEPHEN N. ROBERTS

                                                Attorneys for Defendants
                                                COUNTY OF MONTEREY, THE BOARD OF
                                                SUPERVISORS OF THE COUNTY OF MONTEREY, AND
                                                ANTHONY ANCHUNDO

218494_2.DOC

*In re Initiative Matter*, Cases Nos. C 06-01730 JW; C 06-02369 JW

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR AWARDS OF ATTORNEYS' FEES AND COSTS